*$5.00 9B-H-D BH*
*$5.00* DIAMOND RIDGE BASE

Offcl 256240 Vol 858 Pg 103

**DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS**
Diamond Ridge

STATE OF TEXAS *
*
* KNOWN ALL MEN BY THESE PRESENTS:
COUNTY OF WISE *



This Declaration, made on the date hereinafter set forth by The Alvord 287
Joint Venture , thereinafter referred to as Developer",

W I T N E S S E T H:
WHEREAS, Developer is the owner of that certain tract of land known as Diamond Ridge of 135.90
Acres of land situated in Wise County, Texas (hereinafter referred to as the "Subdivision"), and covering
the referenced land described in the attached exhibit B; and

WHEREAS, it is the desire of developer to place certain restrictions, easements, covenants, conditions,
stipulations and reservations (herein sometimes referred to as the "Restrictions") upon and against such
Tract in order to establish a uniform plan for it's development, improvement and sale, and to insure the
preservation of such uniform plan for the benefit of both the present and future owners of tracts in Tract:

NOW, THEREFORE, Developer hereby adopts, establishes and imposes upon The Subdivision, and
declares the following reservations, easements, restrictions, covenants and conditions, applicable thereto,
all of which are for the purposes of enhancing and protecting the value, desirability and attractiveness of
said Property, which restrictions shall run with said Property and title or interest therein, or any part
thereof, and shall inure to the benefit of each owner thereof. Developer also declares that The
Subdivision shall be subject to the jurisdiction of the "Association" (as hereinafter defined).

**ARTICLE 1**

**DEFINITIONS**

Section 1.01 "Association" shall mean and refer to the Diamond Ridge Property Owners Association,
and its successors and assigns.

Section 1.02 "Diamond Ridge" shall mean and refer to The Subdivision and any other sections of
Diamond Ridge hereafter made subject to the jurisdiction of the Association.

Section 1.03 "Board of Directors" shall mean and refer to the Board of Directors of the Association.

Section 1.04 "Builders" shall mean and refer to persons or entities that purchase tracts and build
speculative or custom homes thereon for third party purchasers.

Section 1.05 "Common Area" shall mean all real property (including the improvements thereto) within
the Subdivision owned by the Developer and/or the Association for the common use and enjoyment of
the owners.

*Return to :*
*Basil Houl - Safeco L T.*
*4001 Airport Fwy, #190*
*Bedford, TX 76021*

**PLs' Exhibit 34**

010552

Offcl 256240 Vol 858 Pg 104

Section 1.06 "Contractor" shall mean and refer to the person or entity with whom an Owner contracts to construct a residential dwelling on such Owner's Tract.

Section 1.07 "Developer" shall mean and refer to The Alvord 287 Joint Venture ~~Joint Venture,~~ and its successors and assigns.

Section 1.08 "Tract" shall mean and refer to any plot of land identified as a tract or homesite in the Subdivision.

Section 1.09 "Owner" shall mean and refer to the record owner, whether one or more persons or entities, of fee simple title to any Tract which is a part of the Subdivision, including (i) contract sellers (a seller under a Contract-for-Deed), but excluding those having such interest merely a security for the performance of an obligation, (ii) Developer (except as otherwise provided herein), and (iii) Builders.

**ARTICLE II**
**RESERVATIONS, EXCEPTION AND DEDICATIONS**

Section 2.01 Recorded Subdivision map of the Property. The Developer dedicates for use as such, subject to the limitations as set forth herein, the roads, streets and easements shown on the attached exhibit "A". The Developer further establishes certain restrictions applicable to each Tract as shown on the attached exhibit "A". All dedications, restrictions and reservations created herein or shown on the exhibit "A" shall be construed as being included in each contract, deed, or conveyance executed or to be executed by or on behalf of Developer, whether specifically referred to therein or not. Exhibit "A" is not a recorded plat of the Subdivision, but is an instrument which indicates the placement of roads, easements and setback lines, and it dedicates, and Developer hereby dedicates, a right of way, road, access and utility easements on the Subdivision as indicated on the attached Exhibit"A" to the Association, the members thereof and the each Owner, along the road indicated on exhibit "A" and hereby creates the easements and setback lines as therein indicated. Developer further dedicates a right of way for access to each tract along the road as it exists on the ground.

Section 2.02 Easements. Developer reserves for private use of the Association, the members thereof, each Owner and the utility companies, the utility easements shown on exhibit "A" or that have been or hereafter may be created by separate instrument recorded in the Real Property Records of Wise County, Texas, for the purpose of constructing, maintaining and repairing a system or systems of electric lighting, electric power, telegraph and telephone line or lines, storm surface drainage, cable television, water or any other utility the Developer sees fit to install in, across and/or under The Subdivision. All utility easements in The Subdivision may be used for the construction of drainage swells in order to provide for improved surface drainage of the Reserves, Common Area and/or Tracts. Should any utility company furnishing a service covered by the general easement herein provided request a specific easement by separate recordable document, developer, without the joinder of any other Owner, shall have the right to grant such easement on said property without conflicting with the terms thereof. Any utility company serving Diamond Ridge shall have the right to enter upon any utility easement for the purpose of installation, repair and maintenance of their respective facilities. Neither Developer nor any utility company, political subdivision or other authorized entity using the easements herein referred to shall be liable for any damages done by them or their assigns, agents, employees, or servants, to fences, shrubbery, trees and lawns or any other property of the Owner on the property covered by said easements.

Section 2.03 Title Subject to Easements. It is expressly agreed and understood that the title conveyed by developer to any of the Tracts by contract deed or other conveyance shall be subject to any easement affecting same for roadways or drainage, electric lighting, electric power, telegraph or telephone, or

PLs' Exhibit 34

010553

Offcl 256240 Vol 858 Pg 105

water purposes and other easements heretofore, herein or hereafter granted affecting the Tracts. The Owners of the respective Tracts shall not be deemed to own pipes, wires, conduits or other service lines running through their Tracts which are utilized for or service other Tracts, but each Owner shall have an easement in and to the aforesaid facilities as shall be necessary for the use, maintenance and enjoyment of his Tract. The Developer may convey title to said easements to the public, a public or private utility company or the Association.

Section 2.04 Utility Easements.

(a) Utility ground and aerial easements, if any have been dedicated in accordance with exhibit "A".

(b) No building shall be located over, under, upon or across any portion of any utility easement or setback line. The Owner of each Tract shall have the right to construct, keep and maintain concrete drives, fences, and similar improvements across any utility easement, and shall be entitled to cross such easements at all times for purposes of gaining access to and from such Tracts, provided, however, any concrete drive, fence or similar improvement placed upon such Utility Easement by the Owner shall be constructed, maintained and used at Owner's risk and, as such, the Owner of each Tract subject to said Utility Easements shall be responsible for (i) any and all repairs to the concrete drives, fences and similar improvements which cross or are located upon such Utility Easements and (ii) repairing any damage to said improvements caused by the Utility District or any public or private utility in the course of installing, operating, maintaining, repairing, or removing its facilities located within the Utility Easements.

**ARTICLE III**
**USE RESTRICTIONS**

Use Restrictions

Section 3.01
A. Land Use and Building Type   All lots shall be known and described as Lots for single-family residential dwellings only (hereinafter sometimes referred to as "Residential Lots"), and no structure shall be erected, altered, placed or permitted to remain on any Residential Lot other than one (1) single-family dwelling not to exceed two (2) stories in height, with or without a detached or an attached garage except as shown in Section 6.  As used herein, the term "Residential Purposes" shall be construed to prohibit the use of said Lots for duplex houses, garage apartments, or apartment houses. Additionally, no Lot may be used for a wrecking yard or for the storage of used or abandoned cars, equipment or machinery.

B. Dwelling Size   Any one-story residence constructed on the property shall have a ground floor area of not less than 1200 (any two-story residence constructed on the property shall have a ground floor area of not less than 900 square feet), exclusive of garages, open porches, terraces, patios, driveways, or carports, and shall be completed within twelve (12) months from starting construction. Any manufactured or mobile home must be minimum of 1200 square feet.  No single wide manufactured housing or mobile home is allowed in Diamond Ridge. Any homes to be built must be approved by the developer.

C. Type of Construction and Materials          (a) A residence moved onto a tract must be of sound construction and in good repair. All outbuildings must be of new material. Any home older than

PLs' Exhibit 34

Offcl 256240 Vol 858 Pg 106

one year old must be approved by the developer or the Architectural Control Committee.

(b) The exterior surface of frame buildings must be painted with at least two coats of paint within 180 days after the building is constructed or moved onto the property.

(c) New construction must be completed within twelve months.

(d) Manufactured housing must be underpinned and fully skirted with material complimentary to the major structure within 120 days after being moved onto the property.

Section 3.02 Composite Building Site. Any Owner of one or more adjoining Tracts (or portions thereof) may, with the prior written approval of the Developer or Architectural Control Committee, consolidate such Tracts or portions into one building site, with the privilege of Placing or constructing improvements on such resulting site, in which case the side set-back and fencing lines shall be measured from the resulting side property lines rather than from the Tract lines as indicated on one single tract description.

Section 3.03 Location of the Improvements upon the Tract.
(a) The minimum dimension of lots and yards, and the minimum lot area per family shall, subject to Section 4.05 of these restrictions, be as follows: (I) Lot area: the minimum lot area in this District shall be as shown on Exhibit "A"; (2) Front Yard: All tracts shall have a front yard having a minimum depth of 100 feet and a maximum depth of 120 feet from the nearest edge of the road to the nearest side of the home, and no houses or mobile home or manufactured housing or other structure may be placed, kept or constructed outside these tolerances. Residence placement shall be facing the street with the front, longest side of manufactured housing squarely facing the street, so as to provide a generally uniform appearance in the Development from Tract to Tract. Orientation and placement of manufactured housing and all other structures shall be approved in advance of placement by the Developer or the Architectural Control Committee and failure to orient or place any manufactured housing or other structure in strict accordance with said advance approval shall require Owner, at its sole expense, to reorient and replace said manufactured housing and structure to the specification required by Developer or the Architectural Control Committee, immediately. (3) Side Yard: The minimum distance from the side building line to the property line shall be 10 feet. (4) Rear Yard: The minimum distance from the rear building line to the property line shall be 20 feet. (5) Height Regulations: The maximum height shall be two stories. These distances may be waived by the Developer or the Architectural Control Committee for individual Tracts upon request of the Owner, where the physical and legal characteristics of the particular Tract would render such placement unreasonable or impractible, such as lot dimensions, location of easements, pipeline easements, 100 year flood plain or in the natural drainage of the land, or other similar good cause shown, with due consideration to the general aesthetic tenor of the development, and to have a generally uniform appearance in the development from Tract to Tract.
(b) All dwellings must be equipped with septic tank or other sewage disposal system meeting all applicable laws, rules, standards regulations and specifications, and all such dwellings must be served with water and electricity.

Section 3.04 Use of Temporary Structures. No structure of a temporary character, whether trailer, basement, tent, shack, garage, barn or other outbuilding shall be maintained or used on any Tract at any time as a residence, either temporally or permanently; provided, however, that Developer reserves the exclusive right to erect, place and maintain such facilities in or upon any property in the Subdivision that it owns as in its sole discretion may be necessary or convenient while selling Tracts, selling or constructing residences and constructing other improvements within the Subdivision. Developer reserves the right to sell the lot, that the temporary sales office is located on, and lease said office back from the

PLs' Exhibit 34

010555

Offcl 256240 Vol 858 Pg 107

purchaser of the lot.

Section 3.05 Walls and Fences. Walls and fences, if any, must be approved prior to construction by the Developer or Architectural Control Committee. Fencing is not permitted in front of the face of the residence, or closer to the street than the residence. Fences and walls between the residence and the side lot lines shall be of masonry, new wood fencing, chain link or welded iron. No wire fence such as barbed wire or hog wire by way of illustration, shall be allowed closer to the street than the residence or more than two feet from any side property line. However, a wire fence connecting the side property lines, more distant from the street than the residence and not closer to the residence than fifty feet (or the rear property line if less than fifty feet) may be allowed when an approved fence in accordance with these restrictions has been constructed between the residence and the side property lines.

Fences or walls must be made out of new materials.

Section 3.06 Prohibition of Offensive Activities. No Activity, whether for profit or not, shall be conducted on any tract which is not related to single family residential purposes, unless said activity meets the following criteria: (a) no additional exterior sign of activity is present, (b) it is the type of activity that usually happens in a home, (c) no additional traffic, that would not be there normally, is created, and (d) nothing dangerous is present that shouldn't be there, and (e) the activity does not constitute a nuisance or annoyance to any other Owner. Additionally, under no circumstances shall any illegal activity or drug abuse, illegal drug consumption, sale, transfer or manufacturing be allowed on the property. No sign, symbol, or indication shall be allowed on the property which would indicate the presence of any felon or person placed on felony probation or deferred adjudication or crime involving children, sex or assault. With regard to Customary sales activities required to sell homes in the Subdivision, the prohibitions of this paragraph are waived. The discharge or use of firearms is expressly prohibited. The Association shall have the sole and absolute discretion to determine what constitutes a nuisance or annoyance. No noxious or offensive trade or activity shall be carried on upon any lot, nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.

Section 3.07 Garbage and Trash Disposal. Garbage and trash or other debris accumulated in this Subdivision shall not be permitted to be dumped at any place upon adjoining land where a nuisance to any residence of this Subdivision is or may be created. No tract shall be used or maintained as a dumping ground for rubbish. Trash, garbage or other waste shall not be allowed to accumulate, shall be kept in sanitary containers and shall be disposed of regularly. All equipment for the storage or disposal of such material shall be kept in a clean and sanitary condition. No garbage container bigger than 90 gallons shall be used.

Section 3.08 Motor Vehicles. Any unlicenced motor vehicles shall be garaged. No motor bikes, motorcycles, motor scooters or other vehicles of that type shall be permitted in the subdivision, if they are a nuisance by reason of noise or manner of use. No parking will be permitted on any road or street in the subdivision. No semi trucks, 18 wheeled trucks, 10 wheeled trucks or vehicles with 10 or more wheels or vehicles having a gross empty weight of six thousand pounds or more shall be permitted in the subdivision and none shall be allowed to park in the subdivision, except such vehicles shall be allowed to deliver mobile homes and construction material for home construction when issued a permit to do so by the Developer or Architectural Control Committee and upon the agreement by the owner or operator to repair any damage to the subdivision or its roads from the use of such vehicle. This paragraph shall not be construed to prohibit the use of the roads by a school bus for the local school district to embark and disembark children or normal, customary and and ordinary trash collection.

PLs' Exhibit 34

010556

**Section 3.09 Signs.** No sign, advertisement, billboards or advertising structure of any kind may be erected or maintained on any Tract without the consent in writing of the Architectural Control Committee, except one (1) professionally made sign not more than twenty-four inches by twenty-four inches, advertising an Owner's Tract for sale or rent, and one (1) professionally made sign, not more than twelve inches (12") wide by twenty-four inches (24") long identifying the tract owner's name or names. Declarant or any member of such Committee shall have the right to remove any such sign, advertisement or billboard or structure which is placed on any Tract in violation of these restrictions, and in doing so, shall not be liable, and are hereby expressly relieved from, any liability for trespass or other tort in connection therewith, or arising from such removal.

**Section 3.10 Animal Husbandry.** No animals shall be kept on a tract so as to be a nuisance to adjoining property owners. One head of livestock will be allowed per acre. No more than ten chickens shall be allowed. No pets are to run at large in the subdivision. No Swine except, one Potbellied pig will be allowed per Tract.

**Section 3.11 Lot Maintenance** The owners or occupants of all Lots shall at all times keep all weeds and grass between the house and the street thereon cut in a sanitary, healthful and attractive manner and shall in no event use and Lot for storage of materials and equipment except for normal residential requirements or incident to construction of improvements thereon as herein permitted or permit the accumulation of garbage, trash, or rubbish of any kind thereon. In the event of default on the part of the Owner or occupancy of any Lot in observing the above requirements or any of them, such default continuing after ten (10) d~ys written notice thereof, The Association may, at their option, without liability enter upon said Lot and cause to be cut such weeds and grass and remove or cause to be removed such garbage, trash, and rubbish to do any other things necessary to secure compliance with these restrictions so to place said Lot in a neat, attractive, healthful and sanitary condition and may charge the Owner or occupant of the property to pay such statement immediately upon receipt thereof.

**Section 3.12 Drainage.** Natural established drainage patterns of streets, tracts or roadway ditches will not be impaired by any person or persons. Driveway culverts must be installed and will be of sufficient size to afford proper drainage of ditches without backing water up into ditch or diverting flow. Drainage culvert must be constructed of concrete or metal and must have a minimum diameter of 15 inches. Filling or obstructing the water flow of any flood way or the natural path or flow of water or drainage is prohibited. The Association may remove, with or without replacing, without liability, any culvert, object or objects that obstructs to any extent the flow of water through the street ditches, and charge the costs of doing so to the Owner as a maintenance charge. No Owner will allow or install any man made drainage which does or would affect any adjoining lot in the subdivision.

**Section 3.13 Satellite Dish** Satellite dishes are not to visible from any street.

**Section 3.14 Sewage Disposal.** All dwellings must be equipped with a sewage disposal system that meets all applicable laws, rules, standards and specifications of State, County and City Health Department regulations and requirements for sewage disposal. No cesspool may be installed on any Lot and whenever a residence is established on any site, it shall provide only an inside toilet or toilets and it shall be connected with a septic tank and drain field approved by the Wise County Health Department, Decatur Texas and all governmental agencies or authorities having jurisdiction. No septic tank may drain into road ditches, either directly or indirectly. Each system must be designed by a Registered Professional Sanitarian based upon a site evaluation on the subject lot. Septic tank performance cannot be guaranteed, even though it meets all provisions of the rules of Wise County, Texas, for private sewage facilities. Inspection and/or acceptance of a private sewage facility by the Public Works Department shall indicate only that the facility meets minimum requirements and does not relieve the owner of the

**PLs' Exhibit 34**

010557

Offcl    256240 Vol    858 Pg    109

property from complying with County, State and Federal regulations. Private sewage facilities, although approved as meeting minimum standards, must be upgraded by the owner at the owner's expense if normal operation of the facility results in objectionable odors, if unsanitary conditions are created or if the facility, when used, does not comply with governmental or Association regulations. A properly designed and constructed private sewage facility system, in suitable soil, can malfunction if the amount of water it is required to dispose of is not controlled. It will, therefore, be the responsibility of the lot owner to maintain and operate the private sewage facility in a satisfactory manner.

## ARTICLES IV
## ARCHITECTURAL CONTROL COMMITTEE

Section 4.01  Basic Control.

(a) No building, residence, structure, manufactured housing or other improvements of any character shall be erected or placed, or the erection or placing thereof commenced or changes made in the design or exterior appearance thereof (excluding, without limitation, painting, staining or siding), or any addition or exterior alteration made thereto after original construction, or demolition or destruction by voluntary action made thereto after original construction, on any Tract in the Subdivision without the necessary approval (as hereinafter provided) from the Committee, of the construction plans and specifications for the construction or alteration of such improvements or demolition or destruction of existing improvements by voluntary action.

(b) Each application made to the Committee , or to the Developer under Section 4.02 below accompanied by three sets of plans and specifications for all proposed construction (initial or alteration) to be done on such Tract, including plot plans showing location on the tract. Upon receipt, the Architectural Control Committee shall forward one set of the plans and specifications to the Developer.

Section 4.02  Architectural Control Committee.

(a) The authority to grant or withhold architectural control approval as referred to above is initially vested in the Developer, with full powers as granted to the Architectural Control Committee of the Association; provided, however, the authority of the Developer shall cease and terminate upon the election of the Architectural Control Committee of the Association (sometimes herein referred to as the "Committee"), in which event such authority shall be vested in and exercised by the Committee (subject to the rights of the developer to absolute control until satisfaction of (b) below), hereinafter referred to, except as to plans and specifications and plot plans  previously submitted to the Developer which shall continue to exercise each authority over all such plans, specifications and plot plans. The terms "Committee" and "Architectural Control Committee", as used in this Declaration, shall mean or refer to the Developer or to the Diamond Ridge Architectural Control Committee composed of members of the Association, as applicable

(b) At such time as Fifty-One percent (51%) of all of the Lots in all Phases of the Subdivision are conveyed by Developer (from time to time hereafter referred to as the "Control Transfer Date") the Developer shall cause an instrument transferring control to the Association to be placed of record in the Real Property Records of Wise County, Texas (which instrument shall include the Control Transfer Date). Thereupon, the Association shall appoint a committee of (3) members to be known as the Diamond Ridge Architectural Control Committee, and two (2) members shall constitute a quorum. From and after the Control Transfer Date, each member of the Committee must be an Owner of property in some Phase of the Subdivision . Additionally, the Developer shall have the right to discontinue the

PLs' Exhibit 34

exercise of architectural control privileges and arrange for the transfer to the Association at any time prior to the Control Transfer Date by filing a statement and instrument to such effect in the Real Property Records of Wise County, Texas.

Section 4.03  Effect of Inaction.  Approval or disapproval as to architectural control matters as set forth in the preceding provisions of the Declaration shall be in writing. In the event that the authority exercising the prerogative of approval or disapproval (whether the Developer or the Committee) fails to approve or disapprove in writing any plans and specification and plot plans received by it in compliance with the preceding provisions within thirty (30) days following such submissions, such plans and specifications and plot plan shall be deemed approved and the construction of any such building and other improvements may be commenced and proceeded with in compliance with all such plans and specifications and plot plan and all of the other terms and provisions hereof.

Section 4.04  Effect of Approval.  The granting of the aforesaid approval (whether in writing or by lapse of time) shall constitute only an expression of opinion by the Committee that the terms and provisions hereof shall be complied with if the building and/or other improvements are erected in accordance with said plans and specifications and plot plan; and such approval shall not constitute any nature of waiver or estoppel either as to the persons expressing such approval or any other person in the event that such building and/or improvements are not constructed in accordance with such plans and specifications and plot plan, but, nevertheless, fail to comply with the provisions hereof. Further, no person exercising any prerogative of approval of disapproval shall incur any liability by reasons of the good faith exercise thereof.

Section 4.05  Variance.  The Developer, and the Committee, may authorize variances from compliance with any of the provisions of this Declaration or minimum acceptable construction standards or regulations and requirements as promulgated from time to time by the Developer, the Committee, and when circumstances such as when the physical and legal characteristics of the particular tract would render the restriction unreasonable such as lot dimensions, placement of easements, pipeline easements, one hundred year flood plain or the drainage of the land with due consideration to the general aesthetic tenor of the development. Variances are to be granted sparingly and limited to only that deemed absolutely necessary.  The decision of the Developer and the committee is conclusive and final.  The Developer, and the Committee, reserve the right to grant variances as to building set-back lines, minimum square footage of the residence and all other items. Such variances must be evidenced in writing and shall become effective when signed by the Developer or by at least a majority of the members of the Committee. If any such variances are granted, no violation of the provisions of this Declaration shall be deemed to have occurred with respect to the matter for which the variance is granted; provided, however, that the granting of a variance shall not operate to waive any of the provisions of this Declaration for any purpose except as to the particular property and particular provisions hereof covered by the variance, nor shall the granting of any variance by the developer or the Committee, effect in any way the Owner's obligation to comply with all governmental laws and City ordinances and regulations affecting the property concerned and the tract.

**ARTICLE V**

**Diamond Ridge PROPERTY OWNERS ASSOCIATION**

Section 5.01  Membership.  Every person or entity who is a record owner of any Tract which is subject to the Maintenance charge (or could be following the withdrawal of an exemption therefrom) and other assessments provided herein, including contract sellers, shall be a "Member" of the Association. The foregoing is not intended to include persons or entities who hold an interest merely as security for the

PLs' Exhibit 34

performance of an obligation or those having only an interest in the mineral estate. Owners shall have one membership for each Tract owned by such Member. Memberships shall be appurtenant to and may not be separated from the ownership of the Tracts. Regardless of the number of persons who may own a Tract (such as husband and wife, or joint tenants, etc.) there shall be but one membership for each Tract. Additionally, the Directors of the Association shall also be Members of the Association (as more particularly described in the By-laws). Ownership of the Tracts shall be the sole qualification for membership. The voting rights of the Members are set forth in the Bylaws of the Association, but the Developer shall have three votes for every unsold tract and there shall be only one vote per tract for each tract owned by any person other than the Developer.

Section 5.02 Non-Profit Corporation. Diamond Ridge Property Owners Association, Inc., a non-profit corporation, has been (or will be) organized and it shall be governed by the Articles of Incorporation and bylaws of said Association; and all duties, obligations, benefits, liens and rights hereunder in favor of the Association shall vest in said corporation. The main purpose of the Diamond Ridge Property Owner's Association shall be to maintain the roads and enforce these restrictions.

Section 5.03 Bylaws. The Association has adopted or may adopt whatever Bylaws it may choose to govern the organization or operation of the Subdivision and the use and enjoyment of the Tracts and Common Areas, provided that the same are not in conflict with the terms and provisions hereof.

Section 5.04 Owners Right of Enjoyment. Every owner shall have a beneficial interest of use and enjoyment in and to the Common Areas, if any, and such right shall be appurtenant to and shall pass with the title to every assessed Tract, subject to the following provisions:

(a) the right of the Association, with respect to the Common Areas, if any, to limit the number of guests of Owners;

(b) the right of the Association to charge reasonable admission and other fees for the use of any facility situated upon the Common Areas, if any;

(c) the right of the Association, in accordance with its Articles and Bylaws (and until 51% of all tracts in the Subdivision are sold, subject to the prior written approval of the Developer), to (i) borrow money for the purpose of improving and maintaining the Common Areas and facilities (including borrowing from the Developer or any entity affiliated with the Developer) and (ii) mortgage said property, however, the rights of such mortgagee of said property shall be subordinate to the rights of the owners hereunder;

(d) the right of the Association to suspend the Member's voting rights and the Member's and "Related Users" (as hereinafter defined) right to use any recreational facilities within the Common Areas during any period in which the Maintenance Charge or any assessment against his Tract remains unpaid;

(e) the right of the Association to suspend the Member's voting rights and the Member's and Related Users' right to use any recreational facilities within the Common Area, after notice and hearing by the Board of Directors, for the infraction or violation by such Member or Related Users of this Declaration or the "Rules and Regulations", as hereinafter defined, which suspension shall continue for the duration of such infraction or violation, plus a period not to exceed sixty (60) days following the cessation or curing of such infraction or violation.

## ARTICLE VI

## MAINTENANCE FUND

PLs' Exhibit 34

Offcl  256240 Vol  858 Pg  112

Section 6.01  Maintenance Fund Obligation.  Each Owner of a tract by acceptance of a deed therefore, whether or not it shall be expressed in any such deed or other conveyance, is deemed to covenant and agreed to pay to the Association a monthly maintenance charge (the "Maintenance Charge"), and any other assessments or charges hereby levied. The Maintenance Charge and any other assessments or charges hereby levied, together with such interest thereon and costs of collection thereof, including without limitation reasonable attorney's fees and costs of court, as hereinafter provided, shall be a charge on the Tracts and shall be a continuing lien upon the property against which each such Maintenance Charge and other charges and assessments are made.

Section 6.02  Basis of the Maintenance Charge.

(a) The Maintenance Charge referred to shall be used to create two funds to be known as the "Maintenance Fund - Road" and "Maintenance Fund - General", which shall be used as herein provided; and each such Maintenance Charge (except as otherwise hereinafter provided) shall be paid by the Owner of each Tract (or residential building site) to the Association. The Maintenance Charge for the year of purchase shall be pro-rated at closing and then shall be paid annually, in advance, on or before the first day of the first month of each calendar year.  The Developer and the Association may require the charge to be paid monthly in advance.  In the event an Owner obtains consent from the Committee for a Composite Building site pursuant to Section 3.02 hereof, such Composite Building Site shall, for this purpose, be considered one Tract beginning upon the completion of the improvements thereon.

(b) Any Maintenance Charge not paid within thirty (30) days after the due date shall bear interest from the due date at the lesser of (i) the rate of eighteen percent (18%) per annum or (ii) the maximum rate permitted by law. The Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the hereinafter described lien against the Owner's Tract. No Owner may waive or otherwise escape liability for the Maintenance Charge by non-use of any Roads or Common Areas or recreational facilities available for use by Owners of the Subdivision or by the abandonment of his Tract.

(c) The exact amount of the Maintenance Charge applicable to each Tract will be determined by the Developer. All other matters relating to the Maintenance Charge and the collection, expenditures and administration of the Maintenance Fund shall be determined by the Developer or the Board of Directors of the Association, subject to the provisions hereof.

(d) The Association, from and after the Control Transfer Date, shall have the further right at any time, with a majority vote of the association members, to adjust or alter said Maintenance Charge from year to year as it deems proper to meet the reasonable operation expenses and reserve requirements of the Association in order for the Association to carry out its duties hereunder, subject to (e) hereinafter describing charges for the Maintenance Fund - Road.

(e) The Association shall keep the Maintenance Fund - Road in a separate account or accounts from the general Maintenance Fund and shall keep and charge each Tract at the rate of $100 or more per year until the earliest of the following; The roads are dedicated to the public, accepted by a legitimate government and accepted by that government for maintenance, or the fund reaches a balance of Forty Thousand Dollars.  If the fund reaches Forty Thousand Dollars, then the Association may, but is not required to continue to collect said maintenance charge for the road, given expected expenditures.  The Maintenance Fund - Road shall only be used for maintenance and repair of the road, payment of taxes on the road, for collection of fees and charges and Dues for the Maintenance Fund - Road and expenses of dedication and transferring the road to a governmental entity or the public.  If the roads are dedicated to the public, accepted by a legitimate government and accepted by that government for maintenance, and all outstanding bills to the Maintenance Fund - Road or the Association with regard to the Maintenance

**PLs' Exhibit 34**

010561

Fund - Road are paid, then the funds in the Maintenance Fund - Road shall be transferred to the Maintenance Fund - General to be used for the general purposes of the Association and its members. The Developer and its agents may collect and keep the maintenance funds for ten years and so long thereafter as it owns any real property or mortgage interest in any of the property as detailed in sections 6.08.

Section 6.03  Creation of Lien And Personal Obligation.  In order to secure the payment of the Maintenance Charge, and other charges and assessments hereby levied, each Owner of a Tract in the Subdivision, by such party's acceptance of a deed thereto, hereby grants to the Association a contractual lien on such Tract which may be foreclosed on by judicial or non-judicial foreclosure and pursuant to the provisions of Section 51.002 of the Texas Property Code (and any successor statute); and each such owner hereby expressly grants the Association a power of sale in connection therewith. The Association shall, whenever it proceeds with non-judicial foreclosure pursuant to the provisions of said Section 51.002 of the Texas Property Code and said power of sale, designate in writing a Trustee to post or cause to be posted all required notices of such foreclosure sale and to conduct such foreclosure sale. The Trustee may be changed at any time and from time to time by the Association by means of written instrument executed by the President or any Vice-President of the Association and file for record in the Real Property Records of Wise County, Texas. In the event that the Association has determined to non-judicially foreclose the lien provided herein pursuant to the provisions of said Section 51.002 of the Texas Property Code and to exercise the power of sale hereby granted, the Association, or the Association's agent, shall give notice of foreclosure sale as provided in the Texas Property Code as amended.  Upon request by Association, Trustee shall give any further notice of foreclosure sale as may be required by the Texas Property Code, and shall convey such Tract to highest bidder for cash by the Special Warranty Deed. Out of the proceeds of such sale, if any, there shall first be paid all expenses incurred by the Association in connection with such default, including reasonable attorney's fees and a reasonable trustee's fee; second, from such proceeds there shall be paid to the Association an amount equal to the amount in default; and third, the remaining balance shall be paid to such Owner. Following any such foreclosure, each occupant of any such Tract foreclosed on and each occupant of any improvements thereon shall be deemed to be a tenant at sufferance and may be removed from possession by any and all lawful means, including a judgment for possession in an action of forcible detainer and the issuance of a writ of restitution thereunder.

In the event of non-payment by any Owner of any Maintenance Charge or other charge or assessment levied hereunder, the Association may, in addition to foreclosing the lien hereby retained, and exercising the remedies provided herein, upon ten (10) days prior written notice thereof to such nonpaying Owner, exercise all other rights and remedies available at law or in equity including without limitation, the requirement that the party pay reasonable attorney's fees..

It is the intent of the provisions of this Section 6.03 to comply with the provisions of said Section 51.002 of the Texas Property Code relating to non-judicial sales by power of sale and, in the event of the amendment of said Section 51.002 of the Texas Property code hereafter, the President or any Vice-President of the Association, acting without joinder of any other Owner or mortgagee or other person may, by amendment to this Declaration filed in the Real Property Records of Wise County, Texas, amend the provisions hereof so as to comply with said amendments to Section 51.002 of the Texas Property Code.

Section 6.04  Notice of Lien. In addition to the right of the Association to enforce the Maintenance Charge or other charge or assessment levied hereunder, the Association may file a claim or lien against the Tract of the delinquent Owner by recording a notice ("Notice of Lien") setting forth (a) the amount of the claim of delinquency, (b) the interest and costs of amount of the claim of delinquency, (c) the interest and costs of collection which have accrued thereon, (d) the legal description and street address of the

PLs' Exhibit 34

Tract against which the lien is claimed and (e) the name of the Owner thereof. Such Notice of Lien shall be signed and acknowledged by an officer of the Association or other duly authorized agent of the Association. The lien shall continue until the amounts secured thereby and all subsequently accruing amounts are fully paid or otherwise satisfied. When all amounts claimed under the Notice of Lien and all other costs and assessments which may have accrued subsequent to the filing of the Notice of Lien have been fully paid or satisfied, the Association shall execute and record a notice releasing the lien upon payment by the Owner of a reasonable fee as fixed by the Board of Directors to cover the preparation and recordation of such release of lien instrument.

Section 6.05  Liens Subordinate to Mortgages.  The lien described in this Article VI shall be deemed subordinate to a first lien or other liens of any bank, insurance company, savings and loan association, university, pension and profit sharing trusts or plans, or any other third party lender, including Developer, which may have heretofore or may hereafter lend money in good faith for the purchase or improvement of any Tract and any renewal, extension, rearrangement or refinancing thereof. Each such mortgagee of a mortgage encumbering a Tract who obtains title to such Tract pursuant to the remedies provided in the deed of trust or mortgage or by judicial foreclosure shall take title to the Tract free and clear of any claims for unpaid Maintenance Charges or other charges of assessments against such Tract which accrued prior to the time such holder acquired title to such Tract. No such sale or transfer shall relieve such holding acquiring title to a Tract from liability for any Maintenance Charge or other charges or assessments thereafter becoming due or form the lien thereof. Any other sale or transfer of a Tract shall not affect the Association's lien for Maintenance Charges or other charges or assessments. The Association shall make a good faith effort to give each such mortgagee sixty (60) days advance written notice of the Association's proposed foreclosure of the lien described in Section 6.01 hereof, which notice shall be sent to the nearest office of such mortgage by prepaid United States registered or Certified mail, return receipt requested, and shall contain a statement of delinquent Maintenance Charges or other charges or assessments upon which the proposed action is based provided, however, the Association's failure to give such notice shall not impair or invalidate any foreclosure conducted by the Association pursuant to the provisions of this Article VI.

Section 6.06  Purpose of the Maintenance Charge.  The Maintenance Charge - General, levied by the Developer or the Association shall be used exclusively for the purpose of promoting the recreation, health, safety, and welfare of the Owners of the Subdivision and other portions of the Annexable Area which hereafter may become subject to the jurisdiction of the Association. In particular, the Maintenance Charge shall be used for any improvement or services in furtherance of these purposes and the performance of tho Association's duties described in Article VIII, including the maintenance of any Roads, Common Areas, any Drainage Easements and the establishment and maintenance of a reserve fund for maintenance of any Common Areas. The Maintenance Fund may be expended by the Association for any purposes which, in the judgment of the Association, will tend to maintain the property values in the Subdivision, including, but not limited to, providing funds for the actual cost to the Association of all taxes, insurance, repairs, energy charges, replacement and maintenance of the Common Area as may from time to time be authorized by the Association. Except for the Association use of the Maintenance Charge - General to perform its duties described in this Declaration and in the bylaws, the use of the Maintenance Charge for any of the purposes is permissive and not mandatory. It is understood that the judgment of the Association as to the expenditure of said funds shall be final and conclusive so long as such judgment is exercised in good faith. Use of the $100 or more annual Maintenance Charge for the Maintenance Fund - Road as earlier described is mandatory.

Section 6.07  Exempt Property.  The following property subject to this Declaration shall be exempt from the Maintenance Charge and all other charges and assessments created herein: (a) all properties dedicated to and accepted by a local public authority; (b) the Common Area, if any and; (c) all properties owned by

PLs' Exhibit 34

a charitable or nonprofit organization exempt from taxation by the laws of the State of Texas; however, no land, attached manufactured housing or improvements devoted to dwelling use shall be exempt from said Maintenance Charges.

Section 6.08 Handling of Maintenance Charges. The collection and management of the Maintenance Charge or other charge or assessment levied hereunder, shall be performed by the Developer until ten years of the control Transfer Date, at which time the Developer shall deliver to the Association all funds on hand together with all books and records of receipt and disbursements, but the Developer may continue to collect and keep maintenance charges, books and records so long as it owns real property or a mortgage interest in the Property or any part thereof. The Developer and, upon transfer, the Association, shall maintain separate special accounts for these funds, and Owners shall be provided at least annually information on the Maintenance Fund, upon request. The Developer shall have full independent power to collect and maintain these funds and take such action as it may deem necessary to the full extent that the Association could do so to collect and maintain these funds. The Developer may use agents, attorneys, accountants, banks, tax professionals and others to aid in collection and maintenance and may pay those persons reasonable fees and costs from the funds to aid in the maintenance and collection of said funds.

## ARTICLE VII

### DEVELOPER'S RIGHTS AND RESERVATIONS

Section 7.01 Period of Developer's Rights and Reservations. Developer shall have, retain and reserve certain rights as hereinafter set forth with respect to the Association and the Common Area from the date hereof, until the earlier to occur of (i) the Control Transfer date or (ii) Developer's written notice to the Association of Developer's termination of the rights described in Article VII hereof. The rights and reservations hereinafter set forth shall be deemed excepted and reserved in each conveyance of a Tract by Developer to an Owner whether or not specifically stated therein and in each deed or other instrument by which any property within the Common Area is conveyed by Developer. The rights, reservations and easements hereafter set forth shall be prior and superior to any other provisions of this Declaration and may not, without Developer's prior written consent, be modified, amended, rescinded or affected by any amendment of this Declaration. Developer's consent to any one such amendment shall not be construed as a consent to any other or subsequent amendment.

Section 7.02 Right to Construct Additional Improvements in Common Area.
Developer shall have and hereby reserves the right (without the consent of any other Owner), but shall not be obligated, to construct additional improvements within the Common Area at any time and from time to time in accordance with this Declaration for the improvement and enhancement thereof and for the benefit of the Association and Owners, so long as such construction does not directly result in the increase of such Maintenance Charge. Developer shall, upon the Control Transfer Date, convey or transfer such improvements to the Association and the Association shall be obligated to accept title to, care for and maintain the same as elsewhere provided in this Declaration.

Section 7.03 Developer Rights to Use Common Areas in Promotion and Marketing of the Property.
Developer shall have and hereby reserves the right to reasonable use of the Common Area and of services offered by the Association in connection with the promotion and marketing of land within the boundaries of the Property. Without limiting the generality of the foregoing, Developer may erect and maintain on any part of the Common Area such signs, temporary buildings and other structures as Developer may reasonably deem necessary or proper in Connection with the promotion, development and marketing of land within the Property; may use vehicles and equipment within the Common Area for promotional

PLs' Exhibit 34

purposes; and may permit prospective purchasers of property within the boundaries of the Property, who are not Owners or Members of the Association, to use the Common Area at reasonable times and in reasonable numbers; and may refer to the services offered by the Association in connection with the development, promotion and marketing of the Property.

Section 7.04  Developer's Right to Grant and Create Easements.  Developer shall have and hereby reserves the right, without the consent of any other Owner or the Association, to grant or create temporary or permanent easements, for access, utilities, pipeline easement, cable television systems, communication and security systems, drainage, water and other purposes incidental to development, sale, operation and maintenance of the Subdivision, located in, on, under, over and across (i) the lots or other property owned by Developer, (ii) the Common Area, and (iii) existing utility easements. Developer also reserves the right, without the consent of any other Owner or the Association, to (i) grant or create temporary or permanent easements for access over and across the streets and roads within the Subdivision.

Section 7.05  Developer's Rights to Convey Additional Common Area to the Association.  Developer shall have and hereby reserves the right, but shall not be obligated to, convey additional real property and improvements thereon, if any, to the Association as a Road or Roads and any Common Area at any time and from time to time in accordance with this Declaration, without the consent of any other Owner or the Association.

**ARTICLE VIII**

**DUTIES AND POWERS OF THE PROPERTY OWNERS ASSOCIATION**

Section 8.01  General Duties and Powers of the Association.  The Association has been formed to further the common interest of the Members. The Association, acting through the Board of Directors or though persons to whom the Board of Directors has delegated such powers (and subject to the provisions of the Bylaws) shall have the duties and powers hereinafter set forth and, in general, the power to do anything that may be necessary or desirable to further the common interest of the members, to maintain, improve and enhance the Common Areas and to improve and enhance the attractiveness, desirability and safety of the Subdivision. The Association shall have the authority to act as the agent to enter into any and all contracts on behalf of the Members in order to carry out the duties, powers and obligations of the association as set forth in this Declaration. The association and the Developer may enforce these restrictions, and the Developer reserves the right to enforce these restrictions in its own name regardless of whether the developer owns any property in the development. Purchasers agree and covenant to allow Developer to do so to protect the reputation of the Developer. While the Developer has the power to enforce these restrictions, it is under no affirmative duty to do so. The Association may build fences, construct improvements and do such things as may be prudent or required by ordinance, law, regulation, insurance requirements or as may be reasonable to promote the health, safety and welfare of the residents or the public. Fees and costs for enforcement of these restrictions may be charged as part of the maintenance assessments.

Section 8.02  Duty to Accept the Property and Facilities Transferred by the Developer.
The Association shall accept title to any property, including any improvements thereon and personal property transferred to the Association by Developer, and equipment related thereto, together with the responsibility to perform any and all administrative functions and recreation functions associated therewith (collectively herein referred to as "Functions"), provided that such property and Functions are not inconsistent with the terms of this Declaration. Property interests transferred to the Association by Developer may include fee simple title, easements, leasehold interests and licenses to use such property.

PLs' Exhibit 34

Any property or interest in property transferred to the Association by Developer shall be within the boundaries of the Property. Any property or interest in property transferred to the Association by Developer shall, except to the extend otherwise specifically approved by resolution of the Board of Directors, be transferred to the Association free and clear of all liens and mortgages (other than the lien for property taxes and assessments not then due and payable), but shall be subject to the terms of this Declaration, the terms of any declaration of covenants, conditions and restrictions annexing such property to the Common Area, and all easements, covenants, conditions, restrictions and equitable servitude or other encumbrances which do not materially affect the Owners authorized to use such property. Except as otherwise specifically approved by resolution of the Board of Directors, no property or interest in property transferred to the Association by the Developer shall impose upon the Association any obligation to make monetary payments to Developer or any affiliate of Developer including, but not limited to, any purchase price, rent, charge or fee. The property or interest in property transferred to the Association by Developer shall not impose any unreasonable or special burdens of ownership of property, including the management maintenance, replacement and operation thereof.

Section 8.03 Duty to Manage and Care for the Common Area. The Association shall manage, operate, care for, maintain and repair all Common Areas and keep the same in a safe, attractive and desirable condition for the use and enjoyment of the Members. The duty to operate, manage and maintain the Common Areas shall include, but not be limited to the following: establishment, operation and maintenance of a security system, if any, for the Subdivision; management, maintenance, repair and upkeep of the subdivision entrance and other common areas.

Section 8.04 Other Insurance Bonds. The Association shall obtain such insurance as may be required by law, including workmen's compensation insurance, and shall have the power to obtain such other insurance and such fidelity, indemnity, errors and omissions, director indemnity or other bonds as the Association shall deem necessary or desirable.

Section 8.05 Duty to Prepare Budgets. The Association shall prepare budgets for the Association, which budgets shall include a reserve fund for the maintenance of all Common Areas.

Section 8.06 Duty to Levy and Collect the Maintenance Charge. The Association shall levy, collect and enforce the Maintenance Charge and other charges and assessments as elsewhere provided in this Declaration, subject to Section 6.08.

Section 8.07 Duty to Provide Annual Review. The Association shall provide for an annual unaudited independent review of the accounts of the Association. Copies of the review shall be made available to any Member who requests a copy of the same upon payment by such Member of the reasonable cost of copying the same.

Section 8.08 Duties with Respect to Architectural Approvals. The Association shall perform functions to assist the Committee as elsewhere provided in Article IV of this Declaration.

Section 8.09 Power to Acquire Property and Construct Improvements. The Association may acquire property or an interest in property (including leases) for the common benefit of Owners including improvements and personal property. The Association may construct improvements on the Property and may demolish existing improvements. The Association may institute suit and collect sums due and may take such actions as may be necessary or prudent in foreclosing maintenance liens and selling foreclosed properties on such terms as the Association in its sole discretion may deem advisable.

PLs' Exhibit 34

010566

Offcl 256240 Vol 858 Pg 118

Section 8.10 Power to Adopt Rules and Regulations. The Association may adopt, amend, repeal and enforce rules and regulations ("Rules and Regulations"), fines, levies and enforcement provisions as may be deemed necessary or desirable with respect to the interpretation and implementation of this Declaration, the operation of the Association, the use and enjoyment of the Common Areas, and the use of any other property, facilities or improvements owned or operated by the Association.

Section 8.11 Power to Enforce Restrictions and Rules and Regulations. The Association (and any Owner with respect only to the remedies described in (ii) or (iii), below) shall have the power to enforce the provisions of this Declaration and the Rules and Regulations and shall take such action as the Board of Directors deems necessary or desirable to cause such compliance by each Member and each Related User. Without limiting the generality of the foregoing, the Association shall have the power to enforce the provisions of this Declaration and of Rules and Regulations of the Association by any one or more of the following means: (i) By entry upon any property within the Subdivision after notice and hearing (unless a bona fide emergency exists in which event this right of entry may be exercised without notice (written or oral) to the Owner in such manner as to avoid any unreasonable or unnecessary interference with the lawful possession, use or enjoyment of the improvements situated thereon by the Owner or any other persons, without liability by the Association to the Owner thereof, for the purpose of enforcement of this Declaration or the Rules and
Regulations; (ii) by commencing and maintaining actions and suits to restrain and enjoin any breach or threatened breach of the provisions of this Declaration or the Rules and Regulations; (iii) by exclusion, after notice and hearing, of any Member or Related User from use of any recreational facilities within the Common Areas during and for up to sixty (60) days following any breach of this Declaration or such Rules and Regulations by such Member or any Related User, unless the breach is a continuing breach in which case exclusion shall continue for so long as such breach continues; (iv) by suspension, after notice and hearing, of the voting rights of a Member during and for up to sixty (60) days following any breach by such Member or a Related User of a provision of this Declaration or such Rules and Regulations, unless the breach is a continuing breach in which case such suspension shall continue for so long as such breach continues; (v) by levying and collecting, after notice and hearing, an assessment against any Member for breach of this Declaration or such Rules and Regulations by such Member or a Related User which assessment reimbursed the Association for the costs incurred by the Association in connection with such breach; (vi) by levying and collecting, after notice and hearing, reasonable and uniformly applied fines and penalties, established in advance in the Rules and Regulations of the Association, from any Member or Related User for breach of this Declaration or such Rules and Regulations by such Member or a Related User; and (vii) by taking action itself to cure or abate such violation and to charge the expenses thereof, if any, to such violating Members, plus attorney's fees incurred by the Association with respect to exercising such remedy.

Before the Board may invoke the remedies provided above, it shall give registered notice of such alleged violation to owner, and shall afford the Owner a hearing. If, after the hearing, violation is found to exist, the Board's right to proceed with the listed remedies shall become absolute. Each day a violation continues shall be deemed a separate violation. Failure of the Association, the Developer, or of any Owner to take any action upon any breach or default with respect to any of the foregoing violations shall not be deemed a waiver of their right to take enforcement action thereafter or upon a subsequent breach or default.

Section 8.12 Power to Grant Easements. In addition to any blanket easements described in this Declaration, the Association shall have the power to grant access, utility, drainage, water facility and other such easements in, on, over or under the Common Area.

**ARTICLE IX**

**PLs' Exhibit 34**

010567

Offcl 256240 Vol 858 Pg 119

## GENERAL PROVISIONS

Section 9.01 Term. The provisions hereof shall run with all property in the Subdivision and shall be binding upon all Owners and all persons claiming under them for a period of forty (40) years from the date this Declaration is recorded, after which time said Declaration shall be automatically extended for successive periods of ten (10) years each, unless an instrument, signed by not less than two-thirds (2/3rds) of the Owners (including the Developer) of the tracts has been recorded agreeing to amend or change, in whole or in part, this Declaration.

No waiver of enforcement of these restrictions shall be effective unless made in writing. Failure to enforce these restrictions may not be relied upon as any waiver. No purchaser may rely on any inaction or failure to enforce these restrictions by way of waiver or laches, and the County government and any city government having jurisdiction are expressly authorized by these restrictions to enforce these restrictions to the extent of the law.

Section 9.02 Amendments. This Declaration may be amended or changed, in whole or in part, at any time by the written agreement or signed ballot of Owners (including the developer) entitled to cast not less than two-thirds (2/3rds) of the votes of all of the Owners. If the Declaration is amended by a written instrument signed by those Owners entitled to cast not less than two-thirds (2/3rds) of all of the votes of the Owners of the Association, such amendment must be approved by said Owners within three hundred sixty-five (365) days of the date the first Owner executes such amendment. The date an Owner's signature is acknowledged shall constitute prima facia evidence of the date of execution of said amendment by such Owner. Those Members (Owners, including the Developer) entitled to cast not less than two-thirds (2/3rds) of all of the votes of the Members of the Association may also vote to amend this Declaration, in person, or by proxy, at a meeting of the Members (Owners, including the Declarant) duly called for such Purpose, written notice of which shall be given to all Owners at least ten (10) days and not more than sixty (60) days in advance and shall set forth the purpose of such meeting. Notwithstanding any provision contained in the Bylaws to the Contrary, a quorum, for purposes of such meeting, shall consist of not less than seventy percent (70%) of all of the Members (in person or by proxy) entitled to vote. Any such amendment shall become effective when an instrument is filed for record in the Real Property Records of Wise County, Texas, accompanied by a certificate, signed by a majority of the Board of Trustee, stating that the required number of Members (Owners, including the Developer) executed the instrument amending this Declaration or cast a written vote, in person or by proxy, in favor of said amendment at the meeting called for such purpose. Copies of the written ballots pertaining to such amendment shall be retained by the Association for a Period of not less than three (3) years after the date of filing of the amendment or termination.

Section 9.03 Amendments by the Developer. The Developer shall have and reserves the right at any time and from time to time prior to the Control Transfer Date, without the joinder or consent of any Owner or other party, to amend this Declaration by an instrument in writing duly signed, acknowledged, and filed for record for the purpose of correcting any typographical or grammatical error, oversight, ambiguity or inconsistency appearing herein, provided that any such amendment shall be consistent with and in furtherance of the general plan and scheme of development as evidenced by this Declaration and shall not impair or adversely affect the vested property or other rights of any Owner or his mortgagee. Additionally, Developer shall have and reserves the right at any time and from time to time prior to the Control Transfer Date, without the joinder or consent of any Owner of other party, to amend this Declaration by an instrument in writing duly signed, acknowledged and filed for record for the purpose of permitting the Owners to enjoy the benefits from technological advances, such as security, communications or energy-related devices or equipment which did not exist or were not in common use in residential subdivisions at the time this Declaration was adopted. Likewise, the Developer shall have and reserves the right at any time and from time to time prior to the control Transfer Date, without the

PLs' Exhibit 34

010568

joinder or consent of any Owner or other party, to amend this Declaration by an instrument in writing duly signed, acknowledged and filed for record for the purpose of prohibiting the use of any device or apparatus developed and/or available for residential use following the date of this Declaration if the use of such device or apparatus will adversely affect the Association or will adversely affect the property values within the Subdivision.

Section 9.04 Severability. Each of the provisions of this Declaration shall be deemed independent and severable and the invalidity or un-enforceability or partial invalidity or partial un-enforceability of any provision or portion hereof shall not affect the validity or enforceability of any other provision.

Section 9.05 Liberal Interpretation. The provisions of this Declaration shall be liberally construed as a whole to effectuate the purpose of this Declaration.

Section 9.06 Successors and Assigns. The provisions hereof shall be binding upon and inure to the benefit of the Owners, the Developer and the Association, and their respective heirs, legal representatives, executors, administrators, successors and assigns.

Section 9.07 Effect of Violations on Mortgages. No violation of the provisions herein contained, or any portion thereof, shall affect the lien of any mortgage or deed of trust presently or hereafter placed of record or otherwise affect the rights of the mortgagee under any such mortgage, the holder of any such lien or beneficiary of any such deed of trust; and any such mortgage, lien or deed of trust may, nevertheless, be enforced in accordance with its terms, subject, nevertheless, to the provisions herein contained.

Section 9.08 Terminology. All personal pronouns used in this Declaration and all exhibits attached hereto, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa. Title of Articles and Sections are for convenience only and neither limit nor amplify the provisions of this Declaration itself. The terms "herein", "hereof" and similar terms, as used in this instrument, refer to the entire agreement and are not limited to referring only to the specific paragraph, section or article in which such terms appear. All references in this Declaration to Exhibits shall refer to the Exhibits attached hereto.

IN WITNESS WHEREOF, the undersigned, being the Developer herein, has hereunto set his hand of this 22 day of January , 1999, to be effective January 21, 1999.

The Alvord 287 Joint Venture,

By Jentex, Financial, Inc., Authorized Venturer

Jay Lesok, President

STATE OF TEXAS    )
COUNTY OF         )
    This instrument was acknowledged before me on the 2— day of

PLs' Exhibit 34

010569

Offcl  256240 Vol  858 Pg  121

_January_, 1999, by Jay Lesok, President of Jentex Financial, Inc., a Texas Corporation, on behalf of said Corporation, Authorized Venturer of The Alvord 287 Joint Venture Joint Venture.



_____
Notary Public, State of Texas

BASIL L. HOYL, JR.
NOTARY PUBLIC
STATE OF TEXAS
My Comm Exp 07-01-2001

**PLs' Exhibit 34**

010570

Offcl   256240 Vol   858 Pg   122

A 135.90 acre tract of land in the G. B. Buchanan Survey A-31, Wise County, Texas and being the same tract of land described in deed to Nancy Carpenter recorded in Volume 400, Page 96, Real Records, Wise County, Texas and being more particularly described as follows:

BEGINNING at a sixty penny nail found at the northeast corner of said Carpenter tract and the northwest corner of a tract of land described in deed to Ben Heckathorn recorded in Volume 597, Page 31, Real Records, Wise County, Texas and being in the south line of the Old Chishlom Estates according to the plat of same recorded in Volume A, Page 519, Plat Records, Wise County, Texas;

THENCE South 0°33'31" East with the general course of a fence and the west line of said Heckathorn tract 1472.07 feet to a three inch iron post at the southeast corner of said Carpenter tract and the northeast corner of a tract of land described in deed to Daniel Maeyers recorded in Volume 206, Page 317, Deed Records, Wise County, Texas;

THENCE South 89°36'37" West with the general course of a fence 1652.37 feet to a three inch iron post fence corner;

THENCE North 1°06'32" West with the general course of a fence 154.55 feet to a three inch iron post fence corner;

THENCE South 89°41'19" West with the general course of a fence 2629.79 feet to a one inch iron rod found in the west line of a County Road for the southwest corner of said Carpenter tract and the east line of a tract of land described in deed to Bertie Boaz recorded in Volume 655, Page 197, Real Records, Wise County, Texas;

THENCE North 2°01'52" West with the west line of said road 679.15 feet to a 12 inch post at the northeast corner of said Boaz tract and the southeast corner of a tract of land described in deed to Steve Parks recorded in Volume 140, Page 860, Real Records, Wise County, Texas and being South 3306.12 feet and North 88°22'16" East 1411.69 feet from the northwest corner of said Buchanan Survey per record call;

THENCE North 1°57'27" West with the general course of a fence 636.42 feet to the northwest corner of said Carpenter tract and the northeast corner of said Parks tract;

THENCE North 89 36'57" East with the north line of said Carpenter tract 2511.20 feet to an half inch iron rod found for the southwest corner of Block One of said Old Chishlom Estates;

THENCE North 89°38'18" East 1805.43 feet to the POINT OF BEGINNING.

SAVE AND EXCEPT THE FOLLOWING TRACTS:

**PLs' Exhibit 34**

010571

Offcl    256240 Vol    858 Pg    123

September 20, 1998

0530-0443

Tract 50

Field Notes For:

A 1.50 acre tract of land in the G. B. Buchanan Survey A-31, Wise County, Texas and being part of a tract of land described in deed to The Alvord 287 Joint Venture recorded in Volume 796, Page 674 Deed Records, Wise County, Texas and being more particularly described as follows:

BEGINNING at an iron rod set in the north line of said Joint Venture tract from which the northwest corner of said tract bears South 89°36'57" West 458.53 feet;

THENCE South 00°18'41" East 320.34 feet to an iron rod set in the north line of a sixty foot road;

THENCE North 89°41'19" East with the north line of said road 203.89 feet to an iron rod set for corner;

THENCE North 00°18'41" West 320.59 feet to an iron rod set in the north line of said Joint Venture tract;

THENCE South 89°36'57" West 203.89 feet to the POINT OF BEGINNING.

The foregoing field notes were prepared from a survey made on the ground under my supervision.

There are no visible easements or encroachments except as shown.

Surveyed May 14, 1998.
See plat dated 5-16-1998.

Patrick L. Walters
Registered Professional Land Surveyor

**PLs' Exhibit 34**                                                    010572

Offcl   256240 Vol   858 Pg   124

September 20, 1998

0530-0443

Tract 51

Field Notes For:

A 1.64 acre tract of land in the G. B. Buchanan Survey A-31, Wise County, Texas and being part of a tract of land described in deed to The Alvord 287 Joint Venture recorded in Volume 796, Page 674 Deed Records, Wise County, Texas and being more particularly described as follows:

BEGINNING at an iron rod set in the north line of said Joint Venture tract from which the northwest corner of said tract bears South 89°36'57" West 60.02 feet;

THENCE South 47°46'07" East 473.02 feet to an iron rod set in the north line of a sixty foot road;

THENCE North 89°41'19" East with the north line of said road 50.00 feet to an iron rod set for corner;

THENCE North 00°18'41" West 320.34 feet to an iron rod set in the north line of said Joint Venture tract;

THENCE South 89°36'57" West 398.51 feet to the POINT OF BEGINNING.

The foregoing field notes were prepared from a survey made on the ground under my supervision.

There are no visible easements or encroachments except as shown.

Surveyed May 14, 1998.
See plat dated 5-16-1998.

Patrick L. Walters
Registered Professional Land Surveyor

PLs' Exhibit 34

010573

Offcl 256240 Vol 858 Pg 125

September 20, 1998

0530-0443

## Tract 52

Field Notes For:

A 1.66 acre tract of land in the G. B. Buchanan Survey A-31, Wise County, Texas and being part of a tract of land described in deed to The Alvord 287 Joint Venture recorded in Volume 796, Page 674 Deed Records, Wise County, Texas and being more particularly described as follows:

BEGINNING at an iron rod set in the north line of said Joint Venture tract from which the northwest corner of said tract bears South 89°36'57" West 60.02 feet;

THENCE South 1°57'27" East with the east line of a County Road 373.32 feet to an iron rod set for corner;

THENCE North 89°41'19" East 337.74 feet to an iron rod set in the west line of a sixty foot road;

THENCE North 00°18'41" West with the west line of said road 53.34 feet to an iron rod set for corner;

THENCE North 47°46'07" West 473.02 feet to the POINT OF BEGINNING.

The foregoing field notes were prepared from a survey made on the ground under my supervision.

There are no visible easements or encroachments except as shown.

Surveyed May 14, 1998.
See plat dated 5-16-1998.

Patrick L. Walters
Registered Professional Land Surveyor

PLs' Exhibit 34

010574

Offcl   256240 Vol   858 Pg   126

September 20, 1998

0530-0443

Tract 53

Field Notes For:

A 1.00 acre tract of land in the G. B. Buchanan Survey A-31, Wise County, Texas and being part of a tract of land described in deed to The Alvord 287 Joint Venture recorded in Volume 796, Page 674 Deed Records, Wise County, Texas and being more particularly described as follows:

BEGINNING at an iron rod set in the east line of a County Road from which the northwest corner of said Joint Venture tract bears North 1°57'27" West 373.32 feet and South 89°36'57" West 60.02 feet;

THENCE South 1°57'27" East with the east line of a County Road 129.75 feet to an iron rod set for corner;

THENCE North 89°41'19" East 333.99 feet to an iron rod set in the west line of a sixty foot road;

THENCE North 00°18'41" West with the west line of said road 129.70 feet to an iron rod set for corner;

THENCE North 89°41'19" West 337.74 feet to the POINT OF BEGINNING.

The foregoing field notes were prepared from a survey made on the ground under my supervision.

There are no visible easements or encroachments except as shown.

Surveyed May 14, 1998.
See plat dated 5-16-1998.

Patrick L. Walters
Registered Professional Land Surveyor

**PLs' Exhibit 34**                    010575

Offcl   256240 Vol   858 Pg   127

Filed for Record in:
Wise County
Honorable Sherry Parker
County Clerk
On: Mar 30,1999 at 12:36P

As a
Official Records

Document Number:      256240

Amount:           57.00

Receipt Number - 42453
By,
Tawra Stephens, Deputy

ANY PROVISION HEREIN WHICH RESTRICTS THE
SALE, RENTAL, OR USE OF THE DESCRIBED
REAL PROPERTY BECAUSE OF COLOR OR RACE IS
INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

STATE OF TEXAS            COUNTY OF WISE
I hereby certify that this instrument was
filed on the date and time stamped hereon by me
and was duly recorded in the volume and page
of the named records of:
Wise County
as stamped hereon by me.

Mar 30,1999

BY _____ Deputy

Honorable Sherry Parker, County Clerk
Wise County

FILED FOR RECORD THE 30TH DAY OF MARCH A. D., 1999 AT _____ ____.M.

AND DULY RECORDED THE 2ND DAY OF APRIL A. D., 1999 AT  3:00   P . M.

SHERRY PARKER. COUNTY CLERK. WISE COUNTY, TEXAS

BY _____ DEPUTY
KAREN WEAVER

**PLs' Exhibit 34**                                        010576