IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>ANSON FINANCIAL, INC.<br><br>    Debtor.<br><br>B. FRAZIER ASSET MANAGEMENT, INC. F/K/A FRAZIER ASSET MANAGEMENT, INC., AND BRIAN H. FRAZIER INDIVIDUALLY<br><br>    Plaintiffs,<br><br>v.<br><br>ANSON FINANCIAL, INC.<br><br>    Defendant. | § § § § § § § § § § § § § § § § § § § § § | Case No. 21-41517-elm11<br><br><br><br><br><br>Adv. No. 21-04071<br><br>Removed From:<br>Cause No. 342-288776-16;<br>342nd Judicial District Court<br>Tarrant County, Texas |

## (PROPOSED) FINDINGS OF FACT AND CONCLUSIONS OF LAW

B. Frazier Asset Management, Inc. and Brian Frazier (jointly referred to as "FAM") in the above-captioned bankruptcy case and Plaintiff in this Adversary Proceeding ("Plaintiff") hereby respectfully requests that the Court enter the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1.     Anson Financial, Inc. ("Anson" or the "Debtor") filed a voluntary Chapter 7 Bankruptcy case on June 25, 2021 (the "Petition Date").

2.     Jentex Financial, Inc. ("JFI"), entered into a Joint Venture Agreement (the "JV Agreement") creating The Alvord 287 Joint Venture (the "Partnership") for the sole purpose of purchasing, owning, managing, improving and selling real property described as 127.21 Acres in

Wise County, Texas. The JV Agreement was and still is binding on the Joint Venturer/Partners, their heirs, personal representatives and assigns.

3. The Debtor's president and corporate representative admitted in his testimony at the 341 Meeting of Creditors on August 11, 2021, that The Alvord 287 Joint Venture, created by the JV Agreement constituted a partnership. [341 Trans.at 35:24-25 and 36: 1-2]

4. The JV Agreement assigns various duties to each partner, but states in Article V:

**Joint Venturers will share equally in the duties of management of the Joint Venture property. All decisions affecting the Joint Venture or its business will be determined by a majority vote of the ownership interest.**

5. From inception one of the partners, JFI, was collecting on Note obligations due to the Partnership, as well as proceeds from land sales, and keeping the books and records.

6. The JV Agreement requires that accounts in the name of the Joint Venture be maintained in such bank or banks as the Joint Venturers chose. All money of this Partnership and all instruments for the payments of money when received are required to be deposited to the credit of the Partnership on a timely basis. Additionally, all checks drawn on any bank account holding the Partnership funds were to be signed and drawn by both partners if more than $10,000.00 in amount.

7. Pursuant to the JV Agreement, FAM was tasked with (1) selling and marketing the tracts; (2) installing septic systems, as needed, on a direct cost basis, i.e. no overhead, labor, etc.; (3) overseeing the installation of a well on each of the tracts; (4) overseeing and maintaining unsold tracts in saleable condition; and (5) handling foreclosures and resale of foreclosed tracts.

8. Pursuant to the JV Agreement, JFI is responsible for (1) servicing all loans resulting from the sale of tracts out of the land; (2) preparing monthly accounting to the partners; (3) preparing year-end documents and financials; and (4) maintaining a bank account for the JV and accounting monthly for all transactions.

9. After two years of successfully operating the JV, the Venturers agreed to expand the purpose of the JV from only the single land project in Wise County to allow the JV to acquire additional land. The JV Agreement was thereafter amended to restate and slightly amend the specific duties/obligations of the Venturers. Later, by Addendum to Joint Venture Agreement dated April 27, 2000, the parties unanimously agreed that either FAM or JFI could sell, convey or acquire property on behalf of the JV.

10. For more than eighteen (18) years from January 30, 1996, until September 9, 2014, FAM and JFI successfully operated this partnership. FAM completed its initial obligations to develop the tracts (roads, septic, water, etc.), and to sell and market the lots. JFI used its own servicing company to service the loans, but properly transferred the money paid to the servicing company directly into the Partnership bank accounts. JFI also provided access to bank statements and accounted for all transactions on a regular basis.

11. Over the course of the Partnership operations Brian Fraizer let his corporate entity be forfeited under the Tax Code for not timely filing annual reports. Despite these lapses Mr. Frazier, as the sole owner of FAM, continued to perform all obligations of FAM and JFI never considered any such lapses a default. If allowing a partner to temporarily lapse with the State was some type of implied term of the JV Agreement, it was consistently waived by JFI.

12. In 2014, Jay Lesok ("Lesok"), President of JFI, informed FAM, that because of his advanced age and health conditions, he was no longer able to keep up with the amount of work required to fulfill his obligations under the Agreement. He asked FAM to purchase his interest, but a price could not be agreed upon. FAM's obligation to develop the tracts was already complete or substantially complete, while JFI' obligations, including servicing obligations, were largely ongoing or incomplete.

13. The Debtor, Anson Financial, Inc. ("Anson") purchased JFI's interest in the JV, thus becoming the second partner. On September 9, 2014, FAM received a letter from J. Michael Ferguson ("Ferguson"), President of Anson, stating that Anson purchased JFI's interest in the JV because of Lesok's health and medical issues. In the letter, Ferguson promised that Anson would continue to handle JFI's duties as set forth in the JV Agreement and subsequent amendments.

14. Prior to Anson becoming a partner in the JV in the fall of 2014, the Texas Secretary of State had revoked FAM's corporate charter for violations of the Texas Tax Code at least 5 times.

15. Thereafter Anson failed to continue handling JFI's duties as set forth in the Agreement, thereby preventing FAM from exercising its right to ensure proper operation of the Partnership.

16. FAM sent several written notices to Anson requesting compliance with the JV Agreement and Anson failed to comply.

17. Neither JFI nor Anson ever sent written notice of default to FAM prior to FAM filing suit in Tarrant County asserting that Anson had breached the JV Agreement in several respects and seeking to compel an accounting and access to the books and records of the Partnership.

18. Additionally, Anson nor JFI ever complained about FAM's tax forfeitrures as Brian Frazier continued to fulfill FAM's obligations as the sole beneficial owner of FAM's 50% interest.

19. At the time that FAM filed suit, its corporate charter was forfeited by the Secretary of State for failure to comply with the Tax Code. Anson called that to Brian Frazier's attention and FAM reinstated under the Tax Code.

20. 11. The Secretary of State entity ID, 0119293200, remained the same after the reinstatement and name changes.

21. At the time of trial was set in the state court and at the time of trial in this Court, FAM's corporate charter has been reinstated and is good standing with the Texas Secretary of State.

22. FAM sent written notice to Anson that it objected to Anson's operations of the JV.

23. Anson placed Partnership funds in its own bank account and used partnership money for its own benefit over FAM's objections.

24. Anson admits in a partial report it provided in October of 2021 that the JV income was $833,725.70 from January 2014 through December 31, 2019. No reporting was provided to FAM for 2020, 2021 and the first quarter of 2022; however, it appears that the Debtor has been treating all JV income as its own income at least during the course of the bankruptcy.

25. Although a partial accounting was conducted during the course of the Tarrant County litigation, the books and records provided to the accountant did not permit a complete accounting to be done. Anson provided several versions of records to the accountant and they revealed that Anson had been charging the JV for serving fees which it was not permitted to do.

26. The evidence shows that at least $_____ in income came in during 2020, 2021 and the first quarter of 2022.

27. Anson made distributions to itself of at least $_____ during this period and approximately $_____ to FAM.

28. Anson also took out what it called "expenses" in excess of $_____ and those funds are to be charged against Anson's share as there were not equal distributions to FAM.

29. Due to Anson's breaches of the JV Agreement, and its breaches of its duties to FAM, as its partner, FAM expended the sum of $_____ in reasonable attorneys fees enforcing the JV Agreement.

30. Based upon the evidence FAM is owed $_____ for unpaid distributions from the partnership and another $_____ from Anson for its breaches.

31. To the extent that Brian Frazier became the successor beneficial owner of the FAM half of the partnership, all such awards are due to Brian Frazier's share of the partnership and the separate damages claim against Anson.

32. The Debtor had acknowledged on numerous occasions that FAM held a fifty percent interest in the partnership created by The Alvord 287 Joint Venture and offered on numerous occasions to buy FAM's half ownership, while expecting to relieve itself of its

continuing obligations to service the Notes and provide financial reports. No such sale agreement was ever reached.

33. The Debtor then filed this bankruptcy on the eve of the continued trial date and scheduled The Alvord 287 Joint Venture as an entity in which it held a "100% ownership." With a book value of $367,064.56. [See Doc. No. 16]

34. It is clear from the evidence presented that a partnership between FAM and Anson still exists, despite Anson's characterization otherwise.

35. Although Anson, along with FAM, are entitled to share equally in all distributions from the net income of the partnership, the evidence shows several instances in which Anson used partnership funds for its own purposes. First of all, Anson admitted that as of January 2021, it transferred the Alvord Partnership assets to an affiliate, AFI and began paying it a servicing fee on each Note payment. While Anson may have been able to delegate its servicing obligations under the JV Agreement to an affiliate, the expense of all such servicing must be born by Anson as that was part of the consideration due by Jentex, and Anson as its successor, to the Partnership.

36. Plaintiff's Exhibit 99 also shows that Anson acknowledged that 30 Notes were owned by the partnership as of September 30, 2021 with a cumulative balance due of $659,254.90. Thus, the A/B Schedule incorrectly listed the full value of the partnership assets.

37. Exhibit 99 also shows $38,582.00 in "Loan servicing expense" through December of 2019. These expenses, plus all loan servicing charges paid from partnership assets in 2020 through the present must be deducted solely from Anson's half interest.

38. Likewise all legal expenses, other than for preparation of releases of mortgages when loans are paid in full, are actually unauthorized distributions to Anson which must be deducted from its partnership share.

## CONCLUSIONS OF LAW

1. Ownership of the Partnership Assets is governed by Texas Law. (Butner v. United States, 440 U.S. 48 (1979) In re Lawrence, 189 F.3d 838 (9th Cir. 1999)) The Partnership Assets are the property of The Alvord 287 Joint Venture, not property of this bankruptcy estate.

2. This Court finds that Anson breached the Alvord 287 Joint Venture in several respects, that Anson mismanaged the Partnership Assets and engaged in self-dealing by the transfer of many of the Note proceeds to the Debtor's principal, Michael Ferguson, and his law firm.

3. FAM did not materially breach the JV Agreement.

4. Anson's counter claim and claim objection is based solely on the allegation that Frazier's Certificate/Charter forfeiture under § 171.309 of the Texas Tax Code constituted a wrongful withdrawal from the JV or partnership entitling Anson to redeem all of Frazier's interest for the "liquidation value" after deducting penalties, costs, expenses, prejudgment interest and its attorney fees.  No  wrongful withdrawal occurred. Even if the partnership were to no longer exist, the property rights of both partners still remained.

5. As justification for its actions, Anson claims that a section 171.309 Texas Tax Code forfeiture is a "termination of existence" under Texas Bus. Orgs. Code § 152.002(b)(5) and was an automatic event of withdrawal under § 152.501(b)(8) triggering Anson's right to redeem or buyout Frazier's interest in the JV.  Anson further claims this "withdrawal" was a "wrongful" withdrawal because it willfully" dissolved or terminated its existence under § Tex. Bus. Orgs. Code § 52.503(b)(2)(C).

6. There is no basis in Texas Law to support Anson's legal argument that the "consequences" of the tax forfeiture are that Anson may offer to redeem Frazier's interest in the JV at a "liquidation" value in substitution for actual payment until the JV is wound up in the future.

7. The 2nd Court of Appeals has addressed the issue related to tax forfeitures and conflicts between the Texas Bus. Corp. Act (predecessor to the TBOC) and the Franchise Tax Act (now contained in the Tax Code) stating, "We find and hold that **none of the various provisions of the Texas Business Corporation Act relating to forfeiture, dissolution and reinstatement** of the charter of a corporation have any application to the facts of this case." *McGown v. Kittel*, 480 S.W.2d 47, 50 (Tex. Civ. App.—Fort Worth 1972, writ ref'd n.r.e.) (emphasis added). Based on the controlling law in this jurisdiction, no part of the TBOC, including the withdrawal statutes relied on by Anson in its withdrawal claim, have any relevance to FAM's charter forfeiture under the Tax Code.

8. Reinstatement under the Tax Code "relates back" to the date of forfeiture.1 The 2nd Court of Appeals follows this line of cases and is thus controlling over this dispute. *See Parker Cty.'s Squaw Creek Downs, L.P. v. Watson,* 2-08-255-CV, 2009 WL 885941, at *6 (Tex. App.—Fort Worth Apr. 2, 2009, pet. denied) ("The tax code, however, allows a corporation whose charter is forfeited by the secretary of state to have its charter and corporate privileges revived if the corporation files the required reports; pays any taxes, penalties, and interest owed; and has the secretary of state set aside the forfeiture pursuant to a section 171.313 proceeding."). **Neither the forfeiture of corporate privileges by the comptroller nor the forfeiture of a corporation's charter by the secretary of state extinguishes the corporation as an entity and once reinstated it is as though the forfeiture never existed.** *Id* (emphasis added). There is no deadline to reinstate corporate privileges after a tax forfeiture under § 171. *See generally* Tex. Tax Code § 171.

9. Further, a filing entity whose certificate of formation has been forfeited under the provisions of the Tax Code must follow the procedures in the Tax Code to reinstate its certificate of formation. Tex. Bus. Orgs. Code Ann. § 11.254 (West). Forfeitures under the Tax Code have never been intended to extinguish claims of companies, but only to encourage payment of taxes for reinstatement. *See Cognata v. Down Hole Injection, Inc.,* 375 S.W.3d 370, 375–76 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) stating:

("Under the Texas Tax Code, a corporation without corporate privileges is "denied the right to sue or defend in a court of this state." *See* Tex. Tax Code Ann. § 171.252 (West 2008). Despite such clear language, this statute has historically been limited to prohibit delinquent corporations from bringing cross-actions, not from merely defending lawsuits. *See* \*376 *Mello v. A.M.F., Inc.,* 7 S.W.3d 329, 331 (Tex. App.—Beaumont 1999, pet. denied). The restriction against bringing an action in state court functions as a revenue measure, promoting the collection of state franchise taxes. *G. Richard Goins Constr. Co. v. S.B. McLaughlin Assocs., Inc.,* 930 S.W.2d 124, 128 (Tex. App.—Tyler 1996, writ denied). The Tax Code contains other provisions, however, that enable dissolved corporations to have their corporate privileges restored. *See* Tex. Tax Code Ann. §§ 171.312–.313. Under these provisions, if a corporation pays its delinquent taxes, its disability is removed, and the corporation may sue or defend any action, regardless of whether the cause arose before or during the period of forfeiture. G. Richard Goins Constr., 930 S.W.2d at 128.")

9. Forfeitures under the Tex. Bus. Org. Code are similar to Tex. Tax Code forfeitures, but the distinctions are crucial and controlling here. Notably, FAM's charter was forfeited and reinstated pursuant to Tex. Tax Code. Exhibits 2, 3. FAM is not a "Terminated Entity" and did not have a "termination of existence" or "automatically withdraw" under the Tex. Bus. Org. Code as a matter of law.

10. FAM's tax forfeiture and reinstatement process is expressly excluded from TBOC's termination process:

As set forth in subsection (4) "Terminated entity" means a domestic entity the existence of which has been:

(A) terminated in a manner authorized or required **by this code**, unless the entity has been reinstated in the manner provided by this code; or

(B) forfeited pursuant to the Tax Code, **unless the forfeiture has been set aside**.

Tex. Bus. Orgs. Code Ann. § 11.001 (West)(emphasis added)

FAM has been reinstated, the tax forfeiture has been set aside and it is not a "Terminated entity" within the meaning of TBOC.

11. Anson it attempting to use the TBOC as mechanism to require FAM to forfeit its property to Anson at a liquidated value.. For more than fifty years the Texas Supreme Court has consistently held that when a corporation has been denied the

right to use Texas courts as a penalty for its failure to comply with the laws of Texas, the corporation's property is not forfeited or subject to appropriation by third parties, but is held in trust for the stockholder and insuch cases suit must be brought by the individual stockholders, suing in their own right, not for the benefit of the corporation, but to protect their own property rights. *Pratt-Hewit Oil Corp. v. Hewit*, 122 Tex. 38, 47, 52 S.W.2d 64, 67 (1932).

12. Again, in 1951, the Texas Supreme Court held that when the Texas Secretary of State has entered in its records the forfeiture of a corporation's right to do business the legal title to assets remains with the corporation, but beneficial title rests with the stockholders. *Humble Oil & Ref. Co. v. Blankenburg,* 149 Tex. 498, 503, 235 S.W.2d 891, 893 (1951). The Supreme Court goes on to note, the stockholders as beneficial owners must prosecute such actions necessary to protect their property interests by suing in their own right, not for the benefit of the corporation. In 1994, the Texas Supreme Court allowed the owner of a forfeited entity to pursue claims of ownership related to real property owned by the forfeited company, noting the owner held equitable title to the forfeited corporation's property, subject to creditor claims. *Rogers v. Ricane Enterprises, Inc.,* 884 S.W.2d 763, 768 (Tex. 1994).

13. The 2nd Court of Appeals, noted that a sole shareholder or all of the shareholders may themselves deal with the property of a corporation, including binding by contract the corporation as the shareholders are the equitable owners of all of the corporation's assets so long as a creditor of the corporation is not harmed. *Martin v. Martin, Martin & Richards, Inc.*, 12 S.W.3d 120, 124 (Tex. App.—Fort Worth 1999, no pet.). Forfeiture of corporate privileges deprives a corporation of capacity to sue during that time; but it does not void the suit itself. *Cognata v. Down Hole Injection, Inc.*, 375 S.W.3d 370, 376 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). In a federal case applying Texas law, the court decided a shareholder could sue to recover on claims that its corporation could not pursue during forfeiture. *Robinette v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2004 WL 6389547, at *10 (N.D. Tex. Nov. 23, 2004). The court reasoned that the "**forfeiture of a corporate charter does not destroy or forfeit the property of the corporation, and the company's stockholders, who are the beneficial owners of the property, are authorized to prosecute or defend such actions in the courts as necessary to protect their property rights**." *Id.2* (emphasis added)

14. After a tax forfeiture, a corporation continues to exist as an incapacitated corporation. EL *T. Mexican Restaurant v. Bacon*, 921 S.W.2d 247, 251 (Tex. App.—Houston [1st Dist.] 1995). The court found that legal title to an incapacitated corporation, including title to a cause of action, remained in the corporation and beneficial title vests in a shareholder. *Id*. FAM's tax forfeiture in 2013 did not extinguish or divest it of the real and personal property it owned at that time. *See Robinette v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 2004 WL 6389547, at *10 (N.D. Tex. Nov. 23, 2004)(emphasis added) s*tating,* "**forfeiture of a corporate charter does not destroy or forfeit the property** of the corporation, and the company's stockholders, who are the beneficial owners of the property, are authorized

to prosecute or defend such actions in the courts as necessary to protect their property rights." *See also Regal Construction Co. v. Hansel,* 596 S.W.2d 150, 153-157 (Tex. Civ. App. 1979, writ ref d n.r.e.) (holding the beneficial owners of the company's assets could pursue claims related to their beneficial interest in property owned by the forfeited company by suing in their own right.)

15. All improper disbursements and expenditures of Anson for its benefit must be treated as distributions already made to Anson of partnership assets, which will change the 50/50 ownership of the partners if not reimbursed by Anson within ten (10) days from entry of judgment.

16. FAM's share in the partnership is at least fifty percent and, upon reconciliation to commence 11 days after entry of judgment, FAM's share shall proportionately increase to the extent of partnership assets to account for distributions made to Anson that were not also made to FAM.

17. FAM is also entitled to a general unsecured claim in the sum of $_____ against Anson for breaches of its duties to FAM under the JV Agreement, including defalcation and self-dealing.

Respectfully Submitted,

**LAW FIRM OF CALEB MOORE, PLLC**
2205 Martin Drive, Suite 200
Bedford, TX 76021
Telephone: (817) 953-2420
Facsimile: (817) 581-2540
cmoore@thedfwlawfirm.com

By: */s/ Caleb Moore*
Caleb I. Moore
cmoore@thedfwlawfirm.com
Texas Bar No. 24067779

~ and ~

/s/Lyndel Anne Vargas
Lyndel Anne Vargas
State Bar No. 24058913
CAVAZOS HENDRICKS POIROT, P.C.
900 Jackson Street, Suite 570
Dallas, Texas 75202
Phone: (214) 573-7344
Fax: (214) 573-7399
Email:  LVargas@chfirm.com

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served this 28th day of March, 2022 by electronic transmission through the Court's automated Case Management and Electronic Docketing System for the U. S. Bankruptcy Court for the Northern District of Texas on all parties-in-interest submitting to service of papers in this case by said means.

/s/Lyndel Anne Vargas
Lyndel Anne Vargas