

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 15, 2025**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 21-41517 |
| ANSON FINANCIAL, INC., | § | |
| | § | |
| Debtor. | § | |
| | § | |
| B. FRAZIER MANAGEMENT, INC. | § | |
| F/K/A FRAZIER ASSET MANAGEMENT, | § | |
| INC., AND BRIAN H. FRAZIER, | § | |
| INDIVIDUALLY | § | Adversary No. 21-04071 |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| ANSON FINANCIAL, INC., | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

1

Before the Court is a partnership dispute between B. Frazier Management, Inc. f/k/a Frazier

Asset Management, Inc. ("**FAM**") and Anson Financial, Inc. ("**Anson**" or "**Debtor**") related to the

operation of the Alvord 287 Joint Venture (the "**Joint Venture**" or "**JV**").[1]

Prior to the removal of the claims and causes of action in this adversary proceeding, the

parties had been engaged in litigation in the 342nd Judicial District Court of Tarrant County, Texas

(the "**State Court**") under Cause No. 342-288776-16 (the "**State Court Action**"). On June 25,

2021 (the "**Petition Date**") – days before the case was set for jury trial in state court –Anson filed

a voluntary petition for relief under Chapter 11 (Subchapter V) of the United States Bankruptcy

Code, thereby initiating Case No. 21-41517 with this Court (the "**Bankruptcy Case**"). Thereafter,

on November 1, 2021, Anson filed a Notice of Removal pursuant to 28 U.S.C. § 1452 to remove

all claims and causes of action pending in the State Court Action to this Court, thereby initiating

this adversary proceeding.

FAM has asserted claims against Anson for breach of fiduciary duty, defalcation, breach of

contract, and conversion.[2] Pursuant to the Complaint, FAM alleges that, since becoming a partner

---

[1] Brian H. Frazier is also a named plaintiff in this action, but his "individual claims have [only] been asserted in the alternative, in the event that the court . . . makes factual determinations that result in the law being applied in a manner precluding FAM from pursuing its own claims." Docket No. 73 (Plaintiffs' Supplement to Request to Strike Defendant's Plea to the Jurisdiction and Motion to Dismiss Or, Alternatively, to Deny the Same), at p. 13; *see also* Complaint ¶ 2.2 (Plaintiff Brian H. Frazier "appears in his individual capacity as the successor in interest and sole owner of property, rights and duties of B. Frazier Management, Inc. if that entity is determined to have been legally terminated."). As explained further herein, FAM was never legally terminated and, therefore, is capable of asserting its own rights and claims.  Therefore, the Court will not discuss further any alternative individual claims by Brian H. Frazier.

[2] Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 249-63 (Plaintiff's Fifth Amended Petition and Demand for Accounting, referred to herein as simply the "**Complaint**"). The Complaint also included a demand for an accounting and a request for a writ of mandamus. However, FAM's counsel stated at trial that it was not pursuing these claims/issues. *See also* Docket No. 51 (the "**Joint Pretrial Order**") ¶¶ 3.1-14 (Contested Issues of Fact) and ¶¶ 4.1-44 (Contested Issues of Law) (omitting, in each instance, any reference to a claim or request for relief related to an accounting or a writ of mandamus); *Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 245 (5th Cir. 2005) ("It goes without saying that a pre-trial order controls the scope and course of trial; a claim or issue not included in the order is waived, unless presented without objection").

in the Joint Venture in 2014, Anson has misappropriated JV funds, distributed JV profits without providing FAM its share of the proceeds, provided inaccurate and incomplete financial records in an effort to hide how it was misappropriating funds, and cut FAM out of the operation and management of the Joint Venture.

Anson timely filed its Answer, denying the claims and arguing that FAM cannot prevail because it wrongfully withdrew from the Joint Venture as a result of its 2013 tax forfeiture.[3] Anson has also filed a Counterclaim against FAM and Brian H. Frazier (“**Frazier**”), its owner, which primarily seeks to enforce the provisions of the Texas Business Organizations Code to preclude the prosecution of FAM's claims based upon FAM's alleged withdrawal from the Joint Venture.[4] Anson also filed several Pleas to the Jurisdiction challenging FAM and Frazier's capacity to sue based upon FAM's 2013 tax forfeiture, which the State Court denied shortly before the bankruptcy was filed.[5] Following the removal, Anson filed a Plea to the Jurisdiction and Motion to Dismiss for Lack of Subject Matter Jurisdiction based on the same grounds, which was heard at the time of trial.[6]

---

[3] Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 14-41 (Defendant's Third Amended Answer, referred to herein as simply the “**Answer**”). In its Answer, Anson asserted several affirmative defenses including equitable estoppel, fraud, and waiver. *See* Answer ¶¶ 26-27. However, Anson failed to preserve these claims/issues for trial in the Pretrial Order. *See* Joint Pretrial Order ¶¶ 1.1-23 (Defendant's Claims and Defenses), ¶¶ 3.1-14 (Contested Issues of Fact) and ¶¶ 4.1-44 (Contested Issues of Law) (omitting, in each instance any reference to the issue of estoppel, waiver, or fraud); *Arsement*, 400 F.3d at 245 (“It goes without saying that a pre-trial order controls the scope and course of trial; a claim or issue not included in the order is waived, unless presented without objection”).

[4] Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 42-79 (Anson's First Amended Counterclaim, referred to herein as simply the “**Counterclaim**”). Anson, in the Joint Pretrial Order submitted to this Court, has informed the Court that the allegations underlying its Answer and its Counterclaim are the same, and its counterclaims are “directly tied to whether or not Plaintiffs have a claim against the Debtor and the amount of such claim, if any” and are “all efforts to enforce the applicable provisions of the [Texas Business Organizations Code]” concerning withdrawal, redemption, and extinguishment of claims. *See* Joint Pretrial Order ¶ I.22.

[5] *See* Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 301 and 303. The orders were signed on June 18, 2021.

[6] *See* Docket No. 44 (Defendant's Plea to the Jurisdiction and Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1), referred to herein as simply the “**Motion to Dismiss**”); *see also* Docket No. 64 (Notice of Hearing) (setting the hearing on the motion to dismiss to be heard at the same time as the first day of trial in the adversary case).

3

FAM and Frazier have also filed a proof of claim in the Bankruptcy Case based on the claims asserted by FAM against Anson in this action.[7] Anson, in response, filed an objection asserting that the claim cannot be allowed because FAM is a withdrawn partner and because FAM's claims were extinguished as a result of its forfeiture.[8] Determination of the claim objection was consolidated with this adversary proceeding for trial.[9]

The Court conducted a four-day trial of the matter.[10] Having now considered Anson's Motion to Dismiss, FAM's Response,[11] FAM's Complaint, Anson's Answer, Anson's Counterclaim, FAM's Answer,[12] the parties' joint statement of stipulated facts,[13] the parties' other pretrial submissions,[14] the evidence introduced at trial,[15] and the representations and arguments of counsel, the Court issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[16]

---

[7] *See* Case No. 21-41517, Claim No. 21 (proof of claim).

[8] *See* Case No. 21-41517, Docket No. 234.

[9] *See* Case No. 21-41517, Docket No. 257.

[10] A hearing on the Motion to Dismiss was held on the first day of trial and taken under advisement at that time.

[11] Docket No. 48 (Request to Strike Defendant's Plea to the Jurisdiction and Motion to Dismiss Or, Alternatively, To Deny the Same); Docket No. 73 (Plaintiff's Supplement to Request to Strike Defendant's Plea to the Jurisdiction and Motion to Dismiss Or, Alternatively, To Deny the Same).

[12] *See* Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 8-11 (FAM and Frazier's Answer).

[13] *See* Joint Pretrial Order ¶¶ 2.1-25 (collectively, the "**Stipulated Facts**").

[14] *See* Docket Nos. 41 and 42.

[15] The Court will use "**PX**" to refer to Plaintiffs' exhibits, "**DX**" to refer to Defendant's exhibits, and "**DEFREB**" to refer to exhibits marked as rebuttal exhibits by Defendant.

[16] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

## JURISDICTION

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).[17] Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding is core in nature pursuant to 28 U.S.C. § 157(b)(2)(A)-(C).[18]

## FACTUAL BACKGROUND

As previously indicated, this adversary proceeding arises from the prepetition business relationship between FAM and Anson related to the Joint Venture. The Joint Venture was formed in 1996 by FAM and Jentex Financial, Inc. ("**Jentex**") to purchase land, develop it, sell it, owner-finance the sales, and service those loans (hereinafter referred to as "**JV Notes**"). Anson subsequently acquired Jentex's interest in the Joint Venture in 2014. At all times relevant to this dispute, FAM has been owned and controlled by Frazier and Anson has been owned and controlled by Michael Ferguson ("**Ferguson**").

### A.    *The Joint Venture Agreement*

On or about January 24, 1996, FAM and Jentex entered into a Joint Venture Agreement (the "**JV Agreement**") creating the Joint Venture for the sole purpose of purchasing, owning, managing, improving, and selling real property described in 127.21 Acres in Wise County, Texas.[19]

---

[17] The Court has previously addressed the issue of bankruptcy jurisdiction and determined that it had jurisdiction over this proceeding pursuant to 28 U.S.C. §1334 and that these claims were core matters. *See* Docket No. 23 (Order Denying Motion to Abstain and Remand). While Anson has filed a Motion to Dismiss Pursuant to 12(b)(1), the Motion to Dismiss principally challenges FAM's standing or capacity and does not challenge this Court's jurisdiction pursuant to 28 U.S.C. § 1334.  *See* Docket No. 44 (Motion to Dismiss); *see also* Docket No. 1 (Notice of Removal).

[18] To the extent any part of this proceeding would be considered non-core in nature within the meaning of 28 U.S.C. 157(b)(2), the parties have consented to the Court's entry of a final judgment in this adversary proceeding pursuant to 28 U.S.C. 157(c)(2).

[19] *See* PX 1 (the JV Agreement).

The purpose of the Joint Venture was subsequently expanded on or about February 15, 1998 from a single land project in Wise County to allow the Joint Venture to acquire additional land. Subsequently, on or about October 1, 1998, the JV Agreement was again amended to clarify the specific duties and obligations of the partners. Additionally, on or about April 27, 2000, FAM and Jentex executed an addendum to the JV Agreement that allowed either FAM or Jentex to sell or acquire property on behalf of the Joint Venture. The JV Agreement (including its written amendments) constitutes the only contract that existed between FAM and Jentex.[20]

The JV Agreement provides that "Joint Venturers will share equally in the duties of management of the Joint Venture property" with "[a]ll decisions affecting the Joint Venture or its business [to] be determined by a majority vote" of the Venturers.[21] The JV Agreement further assigns specific duties to each partner. FAM, based on its experience in land developments, coordinated the development and sale of the lots, while Jentex, based on its experience as a loan servicer, handled the JV finances and serviced the JV Notes.

Specifically, FAM's duties under the JV Agreement were to "[s]ell and market the tracts out of said land according to the pricing and terms agreed to by the Venture[r]s," to "[i]nstall the septic systems on each tract as needed at the lowest possible cost and at a price agreed to by both parties" with the cost borne by the Joint Venture, to "[o]verse the installation of a well on each of the tracts or arrange for a water system" at a price agreed to by both parties with the cost borne by the Joint Venture, to "[o]versee and maintain unsold tracts and keep them in a saleable condition," and to "[h]andle foreclosures and resales of foreclosed tracts."[22]

---

[20] *See* Joint Pretrial Order, Stipulated Facts ¶ 2.

[21] PX 1 (Second Amendment to Joint Venture Agreement, Article V).

[22] PX 1 (Second Amendment to Joint Venture Agreement, Article V).

Jentex's duties under the JV Agreement were to "[s]ervice all loans resulting from the sale of tracts out of the said land," to "[p]repare bi-monthly accounting to the Venturers," to "[p]repare year-end documents and financials," and to "[m]aintain a bank account for the Joint Venture and account monthly for all transactions."[23] The JV Agreement further provides that "[a]ccounts in the name of the Joint Venture shall be maintained in such bank or banks as the Joint Venturers shall from time to time select" with all money received on behalf of the Joint Venture to "be deposited to the credit of the Joint Venture on a timely basis" and "[a]ll checks drawn for more than $10,000.00 on any bank account…signed by both Joint Venturers."[24]

**B.      FAM's Tax Forfeitures**

During its time as a partner in the Joint Venture, FAM has had its corporate charter and privileges forfeited pursuant to section 171.309 of the Texas Tax Code on several occasions.[25] Specifically, FAM's corporate charter was forfeited in 1997, 2003, 2005, and 2013.[26] Following the 1997 and 2003 forfeitures, FAM had its charter reinstated or the forfeiture reversed within a month of the forfeiture.[27] However, after the 2005 forfeiture, FAM did not reinstate until 2011, over six years after its charter was forfeited.[28] FAM's charter and privileges were again forfeited on February 8, 2013, with FAM only reinstating in January 2017 after this lawsuit was filed.

During periods of forfeiture, FAM continued to do business and continued to operate the Joint Venture with Jentex. There is no evidence that FAM ever notified Jentex of its various tax

---

[23] PX 1 (Second Amendment to Joint Venture Agreement, Article V).

[24] PX 1 (Second Amendment to the Joint Venture Agreement, Article IX).

[25] DX 2, at p. 9.

[26] FAM also experienced tax forfeitures in 1993 and 1995. Both forfeitures were set aside within eight months of the forfeiture. *See* DX 2, at p. 9.

[27] The filing history introduced into evidence shows that FAM's 1997 forfeiture was reversed, as opposed to all other instances where the entity was simply reinstated. *See* DX 2, at p. 9.

[28] DX 2, at p. 9.

forfeitures or that Jentex viewed these forfeitures as events that terminated or breached the JV Agreement. Rather, the partners continued to operate and manage the Joint Venture as usual. Additionally, there is no evidence that FAM ever distributed its assets or otherwise wound down as an entity during any periods of forfeiture.[29]

## C.   *Operations of the Joint Venture From 1996 to 2014*

For nearly twenty years – from 1996 to 2014 – the Joint Venture, through its partners, acquired land, developed it into lots, sold the lots, owner-financed the sales, and serviced the resulting JV Notes.[30] There were approximately 120 residential lots in total, with buyers primarily using the lots for their mobile homes or manufactured homes.

At the outset of the Joint Venture, FAM completed the initial work to develop the lots by utilizing its employees and equipment to install water and electric lines and to pave driveways and roads.[31] FAM also purchased and arranged for the installation of septic systems on each lot at a price agreed upon by both partners.[32]

Additionally, FAM marketed and sold the lots for the Joint Venture at the prices, and on terms, agreed upon by the partners. FAM utilized sales representatives with whom Frazier had worked with on previous development projects,[33] with each sales representative receiving a

---

[29] Frazier testified at trial that FAM never distributed its assets or wound down.

[30] While the majority of lots were financed by the Joint Venture, there were several lots that were not owner-financed.

[31] FAM utilized its employees and equipment to perform this work (aside from the septic installation), with costs for materials paid by the Joint Venture pursuant to an oral agreement between the partners. Frazier testified that FAM and Jentex routinely made these types of operational decisions orally and that they were the types of decisions contemplated by Article V of the JV Agreement.

[32] Early on, Frazier also prepared the plans for the septic lines and performed routine inspections for two years after their installation, as he had the appropriate licensure at the outset of the Joint Venture. *See* DX 10.

[33] These sales representatives included Robert Wood and Dan Hedge. *See* PX 36. Robert Wood continued to sell lots for the Joint Venture after Anson became a partner in 2014. *See* DEFREB 2.

8

commission for each lot sold.[34] After a sales contract was executed by the buyer, either Jentex or FAM would review and sign off on the sale.[35] From 1996 to 2014, all closings were conducted by a title company at the expense of the Joint Venture. To ensure that the sales were closed on the terms and at the price agreed upon by both parties, Frazier would routinely send the closing documents to Jentex for its review and to ensure Jentex was in the loop regarding lot sales. FAM utilized SafeCo Title – which was owned by Basil Hoyl and Katie Frazier, Frazier's ex-wife – and Capital Title – which operated out of the same office as SafeCo and, later, FAM – to conduct the closings and to provide title insurance, with all associated costs paid for by the Joint Venture.[36] Frazier also received an $100 fee for each sale he closed with SafeCo or Capital Title, which he did not remit to the Joint Venture.[37]

By 2004, all of the lots had been sold to buyers. At various points throughout the Joint Venture's operations, lot buyers defaulted on their obligations under the JV Notes. While FAM's duties under the JV Agreement include handling foreclosures, FAM and Jentex orally agreed that FAM would only be responsible for posting the required notices and conducting the foreclosure sales.[38] Under this arrangement, Jentex would prepare notices of cure and notices of acceleration to the lot owners and, if the lot owner did not cure the default, would draft the necessary documents

---

[34] The commissions are typical in the industry and continued after Anson joined the Joint Venture in 2014. *See* DEFREB 2.

[35] *See* PX 36.

[36] The evidence admitted at trial shows that SafeCo performed closings for the Joint Venture from 1999 to 2004. *See* DEFREB 1. FAM also used Capital Title to conduct closings. *See* DEFREB 2. Anson has alleged that Capital Title was located in the same office building as SafeCo and that Capital Title later opened an office in the same building as FAM. *See* Counterclaim, at p. 49. However, there was no evidence or testimony at trial indicating that Capital Title was also owned or operated by Basil Hoyl and/or Katie Frazier.

[37] There was no evidence at trial as to whether Jentex was aware that FAM was receiving this referral fee.

[38] At trial, Frazier testified that this agreement did not alter his duties under the JV Agreement and that, in the absence of such an understanding, FAM remained responsible for all aspects of a foreclosure. It is not clear who handled the other aspects of the foreclosure and whether or how much they were paid. *See* DEFREB 1, at pp. 7-9.

to foreclose on the lot. Frazier's uncle, Alvin Miller, would then post the foreclosure notice and conduct a foreclosure sale for a fee of about $250.[39]

Following a foreclosure, FAM would maintain the lot until it was resold. Early on, FAM would mow the lots itself and clear lots of any debris or trash left behind. However, after several years, the partners agreed to hire subcontractors to perform this work.[40] FAM also inspected the septic system and arranged for any repairs that needed to be done to hook up the next mobile home.[41] Additionally, whenever there were issues related to the septic system or the water or electric hookup on the lots, lot owners would notify Jentex who would in turn notify FAM to address the issue.

During its time as a partner, Jentex primarily handled all things related to the Joint Venture's finances. At the outset, the Joint Venture obtained a $1,000,000 loan from Coselle – an entity controlled and owned by Jentex's principal, Jay Lesok—to acquire the land and pay for expenses associated with developing it for sale. In 1996, Mr. Lesok set up a bank account at Summit National Bank in the name of the Joint Venture, with Mr. Lesok and his wife, Barbara Lesok, listed as authorized signatories on the account.[42] Jentex maintained books for the Joint Venture and regularly accounted for all of the Joint Venture's transactions, maintaining a ledger of all income and expenses in QuickBooks. Jentex also utilized NoteSmith, a loan servicing software, to track the JV Notes and the payments made on the notes. Cashmere—which was also owned and

---

[39] See DEFREB 1, at pp. 7-9 (payment register showing checks written to Alvin Miller for posting and foreclosure).

[40] Frazier testified at trial that the partners agreed to hire a subcontractor to perform this work after several years, which is further supported by the payment records for the Joint Venture produced by Anson. See DEFREB 1, pp. 10-12 (showing payments to various independent contractors for clearing lots beginning in 2001 and for mowing lots beginning in 1999).

[41] Frazier testified that he performed these inspections himself for several years, as he was licensed to do septic work. However, he would use a septic company to install and repair the septic systems, with those costs borne by the Joint Venture.

[42] See DX 5 (identifying the Joint Venture as the account owner).

controlled by Mr. Lesok—serviced the JV Notes for Jentex at no expense to the Joint Venture.[43]

Cashmere collected payments on the JV Notes and, every two months, deposited the amounts it

received into the JV bank account at Summit Bank. All expenses and distributions were paid out

of the JV bank account, and Jentex would regularly provide FAM with bank statements for the

account upon request. Jentex also provided regular reporting in the form of bank statements,

reports showing the payments received on the JV Notes, and payment histories.

The Joint Venture did not make any distributions to the partners from 1996 to 2006. Rather,

all profits went to repay the loan from Coselle. After the Coselle loan was repaid, distributions

commenced. From 2007 to September 2014, each partner received approximately $187,000 in

distributions from the Joint Venture.

**D.    *Anson's Acquisition of Jentex's Interest and Changes Made Upon Takeover***

After nearly twenty years of operating the Joint Venture, Jentex decided to sell its

partnership interest to Anson. On or about September 5, 2014, a Bill of Sale and Business Purchase

Agreement were executed transferring Jentex's one half interest in the Joint Venture to Anson for

$325,000.00.[44] Anson had experience servicing loans and notes, and expressly agreed to assume

all of Jentex's duties under the JV Agreement, including the duty to service the JV Notes, to

maintain a bank account for the Joint Venture, to account for all JV transactions to the partners,

and to prepare accountings and reports.[45] However, shortly after taking over for Jentex, Anson

---

[43] The Joint Venture never paid Jentex or Cashmere a servicing fee to service the JV Notes. However, FAM and Jentex agreed that Jentex could keep any late fees collected from lot owners. *See* PX 6 (discussing Jentex's retention of any late fees).

[44] *See* DX 7.

[45] *See* DX 8 ("[Anson] will handle all of the Jentex duties set forth in the Joint Venture Agreement and subsequent amendments."); PX 2.

made several changes with respect to how it performed these duties and how it managed the Joint

Venture compared to Jentex.[46]

The most notable change relates to Anson's duty to maintain a bank account for the Joint

Venture. Shortly after taking over for Jentex, Anson decided to use its operating account for all JV

transactions rather than a separate JV bank account.[47] Whereas JV funds had previously been

deposited and maintained in a separate bank account in the Joint Venture's name, Anson deposited

the funds it received on account of the Joint Venture into the operating account it used to conduct

all of its business including the servicing of about 450 other loans.[48] Anson made this change

without FAM's knowledge or agreement, only informing FAM that it was not maintaining a

separate bank account in March 2015 after FAM had repeatedly requested access to bank

statements for the JV bank account.[49] FAM objected to Anson comingling JV funds with funds

from its other ventures,[50] and FAM requested that Anson timely deposit all JV funds into a separate

bank account in the Joint Venture's name as required by the JV Agreement.[51] Anson, however,

refused, and suggested that FAM could either accept that Anson would not use a separate bank

account or dissolve the partnership.[52]

---

[46] *See* PX 7, at p. 010920 (Ferguson stating that "I understand how you have done this with Jay Lesok but I do not wish to continue on the same path").

[47] After selling Jentex's JV interest to Anson in September 2014, Mr. Lesok closed the JV bank account at Summit Bank. Mr. Lesok mailed two checks to Ferguson, payable to the Joint Venture, for the balance of the funds in the JV bank account in the amount of $24,000 and for the amounts collected on the JV Notes from August and September 2014 in the amount of $11,094.21. *See* PX 11, at PL_Frazier 086-88. These checks were deposited in Anson's operating account. *See* PX 11, at PL_Frazier 089-90.

[48] *See* PX 7, at p. 010920 ("These loans will be serviced by Anson Financial, Inc. and there will not be a separate checking account. Anson Financial, Inc. services loans for many investors and all cash is deposited into and distributed out of an operating account."); *see also* PX 8, at p. 010929 ("We service over 450 loans and it is not worth the time or effort to just transfer the money from one account to the other.").

[49] *See* PX 7, at p. 010920.

[50] *See* PX 7, at p. 010919-20.

[51] *See* PX 9, at p. 010536.

[52] *See* PX 8, at p. 010929; PX 12, at p. 010934.

In addition to the change related to the JV bank account, Anson also stopped discussing JV expenses with FAM. Whereas Jentex would discuss expenses with FAM and obtain FAM's agreement before incurring new or large expenses on behalf of the Joint Venture,[53] Anson was unwilling to discuss expenses with FAM and began to incur new expenses on behalf of the Joint Venture without FAM's approval, such as those related to road repair.[54]

Anson also began to charge the Joint Venture a monthly loan servicing fee to service the JV Notes.[55] During the previous eighteen years of operation, Jentex was never paid a servicing fee by the Joint Venture. However, shortly after taking over for Jentex, Anson began to charge the Joint Venture a monthly servicing fee, which was calculated as 1% of the principal balance due on the JV Notes for the previous month.[56] Anson only informed FAM of these servicing fees in September 2016, nearly two years after it began charging the Joint Venture for this expense.[57] FAM

---

[53] Article IX of the JV Agreement specifically requires the signature or authorization of both partners for an expense that is greater than $10,000. *See* PX 1, at p. 12. Article V also generally charges both partners with managing JV property and provides that all decisions affecting the Joint Venture and its business be determined by a majority vote. *See* PX 1, at p. 11. Consistent with these provisions, prior to Anson's acquisition of Jentex's interest in the Joint Venture, Frazier and Mr. Lesok discussed expenses and both partners had to agree before a new expense (such as one not expressly provided for in the JV Agreement) or an expense greater than $10,000 were incurred.

[54] *See* PX 44, at p. 007192 (memorializing that the Joint Venture would pay NWT for costs associated with repairing septic systems on Lot 60); PX 8, at p. 010927.

[55] *See* PX 18, at p. 000527 (showing, in a report produced by Anson, servicing fees beginning in September 2014); *see also* PX 50 (AUP Report), at p. 6 (discussing the monthly servicing fee generally).

[56] *See* PX 50 (AUP Report), at p. 6 (explaining that the fee was calculated at "1% of the prior month's outstanding Mortgage Notes Receivable balance"). At trial, Ferguson testified that this servicing fee was typical of the fee charged by loan servicers within the industry. The servicing fee Anson received ranged from between $500 to $1,000 per month, for a total of $61,999.83 from September 2014 through March 2022. *See* PX 102 (showing servicing fees by month); *see also* PX 102, at p. 12522 (showing $2,042.82 in servicing fees for September through December 2014); PX 21 (showing $7,312.93 in servicing fees for 2015 and $11,352.57 for 2016); PX 20 (showing $10,596.17 in servicing fees for 2017); PX 75, at p. 012444 (showing $10,934.51 in servicing fees for 2018); PX 77 at 012452 (showing $8,671.97 in servicing fees for 2019); PX 79, at p. 012461 (showing $7,578.13 in servicing fees for 2020); PX 102, at pp. 012513-14 (showing $6,833.79 in servicing fees for 2021); PX 102, at p. 012523 (showing $1,622.20 in servicing fees for January to March 2022).

[57] In an email sent from Ferguson to Kathy Bond, who worked for Frazier and corresponded on his behalf, on March 27, 2015, Ferguson detailed how Anson intended to manage the Joint Venture and at no time did he indicate that Anson would be charging a monthly servicing fee. *See* PX 7, at p. 010920. Ferguson first raised Anson's receipt of a servicing fee in correspondence sent on September 30, 2016, telling FAM's counsel that he was "more than willing to continue to have Anson Financial, Inc. service the loans and mail a monthly statement along with a monthly check. However,

13

objected to Anson charging the Joint Venture a fee for servicing the JV Notes, reminding Anson that it had a duty to service the JV Notes and that it could not unilaterally charge the Joint Venture a fee for performing that duty.[58] Anson, however, continued to charge the Joint Venture a monthly servicing fee notwithstanding FAM's objection.[59]

Relatedly, Anson also made changes with respect to how it accounted for JV funds it received. Whereas Jentex maintained JV funds in a separate bank account with all expenses and distributions made out of that account, Anson simply tracked JV funds via QuickBooks and used "due to/due from" accounts in QuickBooks to show the amount of JV profits available for distribution to the partners.[60] While Jentex had provided FAM with bank account statements to verify the funds received and expended on behalf of the Joint Venture as well as funds available for distribution to the partners,[61] Anson refused to provide FAM with even redacted bank account statements thereby preventing FAM from verifying the numbers reported in QuickBooks or that Anson was actually holding the JV funds in its account like it said it was.[62] Instead, Anson told

---

the expenses of servicing the loans need to be taken into account." *See* PX 13. While the phrasing would suggest that a servicing fee would be paid going forward, Anson had been receiving a monthly servicing fee for nearly two years.

[58] *See* PX 15, at p. 010767; *see also* PX 1, at p. 6 ("The salary for the services of any Joint Venturer may be paid only when agreed upon by a majority (in ownership interest) of the Joint Venturers.").

[59] Anson stopped servicing the JV Notes itself around 2017, at which point AFI Loan Servicing, LLC began to service the JV Notes on Anson's behalf. While AFI Loan Servicing, LLC serviced the Notes, Ferguson testified that Anson continued to use its operating account for all JV transactions as this was the only account Anson used in relation to the Joint Venture. Anson's use of AFI Loan Servicing, LLC as the servicing entity mirrors Jentex's use of Coselle as the servicing entity. However, again, neither Jentex nor Coselle received a servicing fee from the Joint Venture. FAM does not appear to have objected to Anson using AFI Loan Servicing, LLC as the servicing agent. Rather, FAM objects to Anson charging a servicing fee. Since the bankruptcy filing, a different entity also controlled by Ferguson, AFI Management, has been servicing the JV Notes and has received a servicing fee for doing so. Notably, AFI Management has also been receiving and retaining all payments made on the JV Notes since the petition date. There was no evidence that AFI Management maintained a separate bank account for those funds.

[60] The due to/due from account were identified in QuickBooks as "AFI Payment" and "AFI Receivables," with AFI Payment reflecting the amount "due to" the Joint Venture. *See* PX 50 (AUP Report). Ferguson testified that this amount corresponded with JV profits, as it reflected the amount of funds collected on account of the Joint Venture minus any expenses or distribution.

[61] *See* PX 11, at p. PL_Frazier 091.

[62] *See* PX 12, at pp. 010934-35. At trial, Ferguson acknowledged that FAM had the right to access JV records, however, he maintained that FAM was not entitled to even redacted bank account statements because it was not a JV bank

FAM that it would provide it with monthly reporting to include a profit and loss statement, balance sheet, payment register, and a report from NoteSmith showing the payments received on JV Notes.[63]

In addition to the changes, Anson also failed to account monthly for all transactions and failed to provide accounting or reports in a timely manner. During its first six months as a partner, Anson did not provide any financial reporting to FAM. The reports were delayed, according to Ferguson, because the accounting had not been finalized or reconciled as Anson had been busy preparing and reconciling the accounts for its other business ventures.[64] In late March 2015—after multiple requests by FAM—Anson finally provided FAM with financial reports and an accounting for 2014 and for the first two months of 2015.[65] However, the accounting provided was incomplete and failed to include or identify expenses incurred by the Joint Venture during this time period.[66] Moreover, there are numerous discrepancies in the reports provided, with numbers changing from report to report without any apparent explanation.[67] Because Anson had not yet finalized the Joint Venture's books and accounting until March 2015, FAM also did not receive a distribution of profits until April 2015, at which point communications had broken down between the parties to the point where FAM did not accept the check. From April 2015 to September 2016, Anson failed to provide any monthly reports to FAM or make any distributions.

---

account. However, Ferguson did indicate that Anson's operating account was held by "Anson Financial, Inc. dba Alvord 287 JV." PX 11, at p. PL_Frazier 090.

[63] *See* PX 8, at p. 010924.

[64] *See* PX 7, at p. 010922.

[65] *See PX* 5; PX 8. At that time, Anson also provided profit and loss statements and balance sheets for January and February of 2015, HUD statements for sales closed by Ferguson, and tax statements from Wise and Denton Counties showing delinquent taxes.

[66] These accounting issues are discussed in greater detail in relation to the AUP.

[67] *Compare* PX 17 (showing, in a profit and loss statement generated 03/29/2015, $51,229.46 in Net Income for 2014) *with* PX 24 (showing, in a profit and loss statement generated 09/30/2016, $49,360.28 in Net Income for 2014); *see also* PX 19 and 22.

**E.**   ***Initial Communications and Communication Break
Down Between Anson and FAM in Early 2015***

Shortly after Anson acquired its interest in the Joint Venture, on or about September 9, 2014, Anson sent a letter notifying FAM of its purchase of Jentex's partnership interest.[68] In response, FAM sent a letter on or about September 18, 2014 seeking to confirm a few points with Anson regarding the JV Agreement.[69] Specifically, FAM sought to confirm that there would be two signers on the bank account for the Joint Venture, that both parties needed to sign any checks written from that account, and that both parties would agree before moving forward on any transactions. Additionally, FAM requested access to the JV bank account or its records as well as monthly reporting. Frazier further indicated that he was open to suggestions regarding the operations of the Joint Venture and suggested that the parties meet to discuss the Joint Venture sometime in the future.[70]  FAM did not receive a response.

In January 2015, FAM—after not receiving any reports or year-end financials[71]—started reaching out to Anson to request information concerning the payments received and expenses paid by the Joint Venture during the second half of 2014.[72] Specifically, on January 15, 2015, Kathy Bond—who worked for Frazier and corresponded on his behalf—requested JV bank account

---

[68] *See* DX 8.

[69] *See* PX 3.

[70] *See* PX 3.

[71] Jentex had provided financial reports and bank statements along with distribution checks twice a year, in July and December, to FAM. *See* PX 6. When FAM did not receive this information in December, FAM reached out.

[72] *See* PX 5, at p. 010918; PX 7, at p. 010922.

statements from the second half of 2014.[73] While Ferguson indicated that he would provide everything including a distribution check within the week,[74] Anson failed to do so.[75]

On February 26, 2015, FAM reiterated its request for the past due accounting for 2014, including the JV bank statements and monthly servicing reports for the JV Notes.[76] On March 25, 2015, Ms. Bond again requested that JV bank statements and information related to the payments received on the JV Notes be made available to FAM and informed Ferguson that she intended to pick up the documents from his office within the week.[77] However, Ferguson informed her that he was unable to provide the servicing reports or payment histories for the JV Notes as Anson was still working to finalize and reconcile the information.[78] When Ms. Bond followed up on March 26, 2015 requesting that Anson at least provide the bank account statements,[79] Ferguson made clear that, while Anson would be providing reports and financial statements to FAM, it would not be using a separate bank account for the Joint Venture and it would not provide FAM with bank statements for its account.[80]

---

[73] PX 5, at pp. 010917-18.

[74] PX 5, at p. 010917.

[75] *See* PX 5, at 010915.

[76] PX 6; *see* PX 5, at p. 010915 (email from Ms. Bond to Ferguson sent February 11, 2015).

[77] PX 7, at p. 010922.

[78] Ferguson indicated that these delays were primarily due to Anson's responsibility managing other companies in addition to the Joint Venture and its efforts to reconcile the accounting for those entities as well as the Joint Venture. Ferguson also indicated that property tax delinquencies on three of the lots had also contributed to the delay. *See* PX 7, at pp. 010920-22.

[79] PX 7, at p. 010921. In this email correspondence, Ms. Bond states that Frazier is very concerned regarding Anson's lack of communication and its refusal or inability to provide the requested documents, and further suggests that providing the bank statements would be a sign of good faith that Anson intended to work with FAM.

[80] Specifically, Anson stated that it would provide FAM with payment histories, monthly servicing reports, a balance sheet and income statement, invoices related to property taxes, and a distribution check. Anson further indicated that, going forward, it would provide monthly servicing reports and monthly distribution checks. PX 7, at p. 010920.

In response to Ms. Bond's request for bank statements as a sign of good faith that Anson intended to work with FAM, Ferguson made clear that, while he understood how Frazier had done things with Mr. Lesok, Anson would not continue on the same path.[81] Ferguson informed Ms. Bond and Frazier that he would not be using a separate bank account for the Joint Venture but rather intended to deposit and retain JV funds in its general operating account.[82] According to Anson, depositing the funds it received on account of the JV Notes into a separate bank account in the name of the Joint Venture was not worth the time or effort, as Anson serviced over 450 loans in total.[83] Moreover, Anson would not be distributing all profits to the partners, but rather would hold $33,000 in reserve to pay for certain future expenses the Joint Venture may incur.[84] Ferguson reiterated that he would provide the accounting and reports shortly, at which point in time Frazier could decide how he wanted to proceed.[85] If FAM was not satisfied with how Anson intended to operate the Joint Venture, then Ferguson indicated he would move to terminate the Joint Venture.[86]

FAM objected to Anson's changes related to the handling and use of the funds it received on account of the Joint Venture, expressing concern that Anson may be misappropriating money and demanding that Anson abide by the terms of the JV Agreement.[87] Moreover, FAM reiterated

---

[81] PX 7, at p. 010920.

[82] PX 7, at p. 010920.

[83] PX 8, at p. 010929.

[84] In his March 27, 2015, email, Ferguson indicated that he would keep a balance of $15,000 on the QuickBooks ledger for taxes and insurance on unsold lots. PX 7, at 010920. Subsequently, on March 29, 2015, Ferguson clarified that $10,000 would be reserved for sales expenses such as septic and road repairs and that $23,000 would be reserved for delinquent taxes on lots subject to JV Notes that would be repaid by lot owners if they failed to pay the taxes themselves. DX 10, at p. 2; *see also* PX 8, at p. 010929. Ultimately, Anson distributed the funds held in reserve for repairs.

[85] PX 7, at p. 010929.

[86] PX 7, at pp. 010920-21. Throughout his email correspondence with Ms. Bond, it is clear that Ferguson did not view Frazier as a partner with an equal say in the management of the Joint Venture but instead a passive investor. Ferguson was unwilling to communicate or cooperate with Frazier as a partner in the Joint Venture from the outset, as evidenced by his unilateral decision-making and his refusal to discuss any changes made.

[87] PX 7, at pp. 010919-20, 010930.

18

its concern over Anson's refusal to provide any financial documents to FAM despite multiple requests spanning several months.

Finally, on March 29, 2015, Anson finally provided financial reports and an accounting to FAM for 2014 and the first two months of 2015.[88] However, these reports did not alleviate FAM's concerns or objections. In a certified letter sent by Ms. Bond on March 31, 2015, FAM demanded that Anson deposit JV funds in a separate bank account in the name of the Joint Venture, that Anson stop distributing JV funds, and that Anson discuss bills and expenses with FAM before they were paid.[89] Anson refused this request, with Ferguson telling Ms. Bond that it was neither worth the time nor effort to maintain a separate bank account for the Joint Venture.[90] Rather than make biannual distributions or keep JV funds in a separate account, Anson intended to make monthly distributions to FAM and produce monthly statements showing expenses paid and payments received.[91] Anson reiterated its offer to dissolve the Joint Venture and split the assets and informed FAM that it otherwise intended to continue to manage the JV financials as it wanted.[92]

Around this time, FAM began to inquire about the funds held in the JV bank account maintained by Jentex.[93] Mr. Lesok informed Ms. Bond on April 3, 2015 that he had written checks out in the name of the Joint Venture for the funds held in the JV bank account at the time of the

---

[88] PX 8, at p. 010924. Specifically, Anson provided profit and loss statements, journal entries in the JV QuickBooks, a payment register and balance reports from NoteSmith, HUD statements for the 3 lots closed by Ferguson's law firm, and tax statements showing delinquent property taxes on lots subject to JV Notes. All of these reports—aside from the HUD Reports and tax statements—were generated by Anson. Anson did not provide any documentation to verify the numbers reported, such as copies of checks received, invoices paid, or bank statements.

[89] PX 8, at p. 010930.

[90] PX 8, at p. 010929.

[91] PX 8, at p. 010929.

[92] PX 8, at p. 010929; *see also* PX 11 (again "offering" to dissolve the partnership or to allow Anson to continue managing the JV funds as it said it would).

[93] PX 10, at p. 010932.

sale as well as for the funds collected but not yet deposited at the time of the sale.[94] The checks, which were provided by Ferguson, were made payable to the Joint Venture for the transfer of funds to a new JV account.[95] When asked whether the checks had been deposited into Anson's operating account, Ferguson stated that the operating account was held by Anson doing business as the Joint Venture and that, ultimately, it did not matter what account it had been deposited into because it had been accounted for in QuickBooks.[96] Ms. Bond, in response, indicated that, if the account was in the Joint Venture's name, then the statements should be provided to FAM and that FAM wanted verification for the journal entries.[97]

Concerned that Anson was misappropriating or stealing JV funds,[98] FAM began to demand verification to support the QuickBooks records it had been provided. On April 6, 2015, Ms. Bond reiterated her request to see copies of the bank statements from 2014 in order to verify the information they had been provided by Anson.[99] Anson, however, refused this request, telling Ms. Bond that "[w]hat you have is what you will get" and that if Frazier disagreed, he could pose a way to split the assets and collect his own payments on his JV Notes.[100] On April 6, 2015, Anson sent FAM a check in the amount of $12,500 for its half of the profit distributions due to the partners for January and February 2015.[101] However, Frazier tore up the check and returned it to Anson.[102]

---

[94] *Id.*

[95] *See* PX 11, at p. PL_Frazier 087-88.

[96] PX 11, at p. PL_Frazier 089.

[97] PX 11, at p. PL_Frazier 091.

[98] *See* PX 12, at p. 010937 (telling Ferguson that "[Frazier] thinks that you have been taking money from the joint venture.").

[99] PX 12, at p. 010935.

[100] PX 12, at p. 010934.

[101] *See* DX 11.

[102] *Id.* At trial, Frazier testified that he was concerned that accepting and depositing the distribution check would indicate his agreement with the changes that Anson made related to the JV funds.

By April 2015, communications had totally broken down between FAM and Anson. As these communications demonstrate, Ferguson was unwilling to discuss the operation or management of the Joint Venture with Frazier, seemingly viewing Frazier as an investor rather than a partner with equal say in how the Joint Venture was managed or operated.[103] After Frazier tore up and returned the distribution check in April 2015, Anson stopped making any distributions to FAM and did not provide any financial reports or accounting until September 2016.[104] Moreover, during this time frame, Anson did not update or maintain the JV books and accounting, which were kept in QuickBooks.[105]

### F.   Operation of the Joint Venture from April 2015 through September 2016

During and after the breakdown in communications between the partners, Anson and FAM continued to work together to resell approximately forty-three lots.[106] After the initial development, the Joint Venture sold 120 lots. However, due to a downturn in the market, many borrowers defaulted on their Note resulting in the foreclosure of lots.  At the time Anson joined the Joint Venture in September 2014, there were approximately forty-three lots that needed to be resold. While FAM's salespeople continued to sell the lots for the Joint Venture,[107] Anson became involved with closings, using Ferguson's law firm—J. Michael Ferguson, P.C.—to prepare the documents and perform closings rather than a title company. Frazier objected to this, as Ferguson did not obtain title insurance policies on the lots he closed. Additionally, Frazier objected to

---

[103] *See* PX 7, at p. 010920 (discussing how Anson serviced loans for its other investors).

[104] One of the demands made by FAM in the letter it sent on or about March 31, 2015 was that "[t]here will be no distributions to any partner." *See* PX 9.

[105] Anson did, however, seem to regularly update NoteSmith, the loan servicing software used to track payments on Notes and to generate statements to lot owners.

[106] *See* PX 13, at p. 000370.

[107] In a letter sent by Ferguson on behalf of Anson in September 2016, Ferguson acknowledges that Frazier's salespeople—namely Robert Wood and Dan Hedge—had done a great job in selling lots for the Joint Venture. PX 13, at p. 000370.

Anson's failure to communicate or provide FAM with any information related to the lots it was closing. In response, Ferguson told FAM that it could check the county records if it wanted to know which lots had been sold and closed through Ferguson's firm.[108]

In addition to closing lot sales, Anson also became involved in arranging for septic repairs. Before a lot was resold, the septic system would need to be inspected and repaired, with inspections and repairs typically occurring around the time lots were sold rather than at the time of foreclosure.[109] While FAM had previously arranged for these inspections and repairs, after Anson became a partner, it began to perform closings itself and began to arrange for septic repairs as well. In February 2015, Anson closed the sale of Lot 60 and arranged for NTW to repair the septic system on Lot 60 sale at the Joint Venture's expense.[110] Anson did not communicate with FAM regarding this sale, and at no time did it inform FAM that the septic system needed to be repaired or obtain FAM's consent for the price associated with the repair.[111] Rather than discussing the septic repairs with FAM, Anson simply informed FAM that it would hold $10,000 from JV profits in reserve for sales expenses that included septic repairs, indicating that one septic system needed

---

[108] *See* PX 7, at p. 010919. In a March 27, 2015, email, Ms. Bond stated that Anson "has lots for sale, that we have requested information about and you will not communicate with us." In response, Ferguson said that Frazier "can easily look at county records and see what has sold and what has not." On March 29, 2015, Ferguson did provide HUD statements for the lots that were closed by his law firm. *See* PX 8, at p. 010924.

[109] Under the sales contracts for the lots, the Joint Venture was responsible for installing a working septic system. The evidence in the record indicates that septic systems were inspected and repaired before closing, rather than immediately after foreclosure. *See* PX 44, at p. 007192 (confirming that the septic system would be repaired on Lot 60 in a letter dated February 6, 2015); PX 39, at p. 011014 (01/31/2016 billing statement from Ferguson's law firm billing $750 on 2/6/2015 for "doc prep/closing fee" associated with Lot 60).

[110] In a letter sent to the buyer of Lot 60 on February 6, 2015, Ferguson—as president of Anson, which was described as the "managing member" of the Joint Venture—confirmed that NTW would repair the septic system, and that all costs would be paid by the Joint Venture. *See* PX 44, at p. 007192.

[111] Anson only provided information related to the sales it closed on March 29, 2015, along with the other financial reporting. *See* PX 8, at p. 010924. Prior to that point, Anson told FAM to search county records if it wanted to know which lots had already sold. *See* PX 7, at p. 010919. The only communication from Anson around the time of the closing related to FAM's request for year-end reporting. *See* PX 5 (email correspondence in January and early February 2015).

22

to be repaired and that it would cost about $2,500.[112] Frazier indicated that he could assist with
repairs and provide Ferguson with the contact information for companies Frazier used who would
charge a lower rate.[113] While Ferguson thanked Frazier for the information, Ferguson indicated
that Anson would make the arrangements and did not need FAM's assistance.[114]

By September 2016, as a result of the efforts of both partners, all forty-three of the lots had
been resold.[115] As a result, the Joint Venture made more money than it had at the time Anson
acquired its interest.[116] However, during this time period—as the Joint Venture was incurring more
expenses related to sales and bringing in more revenue as a result of the lot sales—Anson did not
provide any financial reports or accounting to FAM and did not make any distributions to FAM.
In September 2016, after all lots had been resold, FAM again began to request information related
to the Joint Venture's finances.

## G.    *Resumption of Communications between Anson and FAM's Counsel in 2016*

On or about September 30, 2016, FAM—via its counsel, Kelly Gongloff—again reached
out to Anson to attempt to resolve the dispute regarding Anson's performance of its duties under
the terms of the JV Agreement and the changes it had made.[117] FAM reiterated its concern that
Anson was comingling JV funds in its operating account and that Anson was refusing to allow

---

[112] PX 8, at p. 010924.

[113] PX 8, at pp. 010927-28. In response, Ferguson indicated that Robert Wood—who had long worked to sell lots for
Frazier and his father—had already arranged to look at the septic systems.

[114] *See* PX 8, at p. 010927. In a letter sent on February 6, 2015, to the purchaser of a lot, Ferguson as president of
Anson stated that the Joint Venture would arrange for the septic system repairs and was responsible for all costs. In
this letter, Anson described itself as the managing member of the Joint Venture. *See* PX 44, at p. 007192.

[115] PX 13, at p. 000370.

[116] *Id.*

[117] *See* DX 12; *see also* PX 13. In his communications, Ferguson was hostile and, at times, inappropriate, repeatedly
calling Ms. Gongloff "unprofessional" and "irrational" for sending a demand letter and asking clarifying questions
regarding the information provided by Ferguson. *See* PX 16.

FAM access to statements to track the JV funds received, expended, or disbursed.[118] Based on these concerns and pursuant to the JV Agreement, FAM requested a certified bring-to-date accounting to verify the amounts reported as well as a check for the amounts due to FAM for JV profits.[119]

Shortly thereafter, on or about September 30, 2016, Anson provided FAM an accounting through 2015 for the Joint Venture and a check for $89,000 representing FAM's share of JV profits for 2014 and 2015.[120] However, Anson was unable to provide an accounting for the Joint Venture through September 2016 because it had not posted any payments or expenses from 2016 into the JV books maintained in QuickBooks.[121] Additionally, Anson refused FAM's request for a certified accounting to verify the amounts reported by Anson on the JV QuickBooks, telling FAM that it could mail letters to lot owners if it wanted to verify the pay histories and Note balances and view closing statements to verify the cash paid at closing.[122] While Ferguson indicated that Anson would be willing to continue to service the JV Notes and provide monthly servicing reports to FAM, Ferguson stated that the continuation of Anson as the servicing partner was dependent upon Anson receiving a monthly servicing fee for its work.[123]

---

[118] *See* DX12.

[119] *See* DX 12, at p.3.

[120] *See* PX 13.

[121] PX 13 (regarding payments not being posted); PX 14, at p. 7 (regarding expenses not being posted). The documents Anson provided as enclosures to the September 30, 2016, letter included a 2014-2015 Profit & Loss Statement, a 2015 Balance Sheet, and K1 Tax Forms from 2014 and 2015. *See* DX 13.

[122] *See* PX 14, at pp. 8-9.

[123] PX 13 ("…I am more than willing to continue to have Anson Financial, Inc. service the loans and mail a monthly statement along with a monthly check. However, the expenses of servicing the loans need to be taken into account."). As previously noted, Jentex did not charge or receive a servicing fee to service the JV Notes.

Thereafter, Ferguson provided a substantive response to FAM's demand letter.[124] Anson—in response to FAM's contention that Anson had acted contrary to the terms of the JV Agreement—suggested that FAM had breached the JV Agreement many years ago and continued to do so.[125] However, Ferguson did not specify how or when these breaches occurred. In addition, Ferguson noted his objection to Frazier making *any* demands of Anson related to how it chose to operate the Joint Venture.[126] Ferguson made clear that an agreement needed to be reached related to Anson's handling of JV funds and its servicing of the JV Notes, otherwise the partners needed to split the assets or terminate the Joint Venture. Based on the correspondence sent to Ms. Gongloff, it was clear by this point that Anson had no desire or interest in jointly managing the Joint Venture with FAM.[127] In Anson's view, FAM could either get on board with the changes or leave the Joint Venture.

---

[124] *See* PX 14, at p. PL_Frazier 002 (indicating Anson had sent a Fed Ex package containing the accounting that day); PX 14, at p. PL_Frazier 06 (stating that Anson would respond to Ms. Gongloff's demand letter the next day); PX 14, at p. PL_Frazier 003-004 (responding to the substance of the demand letter).

[125] PX 14, at p. 3-4 (stating that "[FAM] breached the agreement many years ago and continues to do so"). Based on the evidence before this Court, this is the first time that Anson mentioned a breach by FAM. *But see* PX 13, at p. 000370 (indicating that "Jay Lesok does not have the same take on what Brian's duties were or are now"). In subsequent email correspondence, Ferguson did provide further information related to this allegation, telling Ms. Gongloff that Frazier had refused to repair the septic systems on lots and to sell lots. *See* PX 16, at p. 010960; *but see* PX 13, at p. 000370 (stating that Frazier's salespeople—Robert Wood and Dan Hedge—had worked very hard to sell all the lots over the last 18 months and that the Joint Venture was now making a lot more money as a result of their efforts). When Ms. Gongloff asked why Anson purchased an interest in the Joint Venture if FAM had been in breach of the Agreement, Ferguson indicated that Mr. Lesok's poor health had necessitated the sale and that Anson acquired Jentex's interest irrespective of FAM's alleged breach.

[126] *See, e.g.,* PX 14, at p. PL_Frazier 003 ("Your client though, just makes demands but takes no responsibility for the present state this JV is in."); PX 14, at pp. PL_Frazier 038-39 (referring to demand letters and follow up emails from Ms. Gongloff as "threats" and stating that "I am not trying to threaten anyone, I am just saying that I have no desire to have our hands tied by an absentee owner who wants to set on the sidelines and tell everyone else how to conduct business…"); *see also* PX 44 (identifying Anson as the "managing member" of the Joint Venture as early as February 2015).

[127] *See, e.g.,* PX 14, at p. PL_Frazier 007 ("What I would appreciate is if you will look at your client a little. I don't know too many people that think you[r] client is easy to deal with. It might be better for all parties if we look for a solution instead of throwing rocks."); PX 14, at p. PL_Frazier 041 ("I have received another of your threatening emails and I am not really that concerned with what Brian expects... Since Brian takes no responsibilities in the company, he might not understand how it works."); PX 16, at p. 010961 ("You are unprofessional. I expect crap from Frazier because that is all he has done for years…Brian Frazier gets sued for taxes, he gets his investors sued, he doesn't protect the notes by advancing delinquent taxes, he doesn't honor agreements."); PX 16, at p. 010960 ("What I said about your client is public record so I think maybe you need to check yourself...You a[r]e just as irrational as your

On October 9, 2016, Ferguson provided additional financials for 2016 and further indicated that the remaining information and a distribution check would be provided within the week.[128] Ferguson indicated that, once that information was provided, FAM would have all the information it needed to determine whether it would agree with how Anson was operating the Joint Venture, would accept a buy-out offer, or agree to split the assets.[129] Shortly thereafter on October 11, 2016, Anson completed the bring to date accounting through September 2016.[130] Around this time— seemingly in response to FAM's request for invoices to verify expenses—Anson provided invoices generated by J. Michael Ferguson, P.C. and by Anson.[131] The statements—which were purportedly generated between January and October 2016[132]—included costs incurred by the Joint Venture from 2014 to date for legal work performed by Ferguson related to closings and foreclosures and for invoices paid to third parties by Ferguson or Anson, such as property taxes, septic repairs, and road repairs.

---

client if you really believe his obligations ended after developing the lots"). *See also* PX 44 (identifying Anson as the managing member of the Joint Venture as early as February 2015).

[128] PX 14, at pp. PL_Frazier at 038-39.

[129] *See* PX 14, at pp. PL_Frazier 038-39.

[130] *See* PX 14, at p. PL_Frazier 045.

[131] *See* PX 39 (J. Michael Ferguson, PC billing statements); PX 45 (Anson Financial, Inc. billing statements). At trial, Frazier and Ms. Gongloff both testified that these statements had been provided to FAM around October 2016 as verification for the expenses it paid to third parties on behalf of the Joint Venture.

[132] Based on the statements themselves, it is clear that the statements were generated around the time they were produced. By September 30, 2016, the Joint Venture owed J. Michael Ferguson, P.C. for work that it performed from September 2014 to date that was never billed to that point and totaled over $13,000. *See* PX 39, at p. 011032. The next statement issued to the Joint Venture dated October 9, 2016, shows that this balance had been cleared, although no payment is reflected in the billing statements. *See* PX 39, at p. 011079. Anson provided an invoice from Anson to the Joint Venture dated January 1, 2016, showing expenses it incurred on behalf of the Joint Venture as well as "management fees" for September 2014 to August 2016, with the Joint Venture at one point owing $34,000 and paying Anson over $32,000 toward the purported balance in June 2016. *See* PX 45, at p. 08857. The January 2016 statement also shows a balance owing as of August 31, 2016, of $22,407. *Id.* at p. 00861. On the statement dated September 30, 2016, Anson showed a past due balance of $22,407 and a payment of $29,500 made on September 14 and 15, 2016 resulting in an overpayment, with Anson owing the Joint Venture around $3500. *Id.* at pp. 00862-63.

In these October communications, Ferguson made clear that Anson had no interest in continuing as a partner with FAM unless FAM agreed to the changes Anson made, as Ferguson did not want his hands tied by Frazier in how he chose to manage the Joint Venture.[133] To that end, Anson offered $335,000 to buy out FAM's interest in the Joint Venture or, alternatively, to split the Joint Venture's assets with FAM picking the first JV Note and Anson picking the second JV Note until all JV Notes were taken.[134] However, Ms. Gongloff—who, in the absence of any records that could verify the expenses and income reported and based on the discrepancies in the reports themselves, was concerned as to the accuracy and completeness of the information made available to her—told Ferguson that she did not think she had enough information to adequately evaluate the offers made by Anson.[135]

Along with the bring-to-date accounting, Anson provided a distribution check in the amount of $35,000 for FAM's half of the JV profits from January through September 2016.[136] However, it was unclear how this figure was calculated. When Ms. Gongloff inquired about the $46,000 discrepancy between the reported JV profits of $116,000 and the distribution made—totaling $70,000 with FAM receiving $35,000—Ferguson accused her of being unprofessional and told her that it was for the installation of septic systems and taxes from 2016.[137] However, when Ms. Gongloff noted that these expenses had already been accounted for, Ferguson suggested that Ms. Gongloff simply did not understand the financial reports and further explained that the JV

---

[133] *See* PX 14, at pp. PL_Frazier 038 and PL_Frazier 045.

[134] PX 14.

[135] *See* PX 16.

[136] *See* PX 14, at p. PL_Frazier 045.

[137] *See* PX 16, at p. 010962.

profits were being reserved for future expenses that he anticipated the JV would incur.[138] Specifically, Ferguson indicated that he was only distributing $70,000 of the total JV profits, with the remainder reserved for future expenses including $10,000 for delinquent property taxes on lots and $25,000 for road and septic repairs.[139] There was no explanation provided as to the remaining $11,000 in JV profits not being distributed.

By this point, it was clear that the parties would be unable to resolve the disputes related to the operation and management of the Joint Venture, particularly as they relate to Anson's actions and decisions related to the servicing of the JV Notes and handling of JV funds. Ferguson responded to demand letters—which Ferguson characterized as threats—and requests for clarification or information with insults, suggesting that Ms. Gongloff was unprofessional, irrational, or unable to comprehend the reports provided.[140] Moreover, Frazier was dissatisfied with the options presented by Ferguson, as he wanted the Joint Venture to continue operating as it had with Jentex and was not interested in selling his interest or splitting the JV Notes. After FAM received the distribution check, FAM and Frazier filed suit.[141]

---

[138] *See* PX 16, at p. 010962 ("[Y]our client got 1/2 of the $70000 that was distributed and he will get more but we are reserving some for the large expense that have to be paid because I know Brian Frazier will not contribute any time or effort much less any money to this company.").

[139] *See* PX 16, at p. 010960. Anson, in 2015, had previously reserved JV profits in the amount of $23,000 for delinquent property taxes and $10,000 for septic repairs, with the reserve for septic ultimately being distributed to the partners. DX 10, at p. 2; *see also* PX 8, at p. 010929. The Court further notes that, while the Joint Venture was responsible for repairing the septic systems under the terms of lot purchase agreements, *see* PX 36 and PX 44, it was not responsible for road repairs. *See* PX 97 (notifying buyers that the roads were private).

[140] *See* PX 16.

[141] Ferguson even took issue with that, suggesting that FAM was unreasonable for filing a lawsuit instead of making a counteroffer on how to split Joint Venture assets. *See* PX 16, at p. 010960.

### H.  State Court Litigation

On November 7, 2016, FAM initiated the State Court Action against Anson.[142] In the Complaint, FAM sought a monetary judgment against Anson on its claims for breach of fiduciary duty, defalcation, breach of contract, and conversion.[143] FAM additionally requested an award of attorneys' fees pursuant to Chapters 37 and 38 of the Texas Civil Practice and Remedies Code and the JV Agreement, as well as an award of exemplary damages against Anson. At no time has either party requested to partition or otherwise terminate the Joint Venture.[144]

Subsequent to FAM filing suit, Anson discovered that FAM's corporate charter had been forfeited pursuant to the Tax Code for failure to pay franchise taxes.[145] After discovering this information, Ferguson formed a new entity using FAM's name, Frazier Asset Management, Inc., listing Ferguson as the sole director.[146] Then, on December 12, 2016, Anson filed a Plea in Abatement, which argued that FAM's claims had been extinguished as they had not been brought within three years of its tax forfeiture, and an Answer denying the claims and asserting various affirmative defenses.[147] On January 5, 2017, FAM reinstated its corporate charter and had its tax

---

[142] Joint Pretrial Order, at Stipulated Fact ¶ 2.13; see also Docket No. 26-2 (Live Pleadings and Orders from State Court). Subsequent to the filing, an amended complaint was filed adding Frazier as a party with Frazier asserting individual claims against Anson in the event a court found that FAM's reinstatement was ineffective such that FAM lacked capacity to maintain the suit itself.

[143] See Complaint. FAM further made a demand for an accounting and requested a writ of mandamus. However, as previously noted, FAM did not pursue those requests for relief at the time of trial. See Joint Pretrial Order. Therefore, in relation to the Complaint, the only claims asserted by FAM before this Court for determination are breach of fiduciary duty, defalcation, breach of contract and conversion.

[144] Docket 26-1 (State Court Docket Report). While Anson contends that FAM is not a partner, Anson maintains that the partnership continued after FAM's withdrawal and has not requested that the Court partition the Joint Venture.

[145] By November 10, 2016, Ferguson was aware that FAM had filed suit. See PX 16, at p. 010960. At trial, Ferguson testified that by November 14, 2016, he was aware that FAM's charter had been forfeited and that the forfeiture prompted him to form a new entity using FAM's name.

[146] PX 63. At trial, Ferguson testified that he created a new entity using FAM's name because he was concerned that someone would take the name and take action as a partner in the Joint Venture. However, this explanation is at odds with his position that FAM was a withdrawn partner without any power to act on behalf of the Joint Venture.

[147] See Docket No. 9-2 (Pleading Index), at pp. 2-5 (Defendant's Plea in Abatement).

forfeiture set aside.[148] FAM also amended its petition, adding Frazier as a plaintiff.[149] However, Anson maintained that the claims were extinguished and were not revived by FAM's subsequent reinstatement.

After the State Court Litigation was initiated, Anson made several distributions to the partners beginning in April 2017.[150] Anson distributed $80,000 to FAM via checks deposited into the court registry, which were remitted to FAM pursuant to a court order.[151] The last distribution was made in September 2017.[152] FAM has not received a distribution of JV profits since that time.

## I.    *Agreed Upon Procedures and Accounting Issues*

### 1.    *Appointment of an Auditor and Terms of the Engagement*

In response to FAM's request for an accounting made as part of its original complaint, the State Court entered an agreed order in October 2018 appointing an auditor to review the books and accounts of the Joint Venture from the time Anson became a partner through the date of the order, with all costs paid to be paid by the Joint Venture out of the JV funds.[153] The order was subsequently revised on January 18, 2019, naming Kent Ray of Milbern Ray & Company ("**Milbern Ray**") as the Court's Auditor and requiring that the parties provide the Auditor with any requested information within ten business days of the request being sent by the Auditor.[154] To

---

[148] *See* DX 2, at p. 7 (Application for Reinstatement and Request to Set Aside Tax Forfeiture dated 12/28/2016). Before it could be reinstated, FAM needed to file a Certificate of Amendment to change the name of the entity as a result of Ferguson incorporating FAM(2). FAM changed the entity name from Frazier Asset Management, Inc. to B. Frazier Management, Inc. *See* DX 2, at pp. 1-3; *see also id.* at p. 10 (correcting a scrivener's error).

[149] Frazier has asserted individual claims against Anson in the alternative as the successor-in-interest and the sole owner of FAM's rights and property in the event it was determined that FAM was legally terminated as a result of its tax forfeiture. *See* Complaint.

[150] *See* DX 24.

[151] *See* Docket No. 26-1 (State Court Docket Report); *see also* PX 50 (AUP Report), at p. 5.

[152] DX 24.

[153] *See* PX 41. As the Agreed Order states, the audit was not to be taxed as an expense to either party. In other words, the expenses related to the audit would not be recoverable as costs pursuant to Texas Rule of Civil Procedure 131.

[154] *See* PX 41 (Agreed Order Appointing Auditor); PX 42 (Order Appointing Alternate Auditor).

tailor the inquiry to the issues in the case and in an effort to save money, the parties agreed to engage Milbern Ray to perform a set of agreed upon procedures to the JV books and records rather than an audit.[155]

On February 4, 2019, Milbern Ray issued its engagement letter and the agreed upon procedures ("AUP"), which the parties later signed.[156] Anson and FAM agreed that Milbern Ray would, among other things: (1) agree cash receipts and disbursements—including notes receivables, loan payments, partner distributions, and expenses—to bank statements; (2) recalculate balances and activity in the Joint Venture's due to/due from account with Anson; (3) trace payments received on JV Notes to bank statements, agree payments received to note amortization table, and recalculate amounts due as of each year-end and as of October 2018; (4) agree all partner distributions to general ledger, check copies, and bank statements; (5) recalculate the loan service fee charged by Anson, (6) agree lot sales to fixed asset subledger and notes receivable; and (7) vouch expenses to supporting invoices and payments.[157]

Milbern Ray, as part of the engagement letter, also requested certain preliminary documents so it could perform the AUP as described.[158] Specifically, Milbern Ray requested: (1) the QuickBooks file for the Joint Venture, which contained the general ledger activity for all accounts including notes receivable from September 2014 through October 2018; (2) closing documents and HUD-1s for all lots sold; (3) loan agreements, amortization tables, and detail/support for

---

[155] At trial, Kyle Hendricks—a CPA at Milbern Ray who worked on the AUP—testified that the parties engaged Milbern Ray to perform an AUP rather than an audit in order to focus on specific issues related to the JV books and because the parties agreed upon certain balances as a starting point for the engagement. *See* PX 54. Mr. Hendricks explained that, in an AUP engagement, the CPA performs agreed upon procedures and issues a report detailing the factual findings made upon applying the procedures. *See* PX 53 (Engagement Letter); *see also* PX 50 (AUP Report).

[156] *See* PX 53 (Engagement Letter signed by Ferguson); PX 54 (Engagement Letter signed by Frazier).

[157] PX 53, at p. 4.

[158] PX 53, at p. 6.

payments received on notes receivable (i.e., JV Notes); (4) support for payments made to partners

for all distributions; (5) detail and support for transactions on the due to/due from accounts with

the Joint Venture on Anson's books including verification that monies went into the account,

including Anson's banks statements, if needed; and (6) support/detail for expenses incurred and

paid, including invoices and payment records for repairs, property taxes, closing costs, loan

servicing fees, professional fees, foreclosure expenses, mowing, and sales expenses.[159] In addition

to these preliminary documents requested, Milbern Ray also noted that the parties would be

responsible for providing it with access to all information that is relevant to the performance of

any of the agreed-upon procedures and any additional documents requested by Milbern Ray to

perform those procedures.[160]

### 2. Delays in Providing Records to Milbern Ray and Restrictions on Performance of the AUP

Anson, by and through Ferguson as its president, was responsible for maintaining and

keeping the financial records of the Joint Venture.[161] While the State Court's Order required that

the parties provide  Milbern Ray with documents requested within ten business days,[162] there were

certain documents that Anson was unable or unwilling to provide.[163] This resulted in a significant

delay, as Milbern Ray tried to gain an understanding of the books and accounts of the Joint Venture,

---

[159] PX 53, at p. 6.

[160] PX 53, at p. 2.

[161] *See* PX 50 (AUP Report); *see also* PX 1 (JV Agreement).

[162] The order required the parties to either provide the documents requested or to file a written objection. *See* PX 41 and PX 42. There is no record of any written objection being filed in the state court regarding the documents requested by Milbern Ray. *See* Docket No. 26-1 (State Court Docket Report).

[163] While Anson did provide documents to Milbern Ray in March 2019, the records provided were incomplete and did not include any supporting documentation for the figures reported. *See* PX 55, at p. 4 (discussing, in a letter sent from Ferguson to Mr. Hendricks, what was produced in March 2019).

and ultimately prevented Milbern Ray from performing the AUP as originally outlined in the engagement letter.

With respect to the documents requested, Anson was unwilling to provide bank statements for the account that held the JV funds. At the time Milbern Ray was engaged, it was aware that the Joint Venture did not have a separate bank account.[164] Even with that understanding, Anson agreed that Milbern Ray would "[a]gree cash receipts and disbursements to bank statement[s], if needed" and that it would provide "verification that [those] monies went into the account (i.e. bank statements, if needed."[165] Notwithstanding this agreement, Anson did not produce any bank account records, aside from a few statements for the account maintained by Jentex which was closed in 2014.[166] Rather, Ferguson informed Milbern Ray that there was no bank account maintained for the Joint Venture and that no cash balances existed in the name of the Joint Venture.[167] While FAM, by and through its counsel, objected to Anson not providing bank account records to Milbern Ray as part of the AUP, Kyle Hendricks testified that reviewing these records were beyond the scope of his engagement because, although Anson owed the JV money, it was his understanding that it did not actually hold JV funds.[168] Consequentially, Milbern Ray was only able to agree cash receipts and disbursements to bank statements for the first few months of 2014.

---

[164] As part of the documents requested, Milbern Ray requested "[d]etail and support for transaction on the Due to/From Account with Alvord on Anson's books," with Milbern Ray "[a]ssuming this would tie to cash per tax returns since no separate bank account exist for Alvord" and requesting that Anson "includ[e] verification that monies went into account (i.e. bank statements, if needed)." *See* PX 53, at p. 6.

[165] PX 53, at pp. 4 and 6.

[166] *See* PX 55, at p. 5.

[167] *See* PX 91, at p. 2 (Ferguson informed Kent Ray via email on 11/13/18 that "[n]o Bank account is kept for Alvord 287 specifically. Anson Financial, Inc…just accounts for the funds due Alvord 287 as a payable."); PX 55, at p. 5 (Ferguson informed Mr. Hendricks, in a letter sent on 09/16/19, that the due to/due from accounts "keep tract [*sic*] of what is available after expenses").

[168] Specifically, during his cross examination, Mr. Hendricks testified that the amounts due to the Joint Venture from Anson were a payable and that he was told by Ferguson that "*there were no cash balances that existed in the name of the JV.*" He further indicated that he did not ask Anson to provide the bank statements for its operating account because it would be like "if you hired me to review the books for your law firm, and someone owed you money, and I go

Additionally, Anson was unable to provide certain financial records related to the expenses incurred by the Joint Venture since it became a partner. First, Anson was not able to provide the general ledger activity for the Joint Venture from 2014 through 2018, as the QuickBooks file provided in March 2019 was incomplete and did not include any expenses—aside from Anson's loan servicing fee—incurred by the Joint Venture in 2018.[169] Anson ultimately provided five versions of QuickBooks to Milbern Ray over the course of their engagement, and the fifth version dated August 2, 2019 was used to perform the AUP.[170]  In addition to the incomplete QuickBooks file, Anson was also not able to provide supporting documents for expenses incurred by the Joint Venture.[171]

In June 2019, Anson provided supplemental documents to Milbern Ray—including an updated QuickBooks file containing expenses for 2018 along with supporting documents for some of the expenses—which allowed Milbern Ray to begin its work performing the AUP.[172] However, it quickly became clear that Milbern Ray would not be able to perform the AUP as outlined in the

---

'Okay, I want to see your bank statements.' I've got not purview to go over here and ask—even if it is a related party—to ask someone for their bank statements." In other words, Ferguson informed Mr. Hendricks that Anson did not hold JV funds in its bank account.

[169] *See* PX 55, at p. 4 (stating, in a letter from Ferguson to Mr. Hendricks, that he would not provide bank statements to verify expense items and that FAM's attorney, Caleb Moore, was playing games by asking Milbern Ray to require bank statements).

[170] PX 56.

[171] *See* PX 55 (discussing issues related to expenses and noting that not all expenses have supporting documents). At trial, Mr. Hendricks testified as to the lack of supporting documentation for invoices and indicated that, as of April 2019, he did not have any information related to expenses incurred in 2018. While some of this information was subsequently provided, Ferguson himself indicated that there were expenses for which he did not have the payment record or invoice for. *See* PX 55. Mr. Hendricks indicated that he was only able to perform the AUP once it was modified to not require him to vouch them to payment records and invoices. The Court notes that, in addition to any obligation Anson had to maintain these records under the JV Agreement, Anson also had an obligation to retain any invoices or payment records from December 2016 through the present due to the ongoing litigation related to these issues.

[172] *See* PX 56 (indicating, in a letter signed by Kent Ray, that all work performed on this engagement to date was on the 3rd version of QuickBooks dated 6/10/19). At trial, Mr. Hendricks testified that the first two versions of QuickBooks provided were incomplete as they did not include the 2018 expenses.

engagement letter based upon the books and records maintained and provided by Anson. The lack of supporting documents made it difficult to determine whether the expenses reported were actually incurred and paid for by the Joint Venture, preventing Milbern Ray from vouching the expenses reported as contemplated by the AUP. Even when there was supporting documents verifying an expense, Milbern Ray could not match it to the expenses reported in QuickBooks due to Anson's practice of "netting" expenses—entering only the net impact of a transaction rather than revenue and expenses—and making batch entries—including, for example, one entry made in October 2017 reflecting all expenses incurred in 2017—that were often not booked in the correct accounting period.[173]

The issues related to expenses significantly delayed Milbern Ray's performance of the AUP, with the State Court granting numerous requests to continue the trial setting to allow Milbern Ray to perform the AUP and issue a report.[174] In June 2019, Mr. Hendricks informed Ferguson of the exceptions he would report related to the expenses—as he was unable to vouch the majority of the expenses based on how they were entered and based on the documents that had been provided to support them—if he were to issue a report based on the information he had been provided, giving Ferguson the opportunity to respond and to provide additional support.[175] This prompted Ferguson, on June 30, 2019, to stop all work on the AUP as it sought to reorganize every transaction—unbundling expenses—entered into QuickBooks since the time Anson became a

---

[173] *See* PX 92 (discussing, in an email sent by Ferguson to Mr. Hendricks on 06/30/19, batch entries and netted entries).

[174] *See* PX 26-1 (State Court Docket Report).

[175] Mr. Hendricks indicated that he would not be able to vouch the majority of expenses to the invoices and payments due to how they were entered in QuickBooks (i.e. the netting of expenses and revenue, batch entries, and entries booked into a different time period than when they were incurred) and due to a lack of proper documentation. Unsupported entries ultimately impacted the due to/due from account and could result in a finding that the due to/due from account was understated. *See* PX 50 (AUP Report), at p. 2 (discussing the extent to which the due to/due from account was understated as a result of unsupported adjustments made in QuickBooks).

partner through October 2018.[176] On or about August 2, 2019, Anson provided the fifth and final version of QuickBooks to Milbern Ray, which was ultimately used to perform the AUP.[177]

However, even after the expenses were unbundled, issues remained. First, Mr. Hendricks indicated that he would not be able to complete the procedure related to vouching expenses based upon the documents he had been provided.[178] Moreover, in addition to unbundling the expenses, the fifth version of QuickBooks also included "adjusting" entries to agree the Profit and Loss Statements and Balance Sheets to prior tax returns.[179] Based on these changes, Mr. Hendricks advised the parties that the budget would need to be revised to account for the additional work that would be required to complete the AUP.[180] Alternatively, Mr. Hendricks suggested that the parties could agree to modify the AUP. However, absent an agreement on how to proceed forward, Milbern Ray indicated that it would terminate the engagement.[181]

Anson did not agree to any of the options identified by Milbern Ray. Ferguson argued that, since Milbern Ray had already done a significant portion of the work on the earlier version, very

---

[176] *See* PX 92.

[177] *See* PX 56.

[178] The AUP required Milbern Ray to vouch expenses entered into QuickBooks to invoices and payment records. However, Ferguson believed that other records—like historical billing, photos showing completed road repairs, Anson or JMFPC bills detailing expenses over a course of several years, emails, credit card charges, and potential liability facing the Joint Venture—were sufficient to verify and support an expense. *See* PX 55, at p. 2 ("It was not Milbern Ray's position to determine what is sufficient in verifying data" and that historical bills plus canceled checks should be sufficient to verify that an expenses was a valid expense of the Joint Venture); PX 55, at p. 3 (noting that emails and exposure to liability should also be used to verify the existence and validity of JV expenses). Additionally, as the engagement dragged on, the parties suggested that they agree to certain expenses—like HUD expenses detailed in an excel sheet. *See* PX 56 (discussing the HUD expenses and why modification would be required to use the sheet).

[179] *See* PX 55, at p. 9 ("Kyle can certainly state that I added $900 [to Interest Income]. I told Kyle when I unwound the expenses, I matched the P&L and Balance Sheet to the Tax Returns for 2014, 2015, 2016, and 2017. This is simply and [*sic*] adjustment made for that reason. I have attached the ledger that shows the adjustments made to match the tax returns.").

[180] *See* PX 56; PX 55.

[181] *See* PX 54, at p. 2 (noting that, if Milbern Ray was unable to complete any of the procedures, it would either note the restrictions or not issue a report and withdraw from the representation); *see also* PX 56.

little remained outstanding.[182] While Mr. Hendricks had indicated incomplete records and bundled expenses had significantly delayed the engagement, Ferguson argued that it had provided Milbern Ray the complete file in March 2019 and that Milbern Ray was in fact delaying the engagement by improperly expressing an opinion as to the state of the JV books.[183]

FAM worked with Anson to resolve issues that were holding up the issuance of an AUP report, particularly as it relates to expenses.[184] On September 18, 2019, a hearing was held to discuss the open issues related to the AUP, including the outstanding balance owed to Milbern Ray and possible revisions to the AUP related to expenses.[185] Following a hearing held on September 18, 2019, in order to have Milbern Ray finish the AUP and issue a report, FAM and Anson ultimately agreed to modify the terms of the AUP related to expenses.

On October 25, 2019, the parties agreed to Revised Agreed Upon Procedures to be applied by Milbern Ray.[186] Most notably, Milbern Ray was no longer to vouch expenses to the underlying supporting documents. Rather, it would agree HUD expenses reported in QuickBooks to a spreadsheet agreed upon by the parties as accurate, recalculate the servicing fee charged by Anson, verify the accrual entries posted, and verify that all other expenses tie to the due to/due from activity. Once the AUP was modified, Milbern Ray was able to perform the AUP and issued a report.

---

[182] This was notwithstanding the fact that Anson had made several entries beyond simply unbundling expenses to ensure that the QuickBooks balances matched what was reported in the tax returns, requiring Milbern Ray to redo much of the work that had already been completed for other procedures beyond expenses.

[183] *See* PX 55, at p. 1 ("[T]he sticking point has been Kyle Hendricks expressing his opinion on what are 'Best Accounting Procedures'…or how it is not good to bundle expenses."); PX 55, at p. 2 ("It was not Milbern Ray's position to determine what is sufficient in verifying data"); PX 55 at 10 (requesting that Mr. Hendricks simply review the expenses entered and indicate whether supporting documents were provided with "[n]o opinions, no resistance").

[184] For example, the parties agreed that Milbern Ray would tie the expenses from HUD statements to an excel spreadsheet rather than to the actual statements. *See* PX 56.

[185] *See* PX 56.

[186] *See* Docket No. 26-1 (State Court Docket Report); Docket No. 9-5, at pp. 366-67 (Revised AUP).

37

### 3.    *Issuance of the AUP Report and Findings*

On December 10, 2019, Milbern Ray issued its report (hereinafter, the AUP Report) detailing its factual findings after applying the modified AUP.[187] The AUP Report identifies the exceptions that were found for each agreed upon procedure.

First, Milbern Ray noted several exceptions when recalculating the balance of the due to/due from accounts and agreeing the activity in those accounts to underlying entries.[188] Notably, Milbern Ray found that Anson had booked multiple entries to adjust the balances in various accounts in order to make the QuickBooks file agree with prior tax returns. However, these entries—which were either unsupported or should not have impacted the balance of the due to/due from accounts—resulted in an understatement of the amount due to the Joint Venture by $42,078.12.[189] In addition, Milbern Ray found that Anson had failed to enter the non-cash portion of a foreclosure of a lot, overstating the balance of the due to/due from accounts by $28,476.[190] In sum, Milbern Ray found that the due to/due from accounts in QuickBooks were understated by $18,010.89.[191]

Second, Milbern Ray made several findings with respect to the JV Notes.[192] After agreeing the Mortgage Note Receivable and Unearned Mortgage Discount in QuickBooks to the NoteSmith report, Milbern Ray found that the balance on the notes receivable as of October 2018 was

---

[187] PX 50 (AUP Report).

[188] *See* PX 50 (AUP Report), at pp. 1-2. The Joint Venture's due to/due from accounts included the AFI Payments and AFI Receivables accounts, with AFI Payments reflecting the amount "due to" the Joint Venture from Anson. *See* PX 50 (AUP Report), at pp. 1-2, 9-10; *see also* PX 55, at p. 5 (describing the due to/due from accounts as how Anson tracked JV profits).

[189] PX 50 (AUP Report), at p. 2.

[190] PX 50 (AUP Report), at p. 3.

[191] PX 50 (AUP Report), at p. 3.

[192] PX 50 (AUP Report), at pp. 3-4.

$900,190 and the unearned balance was $618,134.[193] Additionally, Milbern Ray noted that Anson had—in addition to the servicing fee it charged to the Joint Venture—collected and retained $10,770 in late fees and $3,985 in servicing fees charged directly to lot owners.[194] These funds, which were collected with part of the loan payment received by Anson on account of the Joint Venture, were held by Anson and not booked into the QuickBooks for the Joint Venture.[195]

Third, Milbern Ray agreed the entries for partner distributions to payments made to the partners and noted no exceptions.[196] From September 2014 through October 2018, $446,000 in partner distributions were recorded in QuickBooks.[197] Milbern Ray agreed the entries for FAM's distributions, which totaled $223,000, to entries that lowered the amount due from Anson to the Joint Venture and to checks that FAM received and deposited. Milbern Ray also agreed the entries for Anson's distributions, which also totaled $223,000, to entries that lowered the amount due from Anson to the Joint Venture. However, it did not review any checks because the distributions were simply a bookkeeping entry, as the cash was already in Anson's possession.

Finally, Milbern Ray made several findings in relation to the expenses reported in the books and accounts of the Joint Venture maintained by Anson in QuickBooks. For the HUD related

---

[193] The balances reported in QuickBooks were overstated, however, much of that overstatement was due to the failure to remove the foreclosed lot previously discussed. *See* PX 50 (AUP Report), at p. 4. The balance of the JV Notes were recorded in QuickBooks as Mortgage Notes Receivable with interest recorded as Unearned Mortgage Discount.

[194] PX 50 (AUP Report), at p. 4.

[195] PX 50 (AUP Report), at p. 4. The Court notes that, when Jentex was a partner, FAM agreed that Jentex could retain late fees that it received from lot owners in lieu of charging the Joint Venture a servicing fee. However, Frazier indicated that he never discussed Anson retaining late fees and that FAM did not agree to the retention of these fees, particularly given the fact that Anson was also charging the Joint Venture a servicing fee.

[196] PX 50 (AUP Report), at p. 5.

[197] *See* PX 50 (AUP Report), at p. 6. Per the Revised AUP, Milbern Ray would agree lot sales and HUD expenses to a spreadsheet created by Anson which was stipulated to by both parties rather than to the underlying documents. *See* Docket No. 9-5, at pp. 366-67 (Revised AUP). Ferguson has subsequentially objected to the failure to address a $28,000 discrepancy between HUD statements for closings performed by FAM and the QuickBooks. However, as Mr. Hendricks testified at trial, the AUP Report did not address this discrepancy because he was working off of the spreadsheet and not the HUD statements themselves.

expenses, Milbern Ray noted several minor discrepancies between the HUD-related expenses reported in QuickBooks and the HUD-related expenses recorded in the spreadsheet provided by Anson and agreed upon by the parties.[198] Milbern Ray also recalculated the servicing fee charged by Anson, with only one minor exception noted.[199] Additionally, Milbern Ray verified that accrual entries were posted to Balance Sheet accrual accounts, noting reserve accounts as of October 2018 including: $10,000 for delinquent taxes; $50,000 for road repairs, and $45,000 for septic repairs.[200] As it relates to other expenses, Milbern Ray did not vouch expenses to supporting documents but rather simply verified that all other expenses tied to the due to/due from account, with no major exceptions noted.[201]

The only limitation on the performance of Milbern Ray's engagement noted on the AUP Report relates to Anson's refusal to provide written representations regarding the information it supplied.[202] At the end of its engagement and before it issued the AUP Report, Milbern Ray required that Anson—as the party responsible for the JV financial records—provide a written representation confirming that the QuickBooks file provided accurately reflected the financial accounts for the Joint Venture from 2014-2018 and that Anson had provided Milbern Ray with access to all records relevant to the Joint Venture and the AUP.[203] However, Ferguson refused to

---

[198] PX 50 (AUP Report), at p. 6. Mr. Hendricks testified, and the AUP Report states, that these timing differences did not impact the balances of the due to/due from accounts as they worked themselves out over time.

[199] PX 50 (AUP Report), at p. 6.

[200] PX 50 (AUP Report), at p. 6.

[201] PX 50 (AUP Report), at p. 7. Milbern Ray did note that $44,151 in expenses were booked to an account payable for Ferguson's law firm, which was used to pay invoices generated by Ferguson's law firm. There was nothing improper regarding how these entries were booked, and they ultimately cleared out to one of the due to/due from accounts. *Id.*

[202] PX 50 (AUP Report), at pp. 7-8. Written representations are required under the standards established by the American Institute of Certified Public Accountants for AUP engagements. *Id.* at 7. This requirement was also set forth in Milbern Ray's engagement letter. *See* PX 54, at p. 2. Mr. Hendricks testified that Anson's failure to provide written representations constituted a limitation on the performance of the AUP.

[203] PX 50 (AUP Report).

do so.[204] No other limitations or restrictions were noted regarding Milbern Ray's ability to perform

the AUP.

**J.      *Anson's Pleas to the Jurisdiction and Subsequent
Mandamus Proceedings in the State Court Action***

During the course of the State Court Action, Anson raised several arguments challenging

FAM's ability to pursue claims against Anson based on its February 2013 tax forfeiture, filing over

a dozen motions attempting to dismiss the case on that ground.[205] At the outset of the State Court

Action, in December 2016, Anson filed its Original Plea in Abatement where it argued that FAM's

claims were extinguished as a matter of law because FAM failed to reinstate its corporate charter

within the three-year survival statute found in §11.359(a) of the Texas Business Organizations

Code.[206]

Beginning in April 2019, Anson also began to argue that, upon its 2013 tax forfeiture, FAM

was a withdrawn partner and that FAM's JV interest was automatically redeemed by the Joint

Venture as of that date.[207] As a result, Anson argued that FAM was only entitled to the redemption

value of its JV interest. On April 24, 2019, Anson sent a "Full Satisfaction Notice" offering to pay

---

[204] PX 50 (AUP Report), at p. 8. At trial, Ferguson testified that he did not provide a written attestation because he did not agree with the findings outlined in the AUP Report. However, the attestations requested did not ask whether Ferguson agreed with the AUP Reports findings, but rather whether the JV financial records provided were complete and accurate.

[205] *See* Docket No. 26-1 (State Court Docket Report). This includes the plea in abatement, the pleas to the jurisdiction, and the summary judgment motions filed in the State Court Action. The specific motions can be found in the pleading index filed in this case at Docket No. 9-1 through 9-7.

[206] *See* Docket No. 26-2 (Live Pleadings and Orders from State Court); Docket No. 9-2 (Pleading Index), at pp. 2-5 (Defendant's Plea in Abatement).

[207] Anson relies on §152.501(b)(8) of the TBOC, which provides that the termination of a partner's existence is an event of withdrawal, and §152.601-.602, which provides that the interest of a withdrawing partner must be redeemed at fair market value or, if wrongful, liquidation value. *See, e.g.,* DX 25 (Full Satisfaction Notice).

FAM $105,900—calculated as $325,000 minus any amounts FAM received as distributions and Anson's costs and attorney's fees—to satisfy its obligation to redeem FAM's JV interest.[208]

Shortly thereafter, on April 29, 2019, Anson filed its Counterclaim against FAM, asserting claims for declaratory judgment, breach of fiduciary duty, and breach of the JV Agreement related to FAM's tax forfeiture.[209] Anson sought a declaratory judgment stating that FAM wrongfully withdrew upon its 2013 tax forfeiture and that its JV interest was automatically redeemed by the Joint Venture. Anson further alleged that FAM was liable to Anson for its wrongful withdrawal, and that FAM breached the JV Agreement by withdrawing. Anson also brought a breach of fiduciary duty claim based upon FAM's wrongful withdrawal and refusal to negotiate the redemption value of its JV interest in good faith. Anson did not seek any compensatory damages but did request an award of fees and costs as well as an order limiting FAM's damages to the redemption value of its JV interest, minus any damages caused by FAM's wrongful withdrawal. Plaintiffs filed an Answer on May 10, 2019, denying all claims and asserting a number of affirmative defenses including agreement and waiver, estoppel, and latches.[210]

Anson additionally raised the issue of withdrawal, redemption, and extinguishment in its October 2019 Plea to the Jurisdiction.[211] In the motion, Anson challenged the subject matter jurisdiction of the State Court based upon FAM's tax forfeiture. Specifically, Anson argued FAM lacked standing to assert any claims against Anson because the only interest FAM held in the Joint Venture at the time of its termination was the right to redeem the value of its JV interest.

---

[208] *See* DX 25 (Full Satisfaction Notice).

[209] Docket No. 26-1 (State Court Docket Report); Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 42-79 (Anson's First Amended Counterclaim, which has been previously defined as the "Counterclaim").

[210] *See* Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 8-11 (FAM and Frazier's Answer).

[211] Docket No. 9-5 (Pleading Index), at pp. 192-202 (Defendant's Plea to the Jurisdiction).

Additionally, Anson argued that FAM lacked standing or capacity to bring suit because its existence had been terminated and its corporate status was not reinstated within three years.[212] The State Court, following a hearing on the matter, denied the plea to the jurisdiction.[213]

Shortly thereafter, Anson informed the Court of its intent to seek appellate review of the Court's determination related to the issues of withdrawal and extinguishment. On January 23, 2020, Anson filed a petition for writ of mandamus in the Second Court of Appeals.[214] The Second Court of Appeals, after reviewing Anson's petition, requested that FAM file a response.[215] Thereafter, the Second Court of Appeals requested that both parties provide supplemental briefing on specific issues concerning the tax forfeiture, automatic withdrawal, and extinguishment of claims. On May 20, 2020, the Second Court of Appeals issued a memorandum opinion denying Anson's petition for writ of mandamus.[216] Anson promptly filed a petition for writ of mandamus with the Supreme Court of Texas, which was denied in August 2020.[217]

### K.  *Bank Account Records and Other Litigation Involving Anson*

Throughout the course of the litigation in State Court, FAM has requested that Anson provide bank statements for the account holding JV funds. During the course of the AUP, FAM requested that Anson provide bank statements to Milbern Ray.[218] Additionally, FAM filed several

---

[212] Under § 11.356 of the TBOC, a terminated filing entity's existence continues for the purpose of: (1) prosecuting or defending a claim in the entity's name and (2) permitting the survival of an existing claim by the terminated filing entity until the third anniversary of the effective date of its termination.

[213] *See* Docket No 26-2 (Live Pleadings and Orders from State Court), at p. 268.

[214] *See* Docket No 9-7, at pp. 7-8 (Notice of Filing).

[215] According to the Texas Rules of Appellate Procedures, appellate courts must request that a response be filed if it has a serious question concerning the relief requiring further consideration. *See* Tex. R. App. P. 52.8(9).

[216] *See* Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 276-77 ("The court…is of the opinion that relief should be denied. Accordingly, relator's petition for writ of mandamus is denied).

[217] *See* Docket No. 26-2 (Live Pleadings and Orders from State Court), at p. 278 ("Today the Supreme Court of Texas denied the petition for writ of mandamus in [Case No. 20-0410]."). Anson also filed a request for rehearing, which was denied on October 16, 2020. *See* Docket No. 26-1 (State Court Docket Report).

[218] *See* PX 56.

43

motions to compel the inspection or production of bank records, which were never ruled upon by the State Court.[219] These motions were opposed by Anson, who maintained that its operating account had nothing to do with the Joint Venture and were not discoverable.

In early 2021, FAM was provided bank statements for Anson's general operating account from Ian Ghrist. Mr. Ghrist was employed by Ferguson's law firm at the time Anson acquired its interest in the Joint Venture and provided legal services to Anson related to the Joint Venture during that time.[220] Subsequent to his employment, a dispute arose between Mr. Ghrist and Ferguson, resulting in litigation between Mr. Ghrist and Anson that has spanned multiple years up through the time of the bankruptcy filing in this case. In the initial litigation between Mr. Ghrist and Anson, Mr. Ghrist was represented by attorney Caleb Moore. Subsequently, FAM hired Mr. Moore as its trial counsel in this litigation. During the course of the litigation between Mr. Ghrist and Anson, Mr. Ghrist issued a subpoena to Chase Bank for the production of bank statements, with over 18,000 pages of documents ultimately produced.[221] Mr. Ghrist voluntarily provided these documents to Mr. Moore—who, at that time, was no longer representing Mr. Ghrist in that matter—in the same form as produced by Chase Bank for use in this case.[222] Shortly thereafter, Mr. Moore notified Anson that he obtained these records under the doctrine of shared discovery and that he intended to use them in relation to these proceedings.[223] FAM also filed a motion to

---

[219] *See* Docket No. 26-1 (State Court Docket Report). The docket reflects that a motion to compel was filed in September and November 2019. In December 2019, the State Court heard arguments on the motion to compel, but did not rule on the motion, as shortly thereafter, Anson filed a petition for writ of mandamus which effectively put the case on ice for most of 2020.

[220] *See* Docket No. 61 (Transcript of Hearing and Oral Ruling on Motion to Disqualify).

[221] Ferguson and Anson filed a motion to quash in that proceeding, which was denied.

[222] *See* Docket No. 61 (Transcript of Hearing and Oral Ruling on Motion to Disqualify), at pp. 101-102.

[223] At no time did Anson or Ferguson obtain an order from the relevant state court limiting Mr. Ghrist's disclosure of these records. *See* Docket No. 61, at p. 102. This Court, however, has subsequently entered a protective order which restricts Mr. Moore from disclosing the records due to concerns raised related to the sensitive information contained therein.

44

compel requesting that the State Court compel Anson to supplement its discovery responses and to authenticate the bank statements provided by Chase Bank, which the Court granted in part to require Anson to supplement its discovery responses.[224]

Upon learning that Mr. Moore had received copies of its bank statements, Anson filed a motion to disqualify Mr. Moore from representing FAM. Anson had previously moved to disqualify Mr. Moore based upon his relationship with Mr. Ghrist, which was denied by the state court.[225] In its April 2021 Motion to Disqualify, Anson argued that Mr. Moore conspired with Mr. Ghrist against Anson to unlawfully obtain the bank statements and that Mr. Moore's use and possession of the Chase Bank records was illegal and unethical.[226] However, Mr. Moore argued that he obtained the bank statements lawfully, as they had been produced by Chase Bank pursuant to a validly issued subpoena and were provided to Mr. Moore under the doctrine of shared discovery. The State Court, based upon the motion and arguments of the parties, denied Anson's motion and permitted Mr. Moore to continue as FAM's counsel in the case.[227]

Around this same time, Anson also sued Mr. Moore and his law firm for civil conspiracy based on substantially similar allegations as those raised in the disqualification motion.[228] Anson alleged that Mr. Moore and Mr. Ghrist had conspired together to harm Anson, with Mr. Ghrist

---

[224] *See* Docket No. 26-1 (State Court Docket Report).

[225] *See* Docket No. 26-1 (State Court Docket Report); Docket No. 9-2, at pp. 689-99 (5/2/18 Motion to Disqualify); *Id.* at p. 795 (5/25/18 Order Denying Anson's Motion to Disqualify Caleb Moore); Docket No. 9-3, at pp. 70-79 (2/25/19 Amd. Motion to Disqualify).

[226] Docket No. 9-7, at pp. 315-19 (Defendant's Motion to Disqualify). In the motion, Anson argues that Mr. Moore, by receiving documents produced via a valid subpoena, committed the federal crime of obtaining customer information under false pretenses. He further accused Mr. Moore of violating the rules of professional responsibility.

[227] Docket No. 9-7, at p. 458 (Order Denying Anson's April 14, 2021, Motion to Disqualify Caleb Moore).

[228] Anson had previously sought leave from the State Court to file a third-party petition against Mr. Moore based upon similar allegations that Mr. Moore was conspiring with Mr. Ghrist. However, the State Court denied the motion. *See* Docket No. 9-2 (Pleading Index), at pp. 984-85 (Defendant's Motion for Leave to File Third Party Petition); Docket No. 9-3, at p. 68 (Order Denying Defendant's Motion for Leave).

45

allegedly ghostwriting several pleadings in this case and obtaining bank records for Mr. Moore to use against Anson. Ultimately, the lawsuit was dismissed and Anson was ordered to pay an award of $50,610 in attorney's fees to Mr. Moore, which Anson paid for using JV funds.[229]

## L.    Lead up to Bankruptcy Filing

By Spring 2021, the State Court Action appeared ready to proceed to a jury trial.[230] In April 2021, Anson was ordered to supplement its responses to discovery and to supplement its production of JV financial records to include records from the time period from December 2018 through April 2021.[231] Thereafter, the State Court entered an order setting the case for trial beginning June 28, 2021.[232]

In response, Anson began to file a flurry of motions that sought to relitigate issues that had previously been addressed by the State Court, seemingly in an attempt to delay trial.[233] On May 21, 2021, Anson filed another summary judgment motion based on withdrawal and redemption, notwithstanding the State Court's prior order denying summary judgment on those grounds in 2019.[234] Similarly, on May 26, 2021, Anson moved to dismiss Plaintiff's conversion claim, raising

---

[229] While the Joint Venture was not a party to this lawsuit, Ferguson testified that he believed the attorney fee award was a JV expense because the alleged wrongful conduct underlying the complaint—namely, that Mr. Ghrist ghost wrote the Complaint and that Mr. Moore conspired with Mr. Ghrist to obtain Anson's bank records—was connected to this lawsuit and therefore connected to the Joint Venture.

[230] *See* Docket No. 9-7, at pp. 144-45 (Amended Agreed Scheduling Order).

[231] *See* Docket No. 9-7, at p. 345 (Order Granting in Part Plaintiff's Motion to Compel).

[232] *See* Docket No. 9-7, at pp. 349-54 (Plaintiff's Motion for Continuance of Trial Setting Specially Set for May 3, 2021); Docket No. 9-7, at p. 307 (Order Granting Plaintiff's Motion for Continuance).

[233] These motions—all of which seek dispositive relief—were all filed over a month after the deadline for filing dispositive motions. *See* Docket No. 9-7, at pp. 144-45 (Amended Agreed Scheduling Order) (setting a 4/2/21 deadline for the filing of dispositive motions).

[234] Docket No. 9-7, at pp. 600-05 (Defendant's Motion for Summary Judgment based on Automatic Withdrawal and Redemption filed 5/21/21). Anson had previously filed a motion for summary judgment on these grounds, which the State Court denied in 2019. *See* Docket No. 9-4, at pp. 244-83 (Defendant's Traditional Motion for Partial Summary Judgment filed 5/8/19); Docket No. 26-2 (Live Pleadings and Orders from State Court), at p. 266 (Order Denying Defendant's Traditional Motion for Partial Summary Judgment).

issues that had previously been raised via special exception and ruled upon by the State Court.[235]

Both motions were denied.[236]

Thereafter, Anson again filed pleas to the jurisdiction, arguing that the State Court lacked subject matter jurisdiction based upon FAM's withdrawal from the Joint Venture and the extinguishment of its claims.[237] Anson did not raise any new grounds or facts to support the relief requested, but instead reiterated the same arguments that it had raised in October 2019 which were denied by the State Court and fully briefed as part of the subsequent mandamus proceedings.[238] On June 18, 2019, the State Court, after conducting a hearing on the matter, entered an order denying the pleas to the jurisdiction.[239] In response, Anson moved to continue the June 28 trial setting in order to seek further appellate review of these issues via mandamus proceedings or an interlocutory appeal.[240] The State Court, however, denied both requests and indicated that the case would proceed to trial on June 28, 2021 as scheduled.[241]

---

[235] *See* Docket No. 9-7, at pp. 610-13 (Defendant's Brief in Support of Entry of Order Striking Conversion Claim). These issues had previously been raised via special exception and were resolved by an order entered on May 15, 2019, pursuant to which FAM agreed to replead its conversion claim. *See* Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 245-48 (Order on Defendant Anson Financial, Inc.'s Special Exceptions).

[236] Docket No. 26-2 (Live Pleadings and Orders from State Court), at p. 299 (Order Denying Defendant's Motion for Entry of Order Striking Conversion Claim).

[237] Docket No. 9-7, at pp. 620-30 (Defendant's Plea to the Jurisdiction Based on Extinguished Claims filed 5/26/21) and Docket No. 9-7, at pp. 670-76 (Defendant's Plea to the Jurisdiction Based on Automatic Withdrawal and Redemption filed 5/26/21).

[238] *Compare* Docket No. 9-5, at pp. 192-201 (Plea to the Jurisdiction filed 10/9/2019) *with* Docket No. 9-7, at pp. 620-30 (Defendant's Plea to the Jurisdiction Based on Extinguished Claims filed 5/26/21) and Docket No. 9-7, at pp. 670-76 (Defendant's Plea to the Jurisdiction Based on Automatic Withdrawal and Redemption filed 5/26/21).

[239] Docket No. 26-2 (Live Pleadings and Orders from State Court), at p. 301 (Order Denying Defendant's Plea to the Jurisdiction Based on Automatic Withdrawal and Redemption entered 6/18/21); *id.* at p. 303 (Order Denying Defendant's Plea to the Jurisdiction Based on Extinguished Claims entered 6/18/21).

[240] Docket No. 9-7, at pp. 728-31 (Defendant's Second Motion for Continuance); Docket No. 9-7, at pp. 756-60 (Defendant's Motion to Permit Appeal of Interlocutory Orders).

[241] Docket No. 26-2 (Live Pleadings and Orders from State Court), at p. 319 (Order Denying Anson's Motion for Continuance and Motion for Interlocutory Appeal).

The next day, just three days before the trial was set to begin, Anson filed its Chapter 11 Petition with this Court and a Suggestion of Bankruptcy in the State Court.[242]

## M.    *Procedural History in the Bankruptcy Case*

On June 25, 2021, Anson filed a petition for relief under Chapter 11 of the Bankruptcy Code.[243] As part of the schedules filed in the Bankruptcy Case, Anson reported that it owned 100% of the Joint Venture, which had a book value of $367,064.[244] Anson also reported that it entered into an Asset Management Agreement in late 2020 with AFI Capital doing business as AFI Management (hereinafter AFI Management).[245] As part of this arrangement, AFI Management took over the management of the Joint Venture and the JV Notes along with the other entities and assets that Anson managed for investors, charging Anson a fee of $35 per loan per month.[246] Additionally, Anson transferred approximately $800,000 in funds that it held in its general operating account that was payable to investors—including JV funds—to AFI Management.[247] As of the date of filing, Anson only had $108.06 remaining in its general operating account.[248]

---

[242] Docket No. 9-7, at p. 813 (Suggestion of Bankruptcy).

[243] Anson subsequently amended its bankruptcy petition to elect to proceed under Subchapter V of Chapter 11. *See* Case No. 21-41517, Docket No. 19.

[244] Case No. 21-41517, Docket No. 16 (Schedules), at p. 18.

[245] *See* Case No. 21-41517, Docket No. 16 (Schedules), at pp. 4-5, 27. Ferguson testified that he owned AFI Management. AFI Management is also identified as an insider of Anson on its Schedules. While Anson provided supplemental discovery related to the Joint Venture and its financials through April 2021, there is no evidence that it ever disclosed that it had transferred JV funds to AFI Management or that AFI Management was responsible for servicing the JV Notes.

[246] Case No. 21-41517, Docket No. 16 (Schedules). At trial, Ferguson confirmed that the JV funds were transferred to AFI Capital and that AFI Capital was servicing the JV Notes. After entering into this arrangement with AFI Management, Anson's reported income dropped from $1,936,892 in 2019 and $1,804,289 in 2020 to $240,226 in the first half of 2021. *Id.* at p. 31.

[247] *See also* Case No. 21-41517, Docket No. 16 (Schedules), at p. 5. AFI Management is owned by Ferguson and is identified as an insider of Anson on its Schedules.

[248] Case No. 21-41517, Docket No. 16 (Schedules), at p. 17.

With respect to FAM's claim against Anson, Anson's bankruptcy petition identified FAM as a creditor holding an unsecured claim in the amount of $28,714.56 related to their partnership dispute.[249] On November 1, 2021, all claims and causes of action pending in the State Court litigation were removed to this Court, initiating this Adversary Proceeding.[250] Thereafter, on November 9, 2021, FAM filed a proof of claim in the amount of $674,515.57, representing FAM's share of JV profits generated from January 2020 through the Petition Date, plus any additional funds taken by Anson from JV income prior to January 2020.[251] The basis of FAM's proof of claim and Anson's objection concern the same facts and issues that underlie this Adversary Proceeding.[252] By agreement of the parties, the Claim Objection to Proof of Claim 21 was set to be heard and determined in conjunction with this Adversary Proceeding.[253]

## N.      *Procedural History of the State Court Action Post-Removal*

On November 1, 2021, Anson initiated this Adversary Proceeding by the filing of a Notice of Removal to remove all claims and causes of action in the State Court Action pending in the 342nd Judicial District of Tarrant County, Texas to this Court.[254] Post-removal, FAM filed a motion requesting that the Court remand the removed claims and causes of action to the State Court so that it could proceed to a jury trial.[255] The Court conducted a hearing on the matter and, having considering the submissions of the parties and taking notice of the proof of claim filed by FAM,

---

[249] *See* Case No. 21-41517, Docket No. 1 (Petition).

[250] Case No. 21-41517, Docket No. 169 (Notice of Removal).

[251] *See* Case No. 21-41517, Proof of Claim No. 21.

[252] *See* Case No. 21-41517, Proof of Claim No. 21; Case No. 21-41517, Docket No. 234 (Objection to Proof of Claim No. 21-1).

[253] *See* Case No. 21-41517, Docket No. 257 (Notice of Claim Objection to Proof of Claim 21 to Be Heard at Adversary Proceeding 21-04071 Trial).

[254] Docket No. 1.

[255] Docket No. 11 (Motion for an Order to Abstain and Remand Liability Determination to Trial Court).

determined that it had jurisdiction over this proceeding pursuant to 28 U.S.C. §1334 and that the removed matter was a core proceeding.[256] Accordingly, the Court denied the motion.

On February 7, 2022, the Court conducted a post-removal status conference for the purpose of, among other things, scheduling future proceedings and setting a trial docket call. At the status conference, Anson's counsel indicated that it wanted to file a motion for summary judgment based upon withdrawal and extinguishment. However, based upon the status of the State Court proceedings at the time of removal and the relevant pre-removal orders, the Court entered a Scheduling Order setting the Adversary Proceedings on the April trial docket and informed the parties that no further pretrial dispositive motions would be permitted.[257] Consistent with this order, the parties prepared and filed pretrial submissions in this matter, including a joint pretrial order, witness and exhibit lists, proposed findings and conclusions, and trial briefs.

In advance of the trial docket call, Anson filed a Motion to Disqualify Plaintiff's Counsel.[258] In its motion, Anson argued that disqualification was warranted based upon Mr. Ghrist's disclosure of the Chase Bank records to Mr. Moore,[259] which similarly formed the basis of the disqualification motion filed and denied by the State Court pre-removal.[260] The Court, based

---

[256] *See* Docket No. 23 (Order Denying Plaintiff's Motion to Abstain and Remand).

[257] Docket No. 31 (Scheduling Order). The Scheduling Order provided that "[n]o further pretrial dispositive motions are permitted." As previously noted, dispositive motions were filed and heard by the State Court pre-removal and the deadline for filing dispositive motions had passed by the time the case was removed.

[258] Docket No. 39 (Defendant's Motion to Disqualify Plaintiff's Counsel Caleb Moore).

[259] In the Motion to Disqualify and at the hearing conducted on 4/20/22, Anson's counsel represented to the Court that Mr. Ghrist produced the Chase Bank records he received to Mr. Moore without any alteration, redaction, or limitation. *See* Docket No. 39, at p. 4 ("Ghrist…provided Moore with all of the 18,000 pages of documents…without redaction or limitations."); *id.* at p. 6 ("Ghrist neither redacted any of the documents nor limited the document production…"); *see also* Docket No. 61, at p. 33 (Ferguson, when asked if the bank records were redacted or in any way limited by Mr. Ghrist, testified "No. I've looked at the documents. Nothing was redacted at all."); *id.* at pp. 69, 101. However, at trial, Mr. Ankele represented, as an officer of the court, that he believed that the bank statements had been in some way altered by Mr. Ghrist. Based upon this representation, the Court sustained Anson's objection to the admission of the bank records into evidence.

[260] While Anson's counsel argued that the disclosure of the Chase Bank records was newly discovered evidence warranting reconsideration of the State Court's prior orders, *see* Docket No. 61 (Transcript), the record reflects that

on the evidence and arguments presented, found that Anson had failed to establish grounds to reconsider the prior orders and denied the motion to disqualify.[261]

Notwithstanding the Scheduling Order, on March 29, 2022, Anson filed a Plea to the Jurisdiction and Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1).[262] In this motion, Anson asked the Court to dismiss the claims asserted against Anson because FAM lacked standing because its claims were extinguished as a matter of law, that FAM lacked standing to pursue any of the claims asserted due to its withdrawal from the Joint Venture, and that Frazier individually lacked standing.[263] FAM moved to strike the filing, arguing that the deadline for filing such motions had already passed, and further argued that the State Court had already heard and denied on several occasions.[264] Anson's Plea to the Jurisdiction and FAM's Motion to Strike or Deny were set to be heard alongside the adversary trial scheduled in this case.[265]

The Court conducted a four-day trial on these matters, which stretched over several weeks. At the conclusion of the trial, the Court took the matter under advisement. In light of the pleadings and submissions of the parties, the evidence presented at trial, and the arguments and representations of counsel, the Court makes the following additional findings of fact and

---

Anson had previously moved to disqualify Mr. Moore based upon these bank records and that the motion was denied. *See* Docket No. 9-7, at pp. 315-20 (Anson's Motion to Disqualify); Docket No. 9-7, at p. 458 (Order Denying Anson's April 14, 2021, Motion to Disqualify Caleb Moore).

[261] Docket No. 61 (Transcript of Hearing and Oral Ruling on Motion to Disqualify).

[262] After filing the motion, Anson sought leave from the Court to have this motion heard. The Court notes that this motion was untimely, as the Amended Scheduling Order plainly provides that the deadline for filing dispositive motions had already passed. *See* Docket No. 31 (Scheduling Order).

[263] Docket No. 44 (Motion to Dismiss).

[264] *See* Docket No. 48 (Request to Strike Defendant's Plea to the Jurisdiction and Motion to Dismiss Or, Alternatively, To Deny the Same); Docket No. 74 (Plaintiff's Supplement to Request to Strike Defendant's Plea to the Jurisdiction and Motion to Dismiss Or, Alternatively, To Deny the Same).

[265] Docket No. 64.

conclusions of law. In making its ruling, the Court will first take up Anson's Motion to Dismiss related to FAM's standing and capacity to pursue its claims against Anson. Next, the Court will address the merits of the removed claims and causes of actions. Finally, the Court will address the claim objection.

## *DISCUSSION*

## I.

### A.      *FAM & Frazier's Standing to Sue Anson*

The Court first turns to the jurisdictional challenge raised by Anson in its Motion to Dismiss.[266] In its motion, Anson asserts that this Court lacks subject matter jurisdiction over Plaintiffs' claims because Plaintiffs' lack standing. With respect to FAM, Anson argues that FAM lacks standing because: (1) as a terminated filing entity, it only had the right to sue or defend existing claims or causes of action during the three years that followed its termination and its failure to assert those claims resulted in their extinguishment, and (2) FAM became a withdrawn partner upon forfeiture and, as a withdrawn partner, it can only sue to recover the redemption value of its JV interest. With respect to Frazier, Anson argues that Frazier lacks standing because he is not a transferee or successor-in-interest to any claim or asset of FAM. In response, FAM contends that the issue raised by Anson is one of legal capacity rather than standing and does not implicate the Court's subject matter jurisdiction. The Court agrees.

While the terms are often confused, standing and capacity are distinctive concepts.[267] "[S]tanding is a party's justiciable interest in the suit and is a component of subject matter

---

[266] Docket No. 44 (Motion to Dismiss).

[267] *Linsan, Inc. v. Mercantile Thrift Stores, Inc*., 2023 WL 3698551, at *1 (S.D. Tex. Mar. 2, 2023) ("A challenge to Plaintiff's capacity to bring suit is distinct from a challenge to the Court's subject matter jurisdiction."); *see also Guarantee Co. of N. Am. USA v. Hous. & Land Dev. Corp.,* 2024 WL 3431339, at *5 (S.D. Tex. May 31, 2024); *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 774  (Tex. 2020) (discussing how federal and state courts have used terms like "prudential standing" to refer to issues of capacity and developments within those courts of distinguishing between

jurisdiction," whereas "[c]apacity is a party's legal authority to go into court and prosecute or defend a suit."[268] "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy."[269]

Here, the arguments made by Anson—including extinguishment and withdrawal—challenge FAM's legal authority to pursue its claims, and squarely raise issues of capacity rather than standing.[270] Unlike a challenge to standing, challenges to a party's capacity "do not go to the court's subject matter jurisdiction, but are instead part of the inquiry into the merits of a particular claim."[271] Therefore, Anson's challenges do not implicate the subject matter jurisdiction of this Court.[272]

## B.    FAM & Frazier's Capacity to Sue

Having determined that the issues raised by Anson in its Motion to Dismiss go to the Plaintiffs' capacity to sue rather than standing, the Court next turns to the merits of Anson's motion.

---

standing—which implicates jurisdiction—and capacity—which implicate the merits); *In re Highland Capital Mgmt., L.P.*, 2023 WL 5523949, at *27 (Bankr. N.D. Tex. Aug. 25, 2023) (discussing the same issue); *Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 163 n.7 (5th Cir. 2016) (noting that "the intermingling of standing and capacity issues is not uncommon").

[268] *Greener v. Cadle Co.*, 298 B.R. 82, 87–88 (N.D. Tex. 2003) (quoting *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996)); *see also Guiden v. Cmty. Tr. Bank*, 2014 WL 3498413, at *2 (W.D. La. July 14, 2014) ("The real party in interest and capacity rules are not jurisdictional, unlike the Article III 'case or controversy' standing requirement, but rather exist to ensure the plaintiff is entitled to make the claim.").

[269] *Greener*, 298 B.R. at 87–88 (quoting *Nootsie*, 925 S.W.2d at 661).

[270] *See Greener*, 298 B.R. at 87 (concluding that a challenge to plaintiff's ability to prosecute a claim went to capacity to sue and not constitutional standing); *Linsan*, 2023 WL 3698551, at *1 (concluding that a challenge to the plaintiff's authority to pursue an action in court was a challenge to plaintiff's capacity to sue).

[271] *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021); *see also Pike*, 610 S.W.3d at 774 ("[T]he question whether a plaintiff has established his right to go forward with his suit or satisfied the requisites of a particular statute pertains in reality to the right of the plaintiff to relief rather than to the subject matter jurisdiction of the court to afford it.").

[272] To avoid any doubt, the Court finds that FAM has standing because, in the Complaint, it alleges that it suffered a concrete and particularized injury, that its injury was caused by defendant, and that the injury is redressable by this Court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

While Rule 12(b) does not specifically authorize a motion to dismiss based on lack of capacity to be sued, federal courts have traditionally entertained motions to dismiss raising lack of capacity to sue under 12(b)(6).[273] The Court will therefore review Anson's challenge to FAM and Frazier's capacity accordingly.[274]

Federal Rule of Civil Procedure 17(b), which is made applicable in this proceeding under Bankruptcy Rule 7017, provides that, for an individual, "capacity to sue or be sued is determined…by the law of the individual's domicile" and "for a corporation, by the law under which it was organized."[275] Here, Frazier is domiciled in Texas and FAM is a domestic corporation organized under Texas law.[276] Therefore, this Court looks to Texas state law to determine whether Plaintiffs have capacity to sue.

### 1.    *FAM's Capacity to Sue as a "Terminated Entity"*

In its motions and at trial, Anson has asserted that FAM lacks capacity because it did not reinstate its corporate status or assert its claims within three years from the date its charter was forfeited as required by the Texas Business Organizations Code ("**TBOC**").[277] Whether FAM has

---

[273] Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1360 (3d ed.2004) ("Federal courts ... traditionally have entertained certain pre-answer motions that are not expressly provided for by the rules or by statutes, ... such as motions raising ... a lack of capacity to sue or be sued...."); *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011) ("Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6).") (citing *Blanchard 1986, Ltd. v. Park Plantation, LLC,* 553 F.3d 405, 409 (5th Cir. 2008)).

[274] While the State Court denied the jurisdictional challenges, it did not rule upon extinguishment or withdrawal on the merits, denying several motions for summary judgment related to those issues on numerous occasions and reserving those issues for trial.

[275] Fed. R. Civ. P. 17(b)(1)-(2); Fed. R. Bankr. Pr. 7017.

[276] With respect to Frazier's state of domicile, Frazier testified at trial that he lives in Texas. As to FAM, it is undisputed that FAM is a domestic corporation organized in the State of Texas.

[277] Joint Pretrial Order, at p. 4.

capacity to sue is a question of Texas state law.[278] In Texas, a domestic entity's capacity to sue following a tax forfeiture and reinstatement is governed by the TBOC and Tax Code.[279]

The Texas Tax Code authorizes and directs the comptroller to forfeit the corporate privileges of a corporation that fails to pay its franchise taxes or file its reports as required.[280] Upon forfeiture, "the corporation shall be denied the right to sue or defend in a court of this state."[281] If the corporation fails to revive its corporate privileges within 120 days after forfeiture, the secretary of state is authorized to forfeit the entity's charter.[282] Following forfeiture, an officer or director "may request in the name of the corporation that the secretary of state set aside the forfeiture of the charter."[283] If a request is made and the delinquent tax is paid, §171.313 provides that "the secretary shall set aside the forfeiture of the corporation's charter."[284]

In this case, it is undisputed that FAM's corporate privileges were forfeited by the comptroller and its corporate charter was forfeited on February 8, 2013 by the secretary of state.[285] It is further undisputed that FAM's charter was reinstated and its forfeiture was set aside on January 5, 2017.[286] However, what is at issue is whether FAM—as a result of the 2013 forfeiture and notwithstanding any subsequent reinstatement—was a "terminated entity" subject to the three-year survival period for extinguished entities in §11.356 and for existing claims in §11.359.

---

[278] *See* Fed. R. Civ. P. 17(b)(2).

[279] *See* Tex. Bus. Orgs. Code §3.003.

[280] TEX. TAX CODE §171.251 (providing that forfeiture will occur if the corporation fails to pay its franchise taxes or file its report within 45 days from the date the notice of forfeiture is issued).

[281] TEX. TAX CODE §171.252(1).

[282] TEX. TAX CODE §171.309(2).

[283] TEX. TAX CODE § 171.313(a).

[284] TEX. TAX CODE § 171.313.

[285] Joint Pretrial Order; *see also* DX 1.

[286] Joint Pretrial Order; *see also* DX 2.

The TBOC provides for the limited survival of an entity following the termination of its existence to pursue lawsuits. Section 11.001(4) of the TBOC defines a "terminated entity" as a domestic entity whose existence has been "terminated in a manner authorized or required by [the TBOC]" or "forfeited pursuant to the Tax Code, unless the forfeiture has been set aside."[287] Under §11.356 of the TBOC, a terminated entity continues in existence for three years following termination for the limited purpose of "(1) prosecuting or defending a claim brought by or against the terminated entity or (2) permitting survival of an existing claim by or against the terminated filing entity."[288] However, if an existing claim is not brought within three years from the date of termination, §11.359 provides that any "existing claim by or against a terminated filing entity is extinguished."[289]

Here, Anson asserts that, as of February 8, 2013, FAM was a "terminated entity" and therefore subject to the provisions regarding survival and extinguishment of claims. However, FAM does not satisfy either prong for the definition set forth in §11.001(4). First, the failure to pay franchise taxes is not a basis for termination under the TBOC. Section 11.251 of the TBOC authorizes the secretary of state to terminate the existence of a filing entity for failure to "pay a fee or penalty prescribed by law."[290] Notably, §11.251 does not include the failure to pay franchise taxes as a basis for involuntary termination.[291] Second, §11.001(4) clearly states that an entity that

---

[287] TEX. BUS. ORGS. CODE §11.001(4).

[288] TEX. BUS. ORGS. CODE §11.356(a)(1)-(2).

[289] TEX. BUS. ORGS CODE § 11.359 ("[A]n an existing claim by or against a terminated filing entity is extinguished unless an action or proceeding is brought on the claim not later than the third anniversary of the date of termination of the entity."); id. §11.253.

[290] Tex. Bus. Orgs Code §11.251(b).

[291] Id. Before the enactment of the TBOC, the failure to pay franchise taxes was a basis for involuntary termination. See Act of May 25, 1981, 67th Leg., R.S., ch. 297, § 25(B)(1), 1981 Tex. Gen. Laws 831, 843 (repealed 2003) (providing for forfeiture when a corporation had failed "to pay any fees, franchise taxes [,] or penalties prescribed by law"). However, when the Texas Legislature repealed the Texas Business Corporations Act and enacted the TBOC in 2003, it specifically removed the failure to pay franchise taxes as a basis for termination. See TEX. BUS. ORGS. CODE §11.251(b) (providing that the secretary of state may terminate the existence of a filing entity for failure to "pay a fee

56

is reinstated following a forfeiture is not a "terminated entity."[292] In this case, it is undisputed that FAM's forfeiture was set aside on January 5, 2017.[293] Therefore, FAM is not a "terminated entity" and has capacity to sue.

Nevertheless, Anson argues that, as of February 8, 2013, FAM was a terminated entity subject to the three-year survival period and was required to reinstate within that time frame in order to continue its existence for the purpose of, among other things, maintaining a lawsuit.[294] Anson directs this Court to §11.356, which provides in relevant part, that a terminated entity's existence continues for three years following termination for the purpose of "prosecuting or defending a claim brought by or against the terminated entity" and the survival of existing claims by or against them.[295] However, reinstatement of a forfeited entity is not governed by the TBOC, but rather the Texas Tax Code.[296] Looking to the Texas Tax Code, §171.313—the provision

---

or penalty prescribed by law when due and payable"); *see also G Force Framing LLC v. MacSouth Forest Products, L.L.C.*, 2022 WL 500027, at *6 (Tex. App.—Dallas Feb. 18, 2022, no pet.) (discussing same). Texas courts have given effect to this omission and have concluded that the failure to pay franchise taxes is not a basis for involuntary termination under the TBOC. *G Force Framing LLC*, 2022 WL 500027, at *6; *Wallace Constr. & Dev. Co. v. Madison Plaza, LP*, 2019 WL 4677508, at *4 (Tex. App.—Beaumont Sept. 26, 2019, pet. denied) (mem. op.).

[292] TEX. BUS. ORGS. CODE § 11.001(4)(b) (defining "terminated entity" as "a domestic entity the existence of which has been forfeited pursuant to the Tax Code, unless the forfeiture has been set aside"); *see also G Force Framing LLC*, 2022 WL 500027, at *6 (concluding that an LLC that was reinstated more than three years after its tax forfeiture was not a "terminated entity," and that it retained the ability to pursue its claims because section 11.359 of the TBOC did not apply to the entity once reinstated); *Wallace Constr.*, 2019 WL 4677508, at *4 (holding that "under the terms of section 11.001(4) of TBOC, Wallace never became a terminated entity because…Wallace's forfeiture pursuant to the Tax Code was set aside in 2019").

[293] *See* Joint Pretrial Order.

[294] *See* Joint Pretrial Order. To be clear, there are two distinctive but interlocking arguments made by Anson related to FAM and its failure to act within three years: (1) FAM lacks capacity to sue anyone because it failed to reinstate within three years of its forfeiture and (2) FAM lacks capacity to sue Anson on the claims asserted because those claims were extinguished.

[295] *See* TEX. BUS. ORGS CODE §11.356(a)(1)-(2). Notably, § 11.356(b) contemplates the possibility of reinstatement and, at least implicitly, provides that a reinstated entity can continue its existence for the purposes of continuing its affairs and business. *See* TEX. BUS. ORGS CODE § 11.356(b) ("A terminated filing entity may not continue its existence for the purpose of continuing the business or affairs for which the terminated filing entity was formed unless the terminated filing entity is reinstated under this code or the Tax Code.").

[296] *See* TEX. BUS. ORGS. CODE §11.254 (specifying that "a filing entity whose certificate of formation has been forfeited under the provisions of the Tax Code must follow the procedures of the Tax Code to reinstate the certificate of formation").

governing reinstatement—does not place any time limit on when an entity can reinstate.[297] That is because, unlike termination under the TBOC, "forfeiture of a corporate charter does not extinguish a corporate entity."[298] Texas appellate courts and the Fifth Circuit have recognized that "a corporate charter and corporate privileges can be retroactively reinstated provided a corporation pays whatever taxes it owes, in which case 'it is as though the forfeiture never existed.'"[299] Because FAM's right to sue was revived as a result of its January 2017 reinstatement, FAM's existence is deemed to have continued without interruption from the date of forfeiture and FAM has capacity to sue or defend any causes of action regardless of when they arose.

Moreover, Anson argues that FAM lacks capacity to maintain this suit because its claims were extinguished as a result of FAM's failure to assert them within three years of its forfeiture and that FAM's subsequent reinstatement did not revive the claims. Anson principally relies on §11.359(a) of the TBOC, which provides that "an existing claim by or against a terminated filing entity is extinguished unless an action or proceeding is brought on the claim not later than the third anniversary of the date of termination of the entity."[300] However, "[o]nce a corporation pays its delinquent taxes, the corporation's disability is removed" and the "corporation may sue or defend all causes of action, regardless of whether such causes of action arose before or during the period

---

[297] *G Force Framing LLC*, 2022 WL 500027, at *6 (concluding that an LLC that was reinstated more than three years after its tax forfeiture was not a "terminated entity" and that it retained the ability to pursue its claims because section 11.359 of the TBOC did not apply to the entity once reinstated); *Wallace Constr.*, 2019 WL 4677508 at *4; *see also* TEX. TAX CODE § 171.313.

[298] *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 507 (5th Cir. 2012) (citing *Hinkle v. Adams*, 74 S.W.3d 189, 193-94 (Tex. App.—Texarkana 2002, no pet.)).

[299] *Id.*; *see also Parker Cty.'s Squaw Creek Downs, L.P. v. Watson*, 2009 WL 885941, at *6 (Tex. App.—Fort Worth Apr. 2, 2009, pet. denied) (explaining that "if a corporation files its delinquent reports and pays its delinquent franchise taxes, its corporate privileges and charter are retroactively reinstated" and, once reinstated, "it is as though the forfeiture never existed") (citing *Hinkle*, 74 S.W.3d at 194).

[300] TEX. BUS. ORGS CODE §11.359(a); *see also id.* §11.001(3) (defining "existing claim" to include claims arising pre-termination and in the three years following termination).

of forfeiture."[301] When FAM reinstated its charter, its right to sue related back to the date of its forfeiture. To the extent there was any confusion on this point, §11.359(c) makes clear that the extinguishment of an existing claim is nullified if the terminated entity is reinstated under the Tax Code with retroactive effect.[302] Therefore, consistent with the statutory text and caselaw, FAM's claims were not extinguished by operation of §11.359(a).

Therefore, the Court finds that FAM was not a "terminated entity" and its claims were not extinguished as a matter of law.  Accordingly, Anson's Motion to Dismiss is denied on that ground.

### 2.   FAM's Capacity to Sue as a Withdrawn Partner

Additionally, Anson asserts that FAM lacks capacity to sue because FAM automatically withdrew from the Joint Venture upon the forfeiture of its charter. More specifically, Anson argues that FAM's 2013 tax forfeiture terminated its corporate existence and that such termination is an automatic event of withdrawal from the partnership under the TBOC. Anson contends that, as a result of FAM's withdrawal, FAM only had the right to recover the redemption value of its JV interest. In response, FAM argues that, under Texas law, a tax forfeiture is not a termination of existence and does not constitute an automatic event of withdrawal.

Chapter 152 of the TBOC, which governs general partnerships, provides that a partner "ceases to be a partner on the occurrence of an event of withdrawal."[303] An event of withdrawal occurs on, among other events, "an event specified in the partnership agreement as causing the

---

[301] G. Richard Goins Constr. Co., Inc. v. S.B. McLaughlin Assoc., Inc., 930 S.W.2d 124, 128 (Tex. App.—Tyler 1996, writ denied); see also Marshall Feature Recognition, LLC v. Pepsi-Cola Co., 2015 WL 5912672, at *2 (E.D. Tex. Sept. 27, 2015) (concluding that plaintiff—who filed suit four years after its charter was forfeited and did not reinstate until after filing suit—had capacity to sue when the case was filed because, under Texas law, reinstatement relates back to the date of forfeiture and revives the entity's right to sue as of that date).

[302] Tex. Bus. Orgs. Code §11.359(c)(4).

[303] TEX. BUS. ORGS. CODE § 152.501(a); see also id. § 152.002(b)(5).

partner's withdrawal" or the "termination of a partner's existence."[304] When an event of withdrawal occurs, the remaining partners have the right to continue the business and are not required to wind down the partnership.[305] However, if the partnership continues, the "partnership interest of a withdrawn partner automatically is redeemed by the partnership" and the withdrawn partner is automatically entitled to the redemption value of their interest.[306] Where a partner's withdrawal is wrongful,[307] the redemption price of their partnership interest is the lesser of the fair market value on the date of withdrawal or the amount the partner would have received if a wind-up had occurred.[308]

Here, Anson argues that FAM's tax forfeiture was an event of withdrawal because it terminated FAM's corporate existence. However, under Texas law, "[n]either the forfeiture of corporate privileges by the comptroller nor the forfeiture of a corporation's charter by the secretary of state extinguishes the corporation as an entity" or terminates its existence.[309] Rather, the

---

[304] TEX. BUS. ORGS. CODE §§ 152.501(b)(2), (b)(8).

[305] TEX. BUS. ORGS. CODE § 152.502 ("A partnership continues after an event of withdrawal.").

[306] Tex. Bus. Orgs. Code § 152.601.

[307] A partner's withdrawal is wrongful if, in the case of a partnership that…is for a particular undertaking…before…the completion of the undertaking…as appropriate…the partner is expelled or otherwise withdraws because the partner is willfully dissolved or terminated." See TEX. BUS. ORGS CODE §152.503.

[308] TEX. BUS. ORGS. CODE § 152.602(b). Interest is also payable on the amount owed from the date of withdrawal to the date of payment. TEX. BUS. ORGS. CODE § 152.602(c). The interest rate is set by statute at 6%. See TEX. BUS. ORGS. CODE §152.005 (incorporating, by reference TEX. FIN. CODE §302.002); TEX. FIN. CODE §302.002 (setting the interest rate at 6% per annum). A wrongfully withdrawing party is also liable to the partnership and other partners for damages caused by their withdrawal, and those damages may be offset against the redemption price. See TEX. BUS. ORGS. CODE § 152.503(c); TEX. BUS. ORGS. CODE § 152.604.

[309] Parker Cty.'s Squaw Creek Downs, L.P., 2009 WL 885941, at *6; see also Baisden, 693 F.3d at 507 (explaining that the "forfeiture of a corporate charter does not extinguish a corporate entity" under Texas law) (citing Hinkle, 74 S.W.3d at 193-94); Tiddies, Inc. v. Brown, 2005 U.S. Dist. LEXIS 3456, at *6; Lighthouse Church of Cloverleaf v. Tex. Bank, 889 S.W.2d 595, 601 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ("Forfeiture of a corporate charter does not extinguish the corporation as a legal entity so long as there is a statutory right to have the corporate charter reinstated."); TransPecos Banks v. Strobach, 487 S.W.3d 722, 736 (Tex. App.—El Paso 2016, no pet.) ("Unlike a formal dissolution when the corporation ceases to legally exist and assets are distributed, when a charter is revoked for failure to pay such taxes, this in no way affects the legal existence of the Corporation.").

corporation continues to exist so long as there is a statutory right to reinstate its charter.[310] Moreover, reinstatement of a corporation's charter and privileges is retroactive, as though the forfeiture never existed. By statute, FAM had the right to pay its franchise taxes and have its corporate charter reinstated at any time.[311] Additionally, once FAM reinstated its charter and privileges in January 2017, this reinstatement related back to the date of forfeiture such that it is as if it never happened. Therefore, FAM's forfeiture was not an event of withdrawal from the Joint Venture.[312]

In the alternative, Anson has suggested that FAM's forfeiture may also constitute an event of withdrawal under the JV Agreement. Specifically, Anson relies on Section Article VII of the JV Agreement, entitled "Death of a Joint Venturer," which provides that "the death of any of the Joint Venturers hereto shall terminate this Agreement."[313] According to Anson, FAM's tax forfeiture is akin to a corporate death, triggering this provision. However, as previously noted, forfeiture does not terminate an entity's existence because of the right to reinstate one's charter. Moreover, the JV Agreement provision does not define this as an event of withdrawal, but rather as an event requiring the termination of the Joint Venture itself.

The Court concludes that FAM was not a "withdrawn partner" as a result of its 2013 tax forfeiture because its forfeiture did not terminate its corporate existence. Therefore, the Court will deny Anson's Motion to Dismiss on the basis of withdrawal as well.

---

[310] *Ocram, Inc. v. Bartosh*, 2012 WL 4740859, at *5 (Tex. App.—Houston [1st Dist.] Oct. 4, 2012, no pet.); *see also TransPecos Banks*, 487 S.W.3d at 736 ("A corporation does not cease to exist merely because its charter has been forfeited, so long as there is a statutory right to have the corporate charter reinstated.").

[311] TEX. TAX CODE. § 171.312 (providing that a corporation's charter may be reinstated upon the filing of reports by the corporation and the payment of any taxes, penalties and interest imposed).

[312] Anson has also argued that FAM's reinstatement did not revive its interest in the partnership. However, this argument assumes that FAM's forfeiture was an event of withdrawal. Because FAM's existence was never terminated, it never withdrew from the Joint Venture and remained as a partner in the Joint Venture to the present.

[313] PX 1 (JV Agreement).

### 3. Frazier's Capacity to Sue

Anson also challenged Frazier's capacity to sue Anson as the sole owner and transferee of FAM's rights and interests. Frazier has asserted claims against Anson for breach of contract, defalcation, breach of fiduciary duty, and conversion in his individual capacity as the sole owner of FAM. However, Frazier's claims are asserted in the alternative, in the event that the Court made a determination that FAM lacked capacity to sue as a result of its forfeiture.[314] Because the Court has found that FAM has capacity to sue Anson, the Court need not address any issues related to Frazier's capacity to sue. Therefore, the Court will deny the Motion to Dismiss as it relates to Frazier as the issue is moot.

In sum, the Court—having found that FAM's forfeiture did not terminate its corporate existence and that its reinstatement retroactively revived its corporate privileges including the right to prosecute an action—concludes that FAM has capacity to sue and that its claims were not extinguished. The Court therefore denies the Motion to Dismiss as to FAM for the foregoing reasons and will deny the Motion to Dismiss as to Frazier as moot.

### C. FAM's Capacity to Pursue Claims Against a Partner

In addition to the challenges raised by Anson as part of the Motion to Dismiss, Anson also asserted at trial that FAM lacked capacity to sue Anson for breach of fiduciary duty, defalcation, breach of contract, and conversion because the cause of action belongs to the Joint Venture and not FAM.[315]

---

[314] Complaint ¶ 2.2 (stating that Frazier "appears in his individual capacity as the successor in interest and sole owner of property, rights and duties of [FAM] if that entity is determined to have been legally terminated"); *see also* Docket No. 73 (Plaintiffs' Supplement to Request to Strike Defendant's Plea to the Jurisdiction and Motion to Dismiss Or, Alternatively, to Deny the Same), at p. 13.

[315] Joint Pretrial Order, ¶¶ 1.15, 1.20, 4.28; *see also* Docket No. 41 (Defendant's Trial Brief) ¶ 62.

"[W]hether a claim brought by a partner actually belongs to the partnership is…a matter of capacity because it is a challenge to the partner's legal authority to bring suit."[316] Section 152.211 of the TBOC delineates the authority of partners and partnerships to bring claims and seek various remedies.[317] Section 152.211(b) provides that one partner "may maintain an action against…another partner for legal or equitable relief" to, among other things, enforce a partner's rights under 152.204 of the TBOC and to "enforce the rights and otherwise protect the interests of the partner."[318] In contrast, section 152.211(a) provides that the partnership "may maintain an action against a partner for a breach of the partnership agreement or for the violation of a duty to the partnership causing harm to the partnership."[319] Similarly, § 152.210 expressly provides that a "partner is liable to the partnership *and the other partners* for a breach of the partnership agreement or a violation of a duty to the partnership or other partners…that causes harm to the partnership or the other partners."[320] Consistent with this statutory text, Texas courts have held that "a partner may bring claims for those injuries he suffered directly."[321] Therefore, a partner may

---

[316] *Pike*, 610 S.W.3d at 779.

[317] *Id.* at 779-80.

[318] Tex. Bus. Orgs. Code § 152.211; *id.* § 152.204 (setting forth the duties owed by a partner to the partnership and to other partners including a duty of loyalty and care).

[319] Tex. Bus. Orgs. Code §152.211; *see also Pike*, 610 S.W.3d at 779.

[320] Tex. Bus. Orgs. Code § 152.210.

[321] *Pike*, 610 S.W.3d at 780 (quoting *In re Fisher*, 433 S.W.3d 523, 527-28 (Tex. 2014)); *see also In re Fisher*, 433 S.W.3d at 527-28 (concluding that a limited partner—who made a $1 million payment to the partnership and asserted claims for damages after the other partners failed to make similar payments for loss of earning capacity, lost profits, loss of income, damage to credit reputation and other damages—could maintain an action individually because the partner alleged a personal injury and not an injury to a partnership); *Power v. Power*, 2022 WL 1314944, at *2 (Tex. App.—Dallas 2022) (pet. granted, judgm't vacated w.r.m) (concluding that a partner—who alleged that his partner failed to pay him his proportionate share of profits generated by the partnership and hid assets from him—had capacity to bring a suit against the other partner individually because he did not assert injuries to the partnership and sought his individual share of the partnership assets that the other partner allegedly took and to which the partner personally was entitled).

sue another partner for breaching the agreement or the duties it owed to the partner that cause harm to that partner.

Here, FAM has not sued Anson in a derivative capacity for an injury to the Joint Venture. FAM alleges that Anson's conduct—including its alleged misappropriation of JV profits and the failure to provide FAM with accurate or complete records related to JV finances—harmed FAM directly, as FAM did not receive its proportionate share of the profits generated by the Joint Venture and was kept in the dark on how funds were being used. In the Complaint, FAM has not alleged any injury to the Joint Venture, such as a reduction in the value of the JV interest.[322] Rather, FAM contends that it was aggrieved and has sought to recover for the injuries that it suffered directly as a result of Anson's alleged conduct.

Therefore, consistent with section 152.211(b) of the TBOC, FAM has capacity to maintain an action against Anson for breach of fiduciary duty, defalcation, breach of contract, and conversion because on all counts it is seeking to recover for damages it allegedly suffered directly.

## II.

Having determined that FAM has capacity to maintain this suit, the Court next turns to the merit of the underlying suit. FAM has asserted claims against Anson for breach of fiduciary duty, defalcation, breach of contract, and conversion. Pursuant to the Complaint, FAM alleges that, since becoming a partner in the Joint Venture in September 2014, Anson has improperly used JV funds for its own benefit, withdrew or distributed JV funds without accounting to FAM for its share of the proceeds, refused to provide FAM with information or financial records related to the Joint

---

[322] *See In re Fisher*, 433 S.W.3d at 527-528 (holding that a limited partner could not recover "for injuries to the partnership that merely diminish the value of that partner's interest" but explaining that a "partner who is personally aggrieved may bring claims for those injuries he suffered directly"); *see also Pike*, 610 S.W.3d at 780.

Venture, and cut FAM out of the management and operations of the Joint Venture. In response, Anson has denied the allegations and asserted various defenses.

## A.     *Breach of Fiduciary Duty*

To prevail on a claim for breach of fiduciary duty under Texas law, the plaintiff must establish: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant."[323]

In relation to the foregoing elements, FAM asserts that: (1) Anson owed FAM a fiduciary duty as a matter of law as a partner in the Joint Venture;[324] (2) Anson breached its fiduciary duty by misappropriating JV funds for its own benefit and withholding information related to those JV funds to hide its misappropriation;[325] and (3) Anson's breach benefitted Anson and harmed FAM by siphoning away and distributing funds to itself rather than on a pro rata basis and keeping FAM in the dark concerning Anson's use of JV funds. Anson, however, contends that it was never partners with FAM in the Joint Venture and that it acted in accordance with its duties of loyalty and care.

---

[323] *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied); *see also First United Pentecostal Church v. Parker*, 514 S.W.3d 214, 220–21 (Tex. 2017) (citing same); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting same).

[324] The parties in their pleadings use the terms "partnership" and "joint venture" interchangeably, and this Court similarly has referred to the Joint Venture as a partnership and to the joint venturers as partners. In Texas, joint ventures are viewed by courts as a type of partnership, and they are "governed by the same rules as a partnership." *Enterprise Prods. Partners, L.P. v. Energy Transfer Partners, L.P.*, 529 S.W.3d 531 (Tex.App.—Dallas 2017, pet. filed); *see also Varosa Energy, Ltd. v. Tripplehorn*, 2014 WL 1004250, at *3 (Tex.App.—Houston [1st Dist.] 2014, no pet.) (noting that a joint venture "relationship is similar to a partnership, but the principal distinction is that a joint venture is usually limited to one particular enterprise"); TEX. BUS. ORGS. CODE §152.051(b) (providing that "an association of two or more persons to carry on a business for profit as owners creates a partnership"); *Smith v. Deneve*, 285 S.W.3d 904, 913 (Tex. App.—Dallas 2009, no pet.) ("A joint venture has four elements: (1) a community of interest in the venture, (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise.") (citing *Ayco Dev. Corp. v. G.E.T. Serv. Co.*, 616 S.W.2d 184, 186 (Tex.1981)).

[325] Complaint at ¶ 5.3.

For the reasons discussed below, the Court disagrees with Anson and concludes that FAM has established that Anson owed FAM a duty of loyalty and care, that Anson breached those duties, and that this breach caused harm to FAM, as well as an improper benefit to Anson.

### 1.    *Existence of a Fiduciary Duty*

Turning to the first element, FAM contends that Anson owed a fiduciary duty to FAM as a partner in the Joint Venture in its dealings within the scope of the Joint Venture. Under Texas law, a fiduciary duty "arises as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships."[326] Texas courts have long recognized that "[j]oint venturers have such a formal fiduciary relationship"[327] and "owe a formal fiduciary duty to each other in dealings within the scope of the joint venture."[328]

Here, it is undisputed that, beginning in 1996, FAM and Jentex were partners in the Joint Venture and that Anson acquired Jentex's partnership interest on September 5, 2014.[329] As a result

---

[326] *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019) ("A fiduciary duty 'arises as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships.'" (quoting *Ins. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)); *see also Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) ("[A] formal fiduciary relationship, 'arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers.'") (quoting *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.)); *Bohatch v. Butler & Binion*, 905 S.W.2d 597, 602 (Tex. App.—Houston [14th Dist.] 1995, writ granted), *aff'd*, 977 S.W.2d 543 (1998) ("Texas law undeniably recognizes that partners owe one another a fiduciary duty."); *McBeth v. Carpenter*, 565 F.3d 171, 177 (5th Cir. 2009) ("Texas courts have long held that it is axiomatic that a managing partner in a general partnership, owes his co-partners the highest fiduciary duty recognized in the law.").

[327] *Kana Energy Services, Inc. v. Jiangsu Jinshi Mach. Group Co. Ltd.*, 565 S.W.3d 347, 351 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Rankin v. Naftalis*, 557 S.W.2d 940, 944 (Tex. 1977)); *see also Fitz-Gerald v. Hull*, 237 S.W.2d 256, 264 (Tex. 1951) ("The relationship between joint adventurers, like that existing between partners, is fiduciary in character."); *CBIF Ltd. P'ship v. TGI Friday's Inc.*, 2017 WL 1455407, at *16 (Tex. App.—Dallas 2017, pet. denied) ("The relationship between partners [in a joint venture] is fiduciary in character, and imposes on all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise.") (citing *Fitz Gerald*, 237 S.W.2d at 264).

[328] *Wellogix, Inc. v. Accenture, LLP*, 788 F. Supp. 2d 523, 544 (S.D. Tex. 2011) (citing *Rankin v. Naftalis*, 557 S.W.2d 940, 944 (Tex. 1977).

[329] Joint Pretrial Order at ¶¶ 2.1, 2.8.

66

of Anson's acquisition of Jentex's JV interest, Anson became a partner in the Joint Venture and, as

a result, owed FAM fiduciary duties, including the duty of loyalty and care.

Nevertheless, Anson argues that it did not owe FAM a fiduciary duty because FAM

withdrew from the Joint Venture when its existence was terminated as a result of its tax forfeiture,

which occurred over a year before Anson acquired its interest in the Joint Venture.[330] However, as

discussed in relation to FAM's capacity to sue, the Court finds that FAM's tax forfeiture was not

an event of withdrawal. Consequentially, FAM was still a partner in the Joint Venture at the time

Anson became a partner. Therefore, a formal fiduciary relationship existed between FAM and

Anson as partners in the Joint Venture, imposing fiduciary duties on both partners with respect to

the operation of the Joint Venture.

### 2.    *Breaches of the Duties of Loyalty and Care*

Having determined that a fiduciary relationship existed between FAM and Anson, the Court

must next determine whether Anson breached its duties to FAM. FAM has asserted that Anson

breached its fiduciary duties by misappropriating JV funds and failing to account for JV funds that

it collected. In response, Anson contends that it abided by its duty of care and loyalty, arguing that

it abided by its duties and that it should not be held to the same standard as a trustee with respect

to JV funds.[331]

---

[330] Answer at ¶ 43 (denying "that Frazier Asset Management, Inc. was a partner in the partnership with Anson
Financial, Inc. because Frazier Asset Management, Inc. wrongfully withdrew from the partnership prior to Anson
Financial, Inc.'s buyout of Jentex Financial, Inc.'s interest in the partnership"); Counterclaim at ¶ 32 ("JFI was the
only remaining partner in the Joint Venture after FAM's wrongful withdrawal as of February 8, 2013. Since FAM's
withdrawal preceding Anson's buyout of JFI's interest, Anson has never been a partner with FAM."); Defendant's
Trial Brief at ¶¶ 19-22.

[331] To the extent Anson has asserted that its conduct is protected by application of the business judgment rule, the
Court notes that it is not clear whether the business judgment rule applies in the partnership context. *See In re Perry*,
423 B.R. 215, 288 (Bankr. S.D. Tex. 2010) (stating that, in Texas, the "business judgment rule does not apply to
partnership decisions made by partners in a partnership" but rather "protects the decision of *disinterested* [corporate]
directors") (emphasis in original). However, it is clear that "the TBOC adopts a form of business judgment rule as its
care duty standard." *Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.*, 709 S.W.3d 619, 652 (Tex. Bus.
Ct. 2025), reconsideration denied, 713 S.W.3d 416 (Tex. Bus. Ct. 2025) (citing Elizabeth S. Miller, *Overview of*

In Texas, "joint ventures are governed by the rules applicable to partnerships."[332] Under the TBOC, a partner in a joint venture owes to the joint venture and to the other partners a duty of loyalty and a duty of care.[333] A partner, in discharging these duties, must act "in good faith" and "in a manner the partner reasonably believes to be in the best interest of the partnership."[334] However, a partner "is not held to the standards of a trustee" and does not violate a duty or obligation "merely because the partner's conduct furthers the partner's own interest."[335]

The duty of loyalty includes "accounting to and holding for the partnership property, profit, or benefit derived by the partner in the conduct…of the partnership business or from use by the partner of partnership property."[336] A partner "may use or possess partnership property *only* on behalf of the partnership."[337] Therefore, the duty of loyalty requires that a partner use or hold partnership funds for the benefit of the partnership and to fully account for those funds.[338] A partner

---

*Fiduciary Duties, Exculpation, and Indemnification in Texas Business Organizations*, 49-SUM Tex. J. Bus. L. 1, 36–47 (2020)). Therefore, the Court interprets Anson's argument with respect to the business judgment rule to be an assertion that an error in judgment is insufficient to constitute a breach and that it presumptively satisfied its duty because it acted on an informed basis, in good faith, and with the reasonable belief that its conduct was in the best interest of the partnership. *See* TEX. BUS. ORGS. CODE §152.206(b)-(c).

[332] *Truly v. Austin,* 744 S.W.2d 934, 937 (Tex. 1988) (explaining that "joint ventures are governed by the rules applicable to partnerships"); *Enterprise Prods. Partners, L.P. v. Energy Transfer Partners, L.P.*, 529 S.W.3d 531, 540 n.6 (Tex. App.—Dallas 2017, pet. granted) ("[A] joint venture is governed by the same rules as a partnership.").

[333] TEX. BUS. ORGS. CODE Ann. § 152.204(a); *see also Nguyen v. Hoang*, 507 S.W.3d 360, 379 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

[334] Tex. Bus. Orgs. Code § 152.204(b).

[335] TEX. BUS. ORGS. CODE Ann. § 152.204(c)-(d); *see also Shannon Med. Ctr. v. Triad Holdings III, L.L.C.*, 601 S.W.3d 904, 912 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (explaining that a partner could "comply with its duty of care by entering into a contract with the Partnership that furthered [the partner's] interest, so long as [that partner] acted in good faith and reasonably believed that the contract also was in the Partnership's best interest").

[336] Tex. Bus. Orgs. Code § 152.205(1).

[337] Tex. Bus. Orgs. Code §152.203(b).

[338] *Sierad v. Barnett*, 164 S.W.3d 471, 477 (Tex. App. - Dallas 2005, no pet.) ("A fiduciary has an ongoing duty to account fully for assets within her trust.") (citing *Corpus Christi Bank and Trust v. Roberts*, 597 S.W.2d 752, 755 (Tex. 1980)) (applying this rule to an executor); *In re Leal*, 360 B.R. 231, 242 (Bankr. S.D. Tex. 2007) (applying this rule to a partner in a general partnership who withdrew partnership funds from the partnership's bank account and explaining that the partner held those funds in trust for the partnership and "[a]s the holder of assets in trust, he bore the burden to account for the assets"); *see also* TEX. BUS. ORGS. CODE § 152.003 (making clear that "principles of law and equity…supplement this chapter unless otherwise provided by this chapter or the other partnership provisions."); *id.* § 152.004 ("The rule that a statute in derogation of the common law is to be strictly construed does not apply" to

who withdraws partnership funds and is unable to account for the use of those funds or show that those funds were spent on the partnership's behalf breaches his duty of loyalty.[339]

Additionally, the duty of care includes a duty to act in the conduct of the partnership business "with the care an ordinary prudent person would exercise in similar circumstances."[340] "An error in judgment does not by itself constitute a breach of the duty of care."[341] Moreover, a partner is presumed to satisfy this duty of care where the partner acts on an informed basis, in good faith, and in a manner the partner reasonably believes is in the best interest of the partnership.[342]

Here, FAM asserts that Anson breached its duties of loyalty and care by misappropriating JV funds by taking hundreds of thousands of dollars from the Joint Venture and having the Joint Venture pay for Anson's legal fees with respect to claims asserted by or against it directly. It is undisputed that Anson serviced the JV Notes and deposited the proceeds of those JV Notes into its operating account. These funds are undisputedly JV property, and Anson had a duty to hold these funds for the Joint Venture and to account fully for all funds received or expended on behalf of the Joint Venture. However, the record clearly shows that Anson failed to hold funds for the Joint Venture, instead withdrawing or otherwise expending JV profits for its own benefit.[343] Ferguson admitted that he did not hold JV profits, telling Mr. Hendricks specifically that *no cash balance*

---

the statute's partnership and limited-partnership provisions); *Shannon Med. Ctr.*, 601 S.W.3d at 913 (noting that the burden-shifting rules for self-dealing transactions at common law are applicable to alleged violations of the statutory duties of loyalty and care); *Scott v. Taylor*, 294 S.W. 227, 231 (Tex.Civ.App.-Amarillo 1927, no writ) (burden on fiduciary to show all expenditures were just, necessary and correct and to turn over remaining assets); *Garcia v. Garcia*, 878 S.W.2d 678, 680 (Tex. App.—Corpus Christi 1994, no writ) (when fiduciary fails to file proper inventories and accounts, burden on fiduciary to show validity of deductions from assets).

[339] *In re Edelman*, 2014 WL 1796217, at *26 (Bankr. N.D. Tex, May 6, 2014) (finding that a partner who made unauthorized withdrawals of partnership funds and directed the partnership to pay for personal expenses breached its duty of loyalty and care to the other partners in the partnership).

[340] TEX. BUS. ORGS. CODE Ann. § 152.206(a).

[341] TEX. BUS. ORGS. CODE Ann. § 152.206(b).

[342] TEX. BUS. ORGS. CODE Ann. § 152.206(c) (incorporating § 152.204(b)).

[343] *See In re Edelman*, 2014 WL 1796217, at *26.

*existed in the name of the JV.*[344] Based on the AUP Report, Anson should have had approximately $409,379.07 in JV funds in its operating account as of October 2018.[345] However, at trial, Ferguson testified that Anson did not have $409,379.07 in its bank account, stating that Anson only had around $38,000 in its operating account at that time and that he was unable to say how much, if any, of those funds were JV funds.[346] There was no credible evidence showing that Anson ever used a different bank account to deposit or maintain JV funds.[347] Moreover, Ferguson was unable to account for Anson's use of these JV funds and Anson failed to show that these funds were spent on the Joint Venture's behalf. To the contrary, the JV QuickBooks show that these funds were not used on anything related to the Joint Venture.[348] Accordingly, the Court finds that Anson breached its duties by misappropriating at least 409,379.07 in JV profits.

---

[344] Mr. Hendricks credibly testified that, when he asked about JV bank accounts, Ferguson told him that "there was no bank account maintained for the Joint Venture and no cash balances existed in the name of the Joint Venture." Moreover, Mr. Hendricks testified that it was his understanding, based upon information provided by Anson, that Anson was not actually holding JV funds but that the amount due to the Joint Venture was actually just a receivable.

[345] *See* PX 50 (AUP Report). Ferguson confirmed during his trial testimony that the "AFI Payments" reported on the JV's Balance Sheet reflected the net profits of the Joint Venture. *See also* PX 55, at p. 5 (describing the amount reported as AFI Payments as the amount of JV funds available after expenses). These profits had, historically and consistent with the JV Agreement, been distributed to the partners on a regular basis. Upon taking over from Jentex, Anson indicated that it intended to distribute the net profits on a monthly basis. Ultimately, profits were distributed six times between September 2016 and October 2017 in an amount totaling $223,000 per partner. *See* PX 50 (AUP Report), at p. 5; DX 24 (distribution checks). No profits have been distributed since that time. Ferguson repeatedly testified that Anson held these funds. Additionally, with respect to the amount reflected in the AUP Report, the Court notes that Anson has argued that the AUP Report overstates the amount it held and that it only had $391,000 in JV funds as it does not account for funds reflected on HUD statements as paid at closings conducted by FAM and never received by Anson. However, the Court notes that the AUP Procedures were specifically modified to require Milbern Ray to use a spreadsheet—which was created by Anson and agreed upon as accurate by both parties—for all HUD related items.

[346] Ferguson did not indicate whether or how much of that $38,000 constituted JV funds.

[347] While Ferguson indicated in his testimony that JV funds could have been held in a different bank account maintained by Anson, this testimony was simply not credible. Ferguson was unable to identify which bank account was also used for JV funds, let alone the amount of funds being held at those other institutions. Additionally, the evidence showed that Ferguson repeatedly informed others, including Mr. Hendricks at Milbern Ray and to representatives of FAM, that Anson used its operating account for JV funds. Additionally, the evidence showed that Ferguson had repeatedly insisted on using his operating account and refused to use a different account due to the inconvenience associated with using more than one account.

[348] The JV QuickBooks—where all expenses and distributions were tracked—showed that this money was available as the net profits and available for distribution. The withdrawal or expenditure of these funds is wholly unaccounted for in the financial records maintained by Anson.

Additionally, the evidence at trial showed that, on the eve of trial scheduled in the state court, Anson withdrew an additional $566,806.63 in JV profits from the Joint Venture.[349] Ferguson testified that these funds were withdrawn from Anson's operating account and transferred to AFI Management, a separate entity owned by Ferguson.[350] There was no credible evidence that these funds are being held for the Joint Venture. There is also no basis to conclude that Anson, in withdrawing these funds on the eve of a state court trial setting, acted in good faith or with the reasonable belief that its actions were in the best interest of the partnership. To the contrary, the timing, together with Anson's previous misappropriation of funds and its ongoing failure to account for these funds, suggests that Anson acted solely to further its own interest.

Moreover, the evidence showed that, during this same period of time, Anson used JV funds to pay for its own expenses, including expenses it incurred in litigation.[351] Ferguson testified, and the JV QuickBooks records confirmed that, in 2020 alone, Anson spent over $285,000 in JV funds on legal fees incurred by Anson related to suits it was pursuing or defending on its own behalf.[352] These legal expenses—unlike the expenses associated with closings or foreclosures—were not

---

[349] *See* Discussion, II.A.3. While the JV QuickBooks reflect that Anson should have been holding $704,270 in JV profits at this time, this does not account for the over $409,000 previously withdrawn or expended or the improper expenses Anson charged to the Joint Venture.

[350] JV QuickBooks show that, as of the petition date, Anson should have been holding at least $704,270 in JV funds in its operating account. However, Ferguson testified that Anson was not holding any JV funds in its bank account as of the petition date because, before filing, Anson withdrew approximately $800,000 from the operating account and transferred it to a separate, non-debtor entity owned by Ferguson. However, Ferguson testified that the approximate $800,000 reflected the total amount transferred out of the account to AFI Management on account of all of Anson's business holdings and he did not know how much of that was JV property.

[351] Ferguson testified at trial that he directed or authorized Anson to use JV funds to pay for litigation expenses incurred by Anson in this and other litigation.

[352] *See* PX 107. This amount includes: $207,273.84 incurred by Anson in this litigation, $50,610.41 in legal fees Anson was ordered to pay to Mr. Moore for his attorney's fees in a separate lawsuit Anson initiated against Mr. Moore personally, and $27,390 in legal fees charged by Ferguson's law firm. While Ferguson testified that the $27,390 was for closings that Ferguson's law firm conducted in 2020, this testimony contradicted the QuickBooks records kept and produced by Anson that reflect that legal fees related to closings and sales were separately categorized as an expense item and that the $27,390 in legal fees were separate from the closing fees paid to Ferguson's firm in 2020 which totaled $1424. *See* PX 107. Moreover, this number is out of proportion with the legal fees the Joint Venture paid for closings during busier years where more lots were sold. *See* PX 20 (JV Profit & Loss Statement 2014-April 2019).

expenses incurred by the Joint Venture in the regular course of its business. Rather, these expenses were incurred by Anson in its own capacity in lawsuits in which the Joint Venture was not a party or subject to any liability.[353] By misusing JV funds for its own benefit, Anson did not act in a manner that it could reasonably believe was in the best interest of the Joint Venture and breached its duties of loyalty and care.[354]

Nevertheless, Anson argues that it should not be found liable merely because its actions on behalf of the Joint Venture conferred a benefit to Anson. While Anson correctly notes that a partner does not violate a duty "merely because the partner's conduct further[s] the partner's own interest," that partner remains obligated to act in good faith and with the reasonable belief that its actions were also in the best interest of the partnership.[355] The Court finds that there is no reasonable basis to conclude that Anson was acting in the best interest of the partnership, as Anson did not use any of these funds on expenses of the Joint Venture. Rather, the evidence shows that Anson used JV funds for non-JV expenses including expenses incurred by Anson on its own behalf.  In relation to the missing JV funds, while it is not clear exactly how these funds were used, it is clear based on the JV QuickBooks records that these funds were not expended on behalf of the Joint Venture or on any JV-related expenses. Based on the evidence presented at trial, the Court finds that Anson

---

[353] While Anson has suggested that the Joint Venture properly paid for these expenses because the underlying allegations relate to the Joint Venture, the Joint Venture was not a party in either suit and there is no basis to conclude that these expenses should be classified as JV expense. *See Gilbreath v. Horan*, 682 S.W.3d 454, 530-31 (Tex. App.— Houston [1ˢᵗ] 2023).

[354] *See Gilbreath*, 682 S.W.3d at 530-31 (upholding a jury's finding that a general partner had breached its duties to the limited partnership where it used partnership funds to pay $375,000 in litigation expenses the members of the general partner incurred individually in litigation brought by and against them by another member of the general partner who they had involuntarily committed).

[355] *See* TEX. BUS. ORGS. CODE §152.204(b); *Shannon Med. Ctr.*, 601 S.W.3d at 913 (concluding that there was sufficient evidence to find that a partner breached its duty of care where the partner entered into a lease on behalf of the partnership with an affiliate of that partner and charged the partnership rent that was greater than market rate, explaining that the evidence of the above market rate rent was sufficient to show that the partner had not merely conferred a benefit but had failed to act in good faith or with the reasonable belief that entering into the lease was also in the best interest of the partnership).

used, expended, and transferred JV funds for its own benefit and in a manner that a reasonable person would not believe was in the best interest of the Joint Venture.

Therefore, the Court finds that the weight of the credible evidence establishes that Anson misappropriated JV funds and that this misappropriation constitutes a breach of the duties of loyalty and care that it owed to FAM as a partner in the Joint Venture.

### 3.    Award Based Upon Injury to FAM

Having determined that FAM breached its duties of loyalty and care, the Court must next consider whether FAM suffered damages as a result of Anson's breach. Texas partnership law supports an award of damages based on the harm suffered by the plaintiff or the benefit received by defendant.[356] Therefore, any financial benefit that a partner receives as a result of their breach of the duties of loyalty and care can be included as elements of damages in a breach of fiduciary duty case.[357]

Here, the evidence presented at trial supports an award of actual damages based upon the amount of JV funds that Anson misappropriated from the Joint Venture.[358] For the period covered by the AUP from September 2014 through October 2018, the evidence established that Anson took over $409,379.07 in JV profits from the Joint Venture, with these funds either used or expended by Anson for its benefit. There is nothing in the evidentiary record to indicate that any of the $409,379.07 in JV profits is being held for the Joint Venture or was used to pay for JV expenses.

---

[356] *See Vetter v. McAtee*, 850 F.3d 178, 185 (5th Cir. 2017) (noting that "Texas partnership law supports" an award of damages based not just on plaintiff's lost profits but on the benefit received by defendant) (citing *Woodruff v. Bryant*, 558 S.W.2d 535, 544 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.)).

[357] *Woodruff*, 558 S.W.2d at 544; *see also In re Jones*, 445 B.R. 677, 716 (Bankr. N.D. Tex. 2011) (calculating actual damages based on the amount of partnership funds that were misappropriated); *see also Nguyen v. Hoang*, 507 S.W.3d 360, 377 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *In re Edelman*, 2014 WL 1796217, at *29.

[358] *In re Jones*, 445 B.R. at 716 (calculating actual damages based on the amount of partnership funds that were misappropriated); *see also Nguyen*, 507 S.W.3d at 377; *In re Edelman*, 2014 WL 1796217, at *29.

As for the period of time following the AUP from November 2018 to March 2022, the financial records produced by Anson—which Ferguson testified were true and accurate—showed that the Joint Venture collected $305,960.66 in principal and $266,516.77 in interest on the JV Notes, totaling $572,477.43.[359] The evidence also showed that, from this $572,477.43, the Joint Venture incurred $5,670.80 in authorized expenses for septic repairs, electric, foreclosure expenses, and commissions.[360] While the JV Profit and Loss statements show that loan servicing expenses and legal expenses were paid during this time frame, these expenses were incurred in violation of the JV Agreement.[361] Accordingly, the Joint Venture generated $566,806.63 in profits from November 2018 through March 2022. At trial, Ferguson testified that Anson was not holding any of these profits for the Joint Venture, stating that Anson withdrew all of the JV funds from its operating account in the spring of 2021 and transferred them to a separate entity owned by

---

[359] To determine the amount of principal collected during this time period, the Court compared the $900,190.05 in principal reported on the AUP, *see* PX 50 (AUP Report), to the ending principal balance as of March 2022 reported by Anson in a NoteSmith report. *See* PX 102, at p. 012523. The amount of interest collected is based on the Profit and Loss Statements for 2018-2020 and the NoteSmith report for 2021-March 2022. *See* PX 75 (2018 P&L Statement); PX 77 (2019 P&L Statement); PX 79 (2020 P&L Statement); PX 102, at p. 012515 (Jan. 2021-Feb. 2022 P&L Statement); PX 102, at p. 012523 (NoteSmith chart showing interest collected in March 2022). Frazier, during his testimony, went through these records, with his cross-references summarized in PX 108 which was admitted into evidence. However, the Court notes that it has not relied on PX 108 and instead bases its calculation upon its review and analysis of the underlying QuickBooks records and NoteSmith reports introduced into evidence.

[360] In 2018, the Joint Venture paid a total of $1,670.80 for electric, foreclosure expenses, and septic repairs, which Frazier testified that he agreed with these expenditures and that these expenses were incurred as part of the Joint Venture's ordinary operations. *See* PX 75. In 2020, the Joint Venture paid $4,000 in commissions, which Frazier testified were expenses the Joint Venture had historically paid and which he agreed should be paid by the Joint Venture as an expense. *See* PX 79. Based on the Profit and Loss Statements and Frazier's testimony, the remaining expenses paid by the Joint Venture from November 2018 through March 2022 were for expenses incurred outside the ordinary course of the Joint Venture's business and without authorization from FAM, and therefore should not have been charged to the Joint Venture. *See* Discussion *infra* II.C.3.

[361] *See* Discussion *infra* II.C.3. The bad debt expense of $196,824.25, while classified as an "expense" on the 2019 P&L sheet is not an actual expense but rather an adjustment made by Anson which has no impact on the amount due to the Joint Venture on the Balance Sheets. *See* PX 77 (2019 P&L); PX 50 (AUP Report) (discussing and explaining "bad debt expense" category). There was some discussion at trial related to the $27,327.68 in "closing costs" recorded in December 2018. *See* PX 75 (2018 P&L). Ferguson credibly testified that this amount did not reflect a cash transaction but was instead an adjustment made to the account for lots that he previously believed could not be sold but subsequently were. Moreover, based on the Balance Sheets, the $27,327.68 does not seem to have affected the amount due to the Joint Venture and therefore, similar to the bad debt expense, appears to have been a non-cash adjustment that was improperly labeled as an expense but did not otherwise impact the amount of JV profits reflected in the QuickBooks. *See* PX 74.

Ferguson. There is no credible evidence that these funds are being held for the benefit of the Joint Venture or that they have been expended on behalf of the Joint Venture. Rather, the only credible evidence in the record is that these profits were withdrawn and have not been accounted for.

Accordingly, the Court concludes that, based on the credible evidence presented, including Frazier's testimony and the JV QuickBooks records prepared by Anson, that Anson misappropriated money of the Joint Venture totaling $976,185.70 and that FAM, as an equal partner entitled to 50% of all profits, was thus damaged in the amount of $488,092.85 ($976,185.70 multiplied by 50%). These damages are a direct result of Anson's breach of its fiduciary duties. Therefore, the Court finds that Anson owed FAM a duty of loyalty and care as a partner in the Joint Venture, that Anson breached those duties by misappropriating JV funds, and that FAM was directly harmed as a result of Anson's misappropriation of JV funds.

### 4.      *Economic Loss Rule Does Not Bar Recovery*

Having found that Anson is liable for breach of fiduciary duty, the Court next turns to whether FAM is entitled to recover damages for its claim. Anson argues that the economic loss rule precludes FAM from recovering damages for breach of fiduciary duty.[362] The economic loss rule "generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy."[363] Thus, tort damages are not recoverable if the defendant's conduct "would give rise to liability only because it breaches the parties' agreement."[364] However, the economic loss rule

---

[362] *See Shopoff Advisors, LP v. Atrium Circle, GP*, 596 S.W.3d 894, 908 (Tex. App.—San Antonio 2019, no pet.) (explaining that the "economic loss rule is not an affirmative defense; it 'is a consideration *in measuring damages*'") (quoting *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007)).

[363] Chapman Custom Homes, Inc. v. Dall. Plumbing Co., 445 S.W.3d 716, 718 (Tex. 2014); see also LAN/STV v. Martin K. Eby Constr. Co., 435 S.W.3d 234, 241-42 (Tex. 2014); Sharyland Water Supply Corp. v. City of Alton, 354 S.W.3d 407, 418 (Tex. 2011).

[364] *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).

"does not bar all tort claims arising out of a contractual setting."[365] A party can recover in tort "when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit."[366]

To determine whether the economic loss rule applies to FAM's breach of fiduciary duty claim, the Court must consider the source of Anson's alleged duty and the nature of the claimed injury.[367] As to the duty owed by Anson, Texas law imposes fiduciary duties on a partner in a general partnership as a matter of law, and these duties exist independent of any partnership agreement.[368] As to the nature of the harm, Texas courts have declined to apply the economic loss rule when the harm resulted from the breach of a fiduciary duty as opposed to the failure to perform a contractual obligation.[369] In this case, FAM contends that Anson breached its duties of loyalty

---

[365] *Chapman Custom Homes, Inc.*, 445 S.W.3d at 718; *see also Fleming v. Kinney ex rel. Shelton*, 395 S.W.3d 917, 924 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("The economic loss rule's reach does not automatically extend to all tort claims in all contexts involving disputes related in some way to a contract.").

[366] *Chapman Custom Homes*, 445 S.W.3d at 718; *Fish v. Tex. Legislative Serv.*, 2012 WL 254613, at *14 (Tex. App.—Austin Jan. 27, 2012, no pet.) ("Although the contours of the economic-loss rule are less than precise, the Texas Supreme Court has held that a party who seeks damages for breach of a duty created under a contract, as opposed to a duty imposed by law, cannot recover tort damages for the breach.") (citing *Sw. Bell Tel.*, 809. S.W.2d at 493-94).

[367] *Id.*; *see also Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) (explaining that "[t]he acts of a party may breach duties in tort or contract alone or simultaneously in both" and courts look to the "nature of the injury" in determining "which duty or duties are breached" and whether the cause of action "sounds in contract alone"); *Peterson Grp. v. PLTQ Lotus Grp.*, 417 S.W.3d 46, 62–63 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (concluding that the economic loss rule did not bar an intentional fraud claim because duty to not defraud was independent from obligation to perform contract); *Galyean v. Guinn*, 2022 WL 15527769, at *6 (N.D. Tex. Oct. 24, 2022).

[368] *Ingram v. Deere*, 288 S.W.3d 886, 892 n.1 (Tex. 2009) (characterizing Section 4.04 of the TRPA—which is carried forward in 152.204-152.207 of the TBOC—as "recognizing the unwaivable duties of care and loyalty and the obligation of good faith required of partners under the Texas Revised Partnership Act" and citing case law "recognizing 'as a matter of common law that [t]he relationship between . . . partners . . . is fiduciary in character.'"); *see also* TEX. BUS. ORGS. CODE § 152.002(b)(2)–(4) (providing that a partnership agreement cannot eliminate the duties of loyalty and care).

[369] *Compare Fleming*, 395 S.W.3d at 924 (declining to apply economic loss rule where attorney deducted expenses attributable to other people who were screened out of the litigation at the outset from clients' personal injury recovery without disclosing that to the clients) *with Fish v. Tex. Legislative Serv.*, 2012 WL 254613, at *14–15 (Tex. App.—Austin Jan. 27, 2012, no pet.) (mem. op.) (concluding that economic loss rule barred breach of fiduciary duty claims where "the damages alleged arise only from the nonperformance of duties governed by the partnership agreement") and *Victory Park Mobile Home Park v. Booher*, 2014 WL 1017512 (Tex. App.—Dallas Feb. 26, 2014, no pet.) (applying the economic rule where the only conduct alleged to constitute a breach of fiduciary duty was the failure to remit payment in accord with the partnership agreement).

and care by misappropriating JV funds for its own benefit and failing to disclose these self-interested transactions to FAM.

In addition to the case law, the TBOC recognizes that a partner can seek monetary damages for a partner's breach of its duty of loyalty and care as well as any breach of a partnership agreement. Therefore, applying the economic loss rule to bar recovery for a partner's breach of fiduciary duty claim simply because a partner also seeks to recover for breach of the partnership agreement would defeat the clear language of the TBOC. Moreover, the economic loss rule is principally concerned with preventing litigants from recharacterizing breach of contract claims into torts in order to recover more from a defendant. That concern is simply not implicated in this context, where a partner's fiduciary duty is imposed as a matter of law and exists independent of its duties under a partnership agreement.

Therefore, the Court holds that the economic loss rule does not bar tort recovery on FAM's breach of fiduciary duty claim.

### 5.    *Exemplary Damages*

In this case, FAM has made a request for exemplary damages based upon Anson's willful breach of its duties of loyalty and care. Texas courts have held that, because a breach of a fiduciary duty claim is a tort, exemplary damages can be recoverable for breach of fiduciary duty.[370] Section 41.003 of the Texas Civil Practice and Remedies Code ("**TCRP**") mandates that "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence."[371] Malice is defined as "a specific intent by the

---

[370] *Murphy v. Canion*, 797 S.W.2d 944, 949 (Tex. App.—Houston 1990, no pet.); *In re Jones*, 445 B.R. at 719.

[371] Tex. Civ. Prac. Rem. Code § 41.003(a); *see also id.* §41.002(a) (providing that Chapter 41 "applies to any action in which a claimant seeks damages relating to a cause of action"); *In re Edelman*, 2014 WL 1796217, at *29 (looking to the standard set forth in §41.003(a) to determine the standard for awarding exemplary damages in a breach of

defendant to cause substantial injury or harm to the claimant."[372] However, where "a fiduciary gains a benefit by breaching his fiduciary duty, willful and fraudulent acts may be presumed."[373] Gross negligence is defined to mean an act or omission which objectively "involves an extreme degree of risk considering the probability and magnitude of the potential harm to others" where the defendant has "actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, and welfare of others."[374] Under the TCRP, exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: "(1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or (2) $200,000."[375]

The Court has concluded that Anson breached the duties of loyalty and care that he owed FAM as a partner in the Joint Venture by misappropriating JV funds. In this case, the Court finds that, based on Ferguson's testimony and the other evidence presented at trial, Anson acted intentionally and that Anson obtained a benefit from these breaches. Specifically, the record establishes by clear and convincing evidence that Anson's actions with respect to its misappropriation of JV funds was done intentionally. Anson directed that JV funds be deposited into its operating account. Once deposited, the funds were not held for the benefit of the Joint

---

fiduciary duty case between partners); *In re Jones*, 445 B.R. at 719 (applying the standards set forth in §41.003(a) to determine if exemplary damages are appropriate for a breach of fiduciary duty claim based upon a partner's misappropriation of partnership funds).

[372] Tex. Civ. Prac. Rem. Code §§ 41.001(7).

[373] *See Lesikar v. Rappeport*, 33 S.W.3d 282, 311 (Tex. App.—Texarkana 2000, pet. denied) (upholding punitive damages award where fiduciary engaged in self-dealing, because, in such a situation, fraudulent intent is presumed); *Natho v. Shelton*, 2014 WL 2522051, at *2 (Tex. App.—Austin May 30, 2014, no. pet. h.) ("When a fiduciary intentionally breaches his duty by self-dealing and thereby gaining a benefit for himself, willful and fraudulent acts are presumed."); *In re Edelman*, 2014 WL 1796217, at *29–31 (applying the presumption of intent in *Lesikar*, 33 S.W.3d at 311, to support an exemplary damages award).

[374] Tex. Civ. Prac. Rem. Code § 41.001(11).

[375] Tex. Civ. Prac. Rem. Code § 41.008(b).

Venture but rather directed to be used for Anson's direct or indirect benefit. Based upon the record before it, the Court believes that Anson took these actions intentionally and without regard to FAM's rights or interest. Moreover, Anson took steps to prevent FAM from discovering that it had misappropriated these funds, providing FAM with inaccurate or incomplete financial records and refusing to provide the bank records that would have shown Anson was not holding funds for the Joint Venture. Anson acted intentionally in misappropriating JV funds and obtained a benefit as a result of its breach. Thus, fraudulent acts are presumed for the purpose of awarding exemplary damages.[376]

However, even if this presumption did not apply, the Court concludes that the evidence was clear and convincing that Anson's breach of fiduciary duties constituted at a minimum gross negligence.[377] In this case, there was an obvious risk of harm to FAM—as FAM had an expectation that it would receive distributions of the fair share of JV profits—and that Anson's use and withdrawal of these funds posed an extreme degree of risk that FAM would not receive any distribution of profits. Anson had a subjective awareness of the risk and nevertheless went forward with conscious indifference to FAM's rights. Moreover, Anson, in the Court's view of the credible evidence, intended to gain an additional benefit for itself (and for the other entities whose loans it serviced and to Ferguson as the principal of Anson) and self-dealt by treating JV funds as its own to do with as it pleased.

---

[376] *In re Edelman*, 2014 WL 1796217, at *29 (citing *Lesikar*, 33 S.W.3d at 310) ("While it is a general rule that Texas courts allow the recovery of punitive damages where the defendant, in committing a tort, acted willfully, maliciously, or fraudulently, where punitive damages are awarded for breach of fiduciary duty the actual motives of the defendant and whether the defendant acted with malice are immaterial.").

[377] *In re Jones*, 445 B.R. at 720 (finding that a partner who misappropriated partnership funds—withdrawing funds or otherwise expending them on personal expenses—acted with gross negligence in breaching its fiduciary duty and that plaintiff was entitled to an award of exemplary damages).

Therefore, the Court will award exemplary damages. Anson's misappropriations of JV funds resulted in actual damages to FAM in the amount of $488,092.85, for which the Court will award exemplary damages of $350,000.00.[378]

## B.    Defalcation

In Count Two, FAM asserts that Anson, while acting in a fiduciary capacity, committed defalcation by misappropriating and misapplying the JV funds it held in a fiduciary capacity contrary to the JV Agreement. In response, Anson argues that FAM's defalcation claim is duplicative of its breach of fiduciary duty and breach of contract claims. Moreover, Anson contends that it, as a partner in the Joint Venture, is not held to the same standard as a trustee.

Texas courts have defined defalcation to include "the fraudulent misappropriation of money held in trust" or the failure to properly account for funds they held in a fiduciary capacity.[379] Generally, defalcation requires an intentional wrong or reckless conduct.[380] In Texas, an intentional breach of fiduciary duty is a tort for which a plaintiff may recover exemplary damages.[381] While an intentional breach of fiduciary duty or defalcation may form the basis for an exemplary damage

---

[378] See In re Edelman, 2014 WL 1796217, at *30 (awarding exemplary damages in the amount of $1 million where the actual damage award was $2.5 million dollars).

[379] Goughnour v. Patterson, Tr. of Deborah Patterson Howard Tr., 2019 WL 1031575, at *6 (Tex. App.—Tyler Mar. 5, 2019, pet. denied) (citing Defalcation, BLACK'S LAW DICTIONARY (10th ed. 2014)); see also Stum v. Stum, 845 S.W.2d 407, 415 (Tex. App.—Fort Worth 1992, no writ) disapproved of on other grounds by Humphreys v. Meadows, 938 S.W.2d 750 (Tex. App.—Fort Worth 1996, writ denied) (explaining that the "fail[ure] to properly account for funds [] held in a fiduciary capacity…is defalcation"); Balusik v. Kollatschny, 2002 WL 1822360, at *4 (Tex.App.-Houston [1st Dist.] Aug. 2, 2002, no pet.) (not designated for publication); Saden v. Smith, 415 S.W.3d 450, 471 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (relying on the definition adopted by the Fifth Circuit in discussing a defalcation claim brought against a defendant in state court litigation). The Fifth Circuit defines defalcation as the "willful neglect of duty even if not accompanied by fraud or embezzlement." LSP Inv. Partnership v. Bennett (In re Bennett), 989 F.2d 779, 790 (5th Cir. 1993), cert. denied, 510 U.S. 1011 (1993). While these cases arise in the context of 523(a), these determinations necessarily require the court to look to state law in order to determine whether the debtor owed and breached a fiduciary duty. See In re Jones, 445 B.R. 677, 715 (Bankr. N.D Tex. 2011) (analyzing Texas law to determine whether a partner willfully neglected his fiduciary duty such that it constitutes defalcation under 523(a)).

[380] Bullock v. Bankchampaign, N.A., 569 U.S. 267, 273–74 (2013); see also Defalcation, BLACK'S LAW DICTIONARY (12th ed. 2024).

[381] Tex. Civ. Prac. Rem. Code § 41.003.

award, it is not a separate cause of action from the breach of fiduciary duty claim. At least one Texas court has found that a claim that a defendant misused funds held in trust equated to a claim for breach of fiduciary duty.[382] FAM has not identified—and the Court has been unable to locate—any authority providing that a misapplication of partnership funds or funds held by a fiduciary are recognized as a separate cause of action under Texas law.[383]

Therefore, because defalcation is not a recognized cause of action under Texas law and FAM's defalcation claim merely restates its breach of fiduciary duty claim, the Court will deny the request for relief as to the defalcation count.

## C.  *Breach of Contract*

In Texas, a partner is liable to another for a breach of the partnership agreement that results in harm to the other partner.[384] To establish a breach of contract claim, a plaintiff must prove: "(1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff."[385] In order to prevail, "a plaintiff must demonstrate that it complied with the contract's provisions"[386] and that the defendant "fail[ed] to perform a duty required by the contract."[387]

---

[382] *See Goughnour v. Patterson, Tr. of Deborah Patterson Howard Tr.*, 2019 WL 1031575, at *6 (Tex. App.—Tyler Mar. 5, 2019, pet. denied) (finding that a defalcation crossclaim was in essence a breach of fiduciary duty claim such that it was subject to the same four-year statute of limitations).

[383] *Cohen v. Flat Stone Dev. Co., Inc*, 2018 WL 11312998, at *2 (S.D. Tex. Oct. 5, 2018) (noting that the court could not find any authority for the proposition that a defalcation claim was independent from a breach of fiduciary duty claim).

[384] TEX. BUS. ORGS. CODE §152.210(1); *see also id.* §152.211(b)(1) ("A partner may maintain an action against the partnership or another partner for legal or equitable relief…to enforce a right under the partnership agreement.").

[385] *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.); *see also USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018); *Smith Intern., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007).

[386] *M7 Capital LLC v. Miller*, 312 S.W.3d 214, 222 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing *Preston State Bank v. Jordan,* 692 S.W.2d 740, 744 (Tex. App.—Fort Worth 1985, no writ)).

[387] *Hoover v. Gregory*, 835 S.W.2d 668, 677 (Tex. App.—Dallas 1992, writ denied); *see also Smith Intern., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Hoover*, 835 S.W.2d at 677); *Case Corp. v. Hi–Class Bus.*

With respect to the foregoing, FAM asserts that: (1) the JV Agreement and its subsequent written amendments is a valid agreement between FAM and Anson; (2) FAM carried out its duties under the JV Agreement; (3) Anson breached its duties under the JV Agreement by failing to maintain a bank account for the Joint Venture, failing to notify FAM or obtain its consent before making changes with respect to the operations and management of the Joint Venture, expending JV funds without FAM's consent contrary to the JV Agreement, and failing to provide FAM with a complete accounting of JV transactions; and (4) FAM was damaged as a result of Anson's breaches. In response, Anson has challenged this claim on a number of substantive grounds, including that FAM failed to perform its duties and that Anson fully performed under the JV Agreement.[388]

### 1.      Existence of a Valid Contract

Here, it is undisputed that the JV Agreement and the subsequent written amendments constitute a binding agreement between the parties.[389] The JV Agreement provides that "Joint Venturers will share equally in the duties of management of the Joint Venture property" with "[a]ll decisions affecting the Joint Venture or its business [to] be determined by a majority vote" of the Venturers.[390] The JV Agreement further assigns specific duties to each partner. Upon acquiring Jentex's JV interest, Anson agreed to be bound by the JV Agreement and to perform all obligations as Jentex's successor-in-interest. Therefore, the Court concludes that FAM has established the first element.

---

*Sys. of Am., Inc.,* 184 S.W.3d 760, 769–70 (Tex. App.—Dallas 2005, pet. denied) ("A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform.").

[388] Joint Pretrial Order at ¶ 2.18; Docket No. 41 (Defendant's Trial Brief) at ¶¶ 64-68.

[389] Joint Pretrial Order at ¶ 2.2.

[390] PX 1 (Second Amendment to Joint Venture Agreement, Article V).

## 2.    *FAM's Performance under the JV Agreement*

The Court next turns to whether FAM performed or tendered its duties under the JV Agreement. In order to prevail on a breach of contract claim, "a plaintiff must demonstrate that it complied with the contract's provisions."[391] In other words, a plaintiff must show that he "has performed the obligations imposed upon him or that he…has offered to perform them and was able to do so or unless the party shows some valid excuse for failure to perform."[392] However, a plaintiff is not required to tender performance where they were prevented by the other party from doing so.[393]

FAM contends that, at the time of Anson's alleged breach of the JV Agreement, it performed its duties under the JV Agreement. Specifically, FAM asserts that, from 1996 to 2014, it carried out its duties to the Joint Venture to develop the lots—by paving roads and overseeing the installation of water and septic systems on each lot—and to market and sell the lots. FAM contends that it continued to carry out these duties after Anson joined the Joint Venture, but that any alleged non-performance after that point was the result of Anson's unilateral decision to cut FAM out of the operations and management of the Joint Venture.  Anson disputes this, arguing that third-parties or Anson had to perform tasks for which FAM was responsible.[394]

---

[391] *M7 Capital LLC*, 312 S.W.3d at 222 (citing *Preston State Bank v. Jordan,* 692 S.W.2d 740, 744 (Tex. App.—Fort Worth 1985, no writ)).

[392] *Carr v. Norstok Bldg. Sys., Inc.*, 767 S.W.2d 936, 939 (Tex. App.—Beaumont 1989, no writ) (citing *Acme Pest Control Co. v. Youngman,* 216 S.W.2d 259 (Tex. Civ. App.—Waco 1948, no writ)).

[393] *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004); *see also Petras v. Criswell*, 248 S.W.3d 471, 480 (Tex. App.—Dallas 2008, no pet.) ("Tender is not required, however, if it was prevented by the other party or where the defendant repudiates the contract.").

[394] In the Answer and Defendant's Trial Brief, Anson broadly alleged that FAM failed to carry out its duties under the JV Agreement. However—aside from an allegation regarding missing money—Anson did not plead with any specificity how or when FAM allegedly failed to perform a duty under the JV Agreement. Therefore, the Court is relying upon how the case was tried before the Court as well as the allegations contained in Anson's Counterclaim, where Anson does discuss with greater particularity FAM's alleged failure to perform by contending that FAM's use and payment of third parties to perform its various duties were themselves breaches of the JV Agreement. *See* Counterclaim at ¶ 22.

Under the JV Agreement, FAM's duties were to "[s]ell and market the tracts out of said land according to the pricing and terms agreed to by the Ventures," to "[i]nstall the septic systems on each tract as needed at the lowest possible cost and at a price agreed to by both parties" with the cost borne by the Joint Venture, to "[o]versee the installation of a well on each of the tracts or arrange for a water system" at a price agreed to by both parties with the cost borne by the Joint Venture, to "[o]versee and maintain unsold tracts and keep them in a saleable condition," and to "[h]andle foreclosures and resales of foreclosed tracts."[395]

Turning first to FAM's duties relating to the development of the lots, Frazier credibly testified that he used his men and equipment to install the water lines, electric lines, driveways, and roads at the outset of the Joint Venture. Frazier also testified that he arranged for subcontractors to install the septic system at a price that was agreeable to both joint venturers and that, by 2014, they had been installed on all saleable lots.[396] To the extent FAM's duty to install septic systems included a duty to repair those systems, Frazier stated that he would have arranged for the repairs had Anson informed him of the need for repairs.[397] Next, as to FAM's duty to oversee and maintain unsold lots in a saleable condition, Frazier testified that his men mowed unsold lots for several years at no cost to the Joint Venture. [398] After a few years, a subcontractor was hired to perform

---

[395] PX 1 (Second Amendment to Joint Venture Agreement, Article V).

[396] There are two lots that could not be sold because they have wells on them. Frazier also testified that he, early on in the Joint Venture, had a license to perform septic work and email correspondence admitted at trial indicates that Frazier also drew out plans for the septic and performed inspections in the two years afterward. *See* DX 10.

[397] This testimony is consistent with email correspondence admitted into evidence at trial from March 2015. *See* PX 8. After Frazier raised an objection to unilateral changes made by Anson and requested that Anson operate the Joint Venture as it had been operated before these changes were made, Anson indicated that it would not do so and that it was holding $10,000 in reserve for future septic repairs. At that time, FAM followed up to provide information about the septic systems installed, offered to assist, and raised concerns over the estimated cost to perform repairs. Anson thanked FAM for the information but indicated that it was handling it and was working with the company that installed the systems.

[398] The duty to maintain the lots in saleable condition primarily involved mowing the lots and picking up any trash left on the property. Anson seemed to suggest at various points that FAM's duty to maintain unsold lots in a saleable condition included a duty to repair the roads. However, this conclusion is not supported by the JV Agreement itself, which limits FAM's duty to maintenance of the lots themselves. The lack of language regarding allocation of costs—

this work and those costs were paid by the Joint Venture.[399] The evidence therefore establishes that FAM performed its duties with respect to the development and maintenance of the lots.

Turning finally to the duties related to the marketing and sales of the lots, Frazier testified that he coordinated with salespeople and a title company to sell the lots on the terms agreed upon by the Joint Venture.[400] When lots needed to be foreclosed upon and resold, the Joint Venture used and paid Frazier's associate to post the required notices and conduct the foreclosure sales.[401] The evidence also showed that, after it joined the Joint Venture in 2014, Anson became involved in the marketing and sales of lots that had been foreclosed on by the Joint Venture. Ferguson credibly testified that Anson-affiliated salespeople began to sell lots in addition to FAM's salespeople.[402] The evidence also shows that Anson began to conduct all closings at Ferguson's law firm rather

---

which is present in other provisions relating to projects that would entail significant costs, which a $50,000 road project would certainly be—further supports the conclusion that lot maintenance did not include road maintenance. Additionally, Ferguson testified that he did not believe that the Joint Venture was "technically" responsible for the roads but that he believed the Joint Venture should pay for the repairs due to the number of complaints received from homeowners. *See also* PX 106. Ferguson also testified that the lots were in a saleable condition notwithstanding the issues with the roads.

[399] This is supported by Ferguson's testimony that third parties were paid to mow lots pre-2014 and by the financial records for the Joint Venture entered into evidence.

[400] Frazier testified that he brought in salespeople he had worked with in the past. He further testified that the title company was either owned or operated by his ex-wife. Both were paid a commission or fee related to the performance of their respective task, as is standard in the industry. Additionally, while it was a duty of FAM to arrange for the foreclosure of lots, Frazier credibly testified that he and Jentex's principal agreed that FAM would be responsible for posting the required notices and for conducting sales on the courthouse steps. However, Frazier testified that this arrangement did not alter his duties under the JV Agreement and that, outside an arrangement between both joint venturers, he would be responsible for all aspects of the foreclosures and not just the notice or sale.

[401] Based on the testimony of Ferguson and Frazier, this does not seem to be how foreclosures were conducted post-2014. Since Anson joined the Joint Venture, it appears that Ferguson's law firm has assumed responsibility for handling the foreclosures. There was nothing to suggest that FAM objected or was otherwise opposed to this.

[402] The evidence at trial showed that this was due to the large number of lots that needed to be resold after foreclosure rather than due to FAM's refusal or failure to sell the lots itself. In the correspondence sent by Ferguson to Frazier notifying him that Anson had acquired Jentex's interest in the Joint Venture, Ferguson indicated that Anson would be taking on a role in selling the lots. *See* DX 8 ("I will write you next week once we have taken the time to inspect all properties and give you our proposal for achieving the objective of selling the remaining lots as soon as possible.").

than at the title company utilized by FAM over FAM's objection.[403] Therefore, the evidence establishes that FAM performed its duties with respect to the marketing and sale of the lots.

Nevertheless, Anson maintains that FAM had failed to perform its duties to the Joint Venture. First, Anson argues that, from 1998 to 2014, FAM failed to fulfill its obligations to the Joint Venture because it used third parties to perform duties related to the Joint Venture and paid those third parties with JV funds.[404] At trial, Ferguson testified that, based on the ledgers kept by Jentex for the Joint Venture, third parties were paid by the Joint Venture for mowing and cleaning the lots, marketing and selling the lots, and foreclosing the lots.[405] According to Anson, these payments constitute a breach of FAM's duties to perform these tasks without compensation.[406] The JV Agreement provides that a partner can only be paid a salary for their services with the consent of both partners,[407] but is otherwise silent as to third parties that carry out tasks related to the sale, maintenance, or foreclosure of lots.[408] However, the decision to pay a third party to carry out the duties of a partner constitutes a "decision affecting the Joint Venture or its business" that can be

[403] Anson does not appear to dispute this point. *See* Counterclaim. A large number of lots were foreclosed in and around 2014, meaning that around 40 lots needed to be resold. There was conflicting testimony as to the percentage handled by each partner, but there is no dispute that some of those sales were handled by FAM associates and others were handled by Anson associates. The evidence admitted at trial suggests that this was due, in part, to the large number of lots needing to be resold.

[404] In its pleadings and the trial brief, Anson alleges that FAM failed to carry out its duties under the JV Agreement. However, aside from an allegation concerning $28,000 in closing costs, Anson's trial brief and pleadings lack specificity as to FAM's alleged breach and merely copy-paste FAM's duties under the JV Agreement. Because Anson has failed to articulate in its Answer or Trial Brief how or when FAM breached, the Court has had to rely on the positions articulated by Anson in its countercomplaint and at trial to ascertain how and when it contends FAM failed to perform its duties.

[405] On re-direct, Ferguson testified that he believed FAM had failed to carry out its duties from 1998-2014 and that this conclusion was based solely on the JV records maintained in QuickBooks that show payments to third parties. These third parties (many of whom are relatives of Frazier) were paid to mow and clean lots, to conduct foreclosures, to conduct closings, or to sell lots (with salespeople receiving a commission for each lot sold).

[406] Counterclaim at ¶ 22.

[407] PX 1 (JV Agreement, Article X) ("The salary for the services of any Joint Venturer may be paid only when agreed upon by a majority (in ownership interests) of the Joint Venturers.").

[408] Article V does expressly provide for the use of and payment to third parties to install water or septic systems on each lot.

made with the approval and consent of both partners.[409] Frazier credibly testified that the decision

to use and pay third parties—including the salespeople, the title company, the subcontractor hired

to mow the lots, the septic system company, and the person that posted the notices and conducted

foreclosure sales—was made with Jentex's knowledge and approval.[410] Rather than demonstrating

FAM's failure to perform, the use of and payment to third parties further support the conclusion

that FAM carried out its responsibilities to the Joint Venture by arranging for third parties with the

requisite experience to carry out tasks necessary to fulfill its duties to the Joint Venture.

Additionally, Anson contends that FAM failed to perform its duties after Anson became a

partner. At trial, Ferguson testified that, since acquiring its interest in the Joint Venture, Anson has

managed the sales for the majority of the lots, arranged for the septic repairs, and maintained the

lots in a saleable condition. However, the evidence at trial demonstrated that FAM did in fact

continue to carry out its duties by continuing to sell lots after Anson joined the Joint Venture in

2014.[411] Frazier testified that FAM's salespeople continued to sell lots post-2014, but that Anson

started to sell and close lots on its own over FAM's objection.[412] Additionally, Frazier credibly

testified that he would have arranged for repairs to the septic system had he been aware or informed

---

[409] PX 1 (JV Agreement, Article V).

[410] Jentex's approval and knowledge of these expenses is further supported by the JV ledgers, which show that Jentex issued checks or otherwise made payments to these third parties from the JV account to pay these expenses and then itemized them on the expense ledger in QuickBooks. Moreover, these expenses are standard within the industry, as evidenced by the fact that Anson uses and pays third parties to perform all of these services including the ones that it could perform itself. While Anson alleged in its Counterclaim that the Joint Venture could avoid the fees charged by the title company by using Ferguson's law firm to conduct closings, Ferguson also charges the Joint Venture a fee for conducting closings at his office. *See* Counterclaim at ¶ 22(a).

[411] At trial, Ferguson credibly testified that FAM's salespeople continued to sell lots post-2014 and continued to do so through at least 2016. Additionally, in Anson's Counterclaim, Anson alleges that FAM insisted that it remain involved in the closings post-2014 and objected to Anson's decision to have Ferguson's law firm handle the closings. *See* Counterclaim at ¶ 22.

[412]There was no indication in the testimony or the evidence that Anson's decision to sell lots was the result of any failure to perform by FAM. Rather, the evidence indicates that Anson's involvement was the result of its desire to quickly resell lots after unexpected market circumstances led to about 43 lots being repossessed in a little over a year. *See* PX 13.

of the need for such maintenance.[413] To the extent Anson carried out duties for which FAM was responsible, the evidence at trial demonstrated that this was the result of Anson's desire to solely manage the operations of the Joint Venture without input from FAM.

Moreover, Anson contends that FAM breached the JV Agreement by retaining approximately $28,000 from lot sales that were closed by FAM.[414] Ferguson testified that, based on HUD statements associated with lot sales which were closed by FAM via a title company, FAM received cash deposits totaling $28,000 but never turned these funds over to Anson. However, the evidence at trial, including the testimony of Mr. Hendricks, shows that these funds were used to pay commissions to the salesperson that completed the sale but simply were not recorded on the HUD statements.[415] These commissions were routinely paid for by the Joint Venture at closing using the funds received as deposits.[416] Therefore, the Court concludes that FAM, by using the funds received at closing to pay for expenses incurred by the Joint Venture in the ordinary course of business, did not breach the JV Agreement.

Next, Anson argued at trial that FAM breached the JV Agreement after Anson became a partner in 2014 by refusing to carry out its duties.[417] At trial, Ferguson testified that Frazier—by

---

[413] As previously noted, this testimony is further supported by email correspondence between the parties regarding the septic systems in 2015.

[414] Docket No. 41 (Defendant's Trial Brief) at ¶ 66(f).

[415] Mr. Hendricks credibly testified that, when he inquired about these funds, Ferguson stated that these funds were paid as a commission to the salesperson who completed the sale and simply were not recorded on the HUD statements.

[416] Based on a spreadsheet provided to the Court by Anson showing all lot sales, it appears that the cash deposits received at closing were often used to pay the salesperson. When filling out HUDs, Anson indicated the amount received as a deposit and the amount paid as a commission. Based on the testimony of Mr. Hendricks, the HUD statements completed by Capital Title and/or FAM reflect that deposits were received and do not show that any commission was paid. However, based on the statement made by Ferguson, it appears that this was an error in filling out the paperwork.

[417] Because Anson's trial brief and pleadings lack any degree of specificity as to how or when FAM allegedly failed to perform its duties, the Court has to rely on the positions articulated by Anson's counsel and its principal at trial.

stating that FAM had fulfilled its duties under the JV Agreement[418]—had refused to carry out its duties going forward. However, these statements fall far short of demonstrating an absolute or unconditional refusal to perform in the future but rather refer only to FAM's performance under the JV Agreement up to that date. Moreover, these statements—which were made by counsel in a demand letter sent to Anson regarding Anson's alleged breaches—were made in response to Anson's suggestion that the Joint Venture should be terminated with the partners equally dividing up the assets. Frazier testified that he was not interested in partitioning the Joint Venture because he felt that FAM had performed the majority of its duties by developing the lots for sale and getting the lots sold, whereas Anson's duties to service the loans remained ongoing. Based on the nature of the communication and the context in which it was sent, the Court finds that FAM's statements do not constitute a refusal or repudiation of the JV Agreement.

Therefore, the Court—having considered the evidence at trial and the arguments of the parties—finds that FAM carried out its duties under the JV Agreement. Specifically, the evidence demonstrated that, from 1998 to 2014, FAM carried out its duties under the JV Agreement, and that it continued to do so after Anson became a partner and after Anson is alleged to have breached the JV Agreement. To the extent FAM did not perform certain duties, the evidence showed that FAM was willing to perform those duties and that FAM never refused to perform these duties. Accordingly, the Court finds that FAM has established the second element of its breach of contract claim.

---

[418] Ferguson specifically made reference to correspondence sent by FAM's counsel, Ms. Gongloff, wherein it stated, "FAM has no interest in terminating the Agreement or splitting the venture; especially given that FAM has fulfilled its part of the bargain and AFI's responsibilities have yet to be completed."  DX 12.

### 3.    *Anson's Breach of the JV Agreement*

Turning next to the defendant's alleged breach, FAM contends that Anson failed to perform its obligations under the JV Agreement and otherwise failed to abide by the terms of the JV Agreement.  A breach of contract occurs when a party fails or refuses to perform an act or duty that it has promised to perform.[419]

Here, FAM claims that Anson breached the JV Agreement by: (1) failing to maintain a bank account for the Joint Venture, (2) making unauthorized distributions to itself, (3) failing to prepare and provide adequate accounting, and (4) failing to obtain FAM's consent before making changes with respect to the operation and management of the Joint Venture.  In response, Anson contends that it fully performed its obligations to the Joint Venture.

### a.    *Duty to Maintain Bank Account for the JV*

FAM contends that Anson breached several provisions of the JV Agreement related to how JV funds were accounted for and handled.

First, FAM alleges that Anson breached these duties by failing to maintain a separate bank account for the Joint Venture. Under the JV Agreement, Anson had a duty to, among other things, "[m]aintain a bank account for the Joint Venture."[420] The JV Agreement further clarifies that "[a]ccounts in the name of the Joint Venture shall be maintained in such bank or banks as the Joint Venture shall from time to time select" and that "[a]ll money in the Joint Venture and all instruments for the payments of money when received shall be deposited to the credit of the Joint

---

[419] *Hoover*, 835 S.W.2d at 677; *see also Smith Intern., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Hoover*, 835 S.W.2d at 677); *Case Corp. v. Hi–Class Bus. Sys. of Am., Inc.,* 184 S.W.3d 760, 769–70 (Tex. App.—Dallas 2005, pet. denied) ("A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform.").

[420] PX 1 (Second Amendment to Joint Venture Agreement, Article V).

Venture on a timely basis."[421] The evidence at trial showed that, from 1996 to 2014, Jentex maintained a separate bank account in the name of the Joint Venture.[422] However, once Anson took over in September 2014, Anson decided that it would not maintain a separate bank account for the Joint Venture and, instead, insisted on using its operating account for all JV transactions.[423] Ferguson testified at trial that, since taking over for Jentex, Anson had been comingling JV funds in its operating account, which it also used to service around 450 other loans for other business ventures.[424] FAM never approved this change and, when FAM requested that Anson continue to use a separate bank account for JV funds as Jentex had, Anson made clear that "there will not be a separate checking account" for the Joint Venture.[425]

Anson admits that it used its operating account rather than a separate bank account for the Joint Venture. However, Anson argues that it complied with its duty because it maintained *a* bank account and that nothing in the JV Agreement required that it maintain a separate bank account specifically for the Joint Venture. The Court disagrees. The JV Agreement itself plainly speaks of a duty to "[m]aintain a bank account *for the Joint Venture*" and directs that these accounts shall be maintained "*in the name of the Joint Venture*…in such bank or banks as the Joint Venturers shall from time to time select."[426] Anson was also required to account for "all transactions" out of that account and to obtain FAM's approval on "[a]ll checks drawn for more than $10,000.00 on any

---

[421] PX 1 (Second Amendment to the Joint Venture Agreement, Article IX).

[422] DX 5.

[423] According to Ferguson, it was not worth the time or effort to track the JV funds it received or transfer them into a separate bank account. *See* PX 8; PX 7. Mr. Hendricks credibly testified that, when he asked for JV bank statements at the outset of the AUP engagement, Ferguson told him that there were no bank accounts in the Joint Venture's name (aside from the bank account that Jentex had maintained in the name of the Joint Venture).

[424] PX 8 (discussing the 450 loans it serviced out of its operating account).

[425] PX 7; PX 8, at p. 10929.

[426] PX 1 (Second Amendment to the Joint Venture Agreement, Article V & Article IX).

bank account."[427] Based on the plain text of the JV Agreement, the Court finds that Anson was required to maintain a separate bank account for the Joint Venture and that, by Anson's own admission, it did not do so.

Second, FAM contends that Anson further breached its duties by expending JV funds without notifying FAM or obtaining its approval. Article IX of the JV Agreement provides that "[a]ll checks drawn for more than $10,000.00 on any bank account shall be signed by both Joint Venturers" and that a "Joint Venturer may waive this provision if notified by the other Joint Venturer in advance and giving authorization for such check to the signing Joint Venturer."[428] Anson does not dispute that it failed to comply with this provision, and Ferguson acknowledged at trial that Anson had made payments using JV funds in excess of $10,000 without notifying FAM or getting its approval.[429] Rather, Ferguson testified that this provision was not enforceable because Frazier orally agreed that he would not be a co-signor on any bank accounts when Jentex opened the JV bank account. However, it is undisputed that the JV Agreement and its written amendments constitute the only agreement between the partners. Moreover, Article IX specifically permits a partner to waive the signature requirement as long as the partner is notified and authorizes the expenditure. Frazier credibly testified that, while he was not a co-signor on the JV bank account maintained by Jentex, he and Lesok regularly discussed expenses such that Frazier was notified of and gave approval for all expenditures exceeding $10,000. Anson was therefore required to notify FAM and get its approval before it made any payment that exceeded $10,000 and its failure to do so constituted a breach of the JV Agreement.

---

[427] PX 1 (Second Amendment to the Joint Venture Agreement, Article V & Article IX).

[428] PX 1 (Second Amendment to the Joint Venture Agreement, Article IX).

[429] *See also* PX 107; PX 79.

Relatedly, Article IX of the JV Agreement provides that "[a]ll money in the Joint Venture and all instruments for the payments of money when received shall be deposited to the credit of the Joint Venture" in the bank account maintained for the Joint Venture in its name.[430] However, at trial, the evidence showed that Anson did not timely deposit any JV funds into a separate bank account, but instead used its operating account for money in the Joint Venture and any payments received on account of the Joint Venture. Moreover, Ferguson testified that, throughout the pendency of its bankruptcy, another entity has been collecting payments on JV Notes and depositing it into its bank account. Therefore, the Court finds that Anson, by failing to maintain a bank account for the Joint Venture and expending JV Funds without FAM's consent, failed to abide by the terms of Articles V and IX of the JV Agreement.

### b.     Distributions and Disbursements of JV Funds

Additionally, FAM asserts that Anson breached its duties under the JV Agreement by making unauthorized distributions to itself. With respect to profits earned by the Joint Venture, the JV Agreement provides that "[a]ll income, expenses and losses which may accrue to the Joint Venture...shall be divided" equally between the partners.[431] In other words, the partners were entitled to an equal distribution of profits.[432]

However, the evidence at trial showed that Anson made distributions to itself without providing FAM its equal share such that no funds are available to FAM.[433] Specifically, Anson

---

[430] PX 1 (Second Amendment to the Joint Venture Agreement, Article IX).

[431] PX 1 (Joint Venture Agreement, Article VIII).

[432] The JV Agreement does not require that profits be distribued within a certain time frame, rather it simply states that "[a]ll income, expenses and losses…shall be divided" equally. After the Joint Venture's loan was repaid, Frazier testified that distributions were regularly made to the partners pursuant to this provision from 2011 until Anson joined the Joint Venture. See PX 1.

[433] The term "distribution" is defined in the context of partnerships to include "payments of cash or property to a partner out of earnings or as an advance against future earnings." See Distribution, BLACK'S LAW DICTIONARY (12th

distributed at least $409,379.07 to itself in JV profits from September 2014 through October 2018, as these funds are not in the operating account. Additionally, Ferguson directed Anson to withdraw hundreds of thousands in JV profits from the operating account on the eve of a trial setting in the state court and before filing for bankruptcy. Between November 2018 and March 2022, the total amount of JV profits distributed or disbursed was $555,000.[434]  Therefore, the Court finds that Anson, by disbursing JV profits to itself or for its own benefit without providing FAM its equal share, failed to abide by the terms of Article VIII of the JV Agreement.

### c.    Failure to Adequately and Accurately Account For JV Funds and Transactions

FAM further contends that Anson breached the JV Agreement by failing to keep or maintain a correct and complete accounting for the Joint Venture. Under the JV Agreement, Anson is obligated to "[p]repare bi-monthly accounting to the Venturers," to "[p]repare year-end documents and financials," and to "account monthly for all transactions."[435] According to the JV Agreement, the books of account kept and maintained by Anson for the Joint Venture were to be "correct and complete books of account at all times, showing Joint Venture assets and liabilities and all income received and all monies paid out."[436] These books and records were to be made available to either partner and maintained in a place where either party could access them.[437]

Anson argues that it complied with its duties because Anson had reported to FAM what funds Anson had collected on account of the Joint Venture. At trial, Ferguson testified that he

---

ed. 2024). Corporate distribution is also defined to include "direct or indirect transfer of money or other property, or incurring indebtedness to or for the benefit of its shareholders." *See id.*

[434] This amount includes JV profits incurred after AFI Management began collecting all payments on JV Notes.

[435] PX 1 (Second Amendment to Joint Venture Agreement, Article V).

[436] PX 1 (JV Agreement, Article IV).

[437] PX 1 (JV Agreement, Article IV).

prepared reports on a monthly basis from NoteSmith that detailed payments received, the balance on JV Notes, past due reports, and HUD reports for any lots that sold that month. While these NoteSmith reports adequately accounted for all income and payments received by the Joint Venture, it largely did not account for any of the expenses incurred and paid for by the Joint Venture.[438] Rather, the evidence showed that Anson failed to regularly account for JV expenses, failing to input expenses into QuickBooks for months if not years.[439] By at least March 2019, Anson had not input any expenses for 2018 into QuickBooks,[440] and by June 2019, Anson had still not entered all expenses incurred or paid from 2015 through 2017.[441]

In addition, the evidence shows that, upon taking over for Jentex, Anson failed to prepare or provide year-end reports or bi-monthly accountings to FAM. Anson became a partner in the Joint Venture in September 2014. However, Anson did not provide any reports and was unable to make the books of account for the Joint Venture available to FAM until March 2015, several months after FAM requested those reports and after Anson demanded that FAM accept the changes Anson wanted to make related to how it performed its duties.[442] However, after Frazier returned a distribution check to Anson in April 2015, Anson stopped providing reports to FAM. Anson did not update the JV QuickBooks until September 2016, when FAM against requested access to the books and records for the Joint Venture. Since this lawsuit was filed, Anson has provided several

---

[438] The HUD reports did include and detail expenses incurred by the Joint Venture in relation to the lot sale, such as the commission paid by the Joint Venture to salesmen or closing costs. See PX 35. However, all other expenses—such as those associated with mowing lots, road repair, legal fees, etc.—were exclusively accounted for in the JV QuickBooks records.

[439] Anson only provided year-end documents and financials for 2014 on March 29, 2015. See PX 8, at p. 010924. Similarly, in October 2016, Anson was only able to provide accounting through 2015 because Ferguson had not yet reviewed or entered any expenses from 2016 into QuickBooks by that time. See PX 14, at p. PL_Frazier 007-008.

[440] QuickBooks was subsequently updated to include the 2018 expenses in June 2019. PX 56; PX 104.

[441] PX 104.

[442] PX 9, at p. 010924. According to Ferguson, he was unable to provide these reports because he was busy managing his other entities and preparing accountings for those entities. See PX 7, at p. 010920.

reports to FAM, however, these records were not provided on a regular basis and were provided only in response to a discovery request.

Moreover, the evidence shows that, even when Anson provided financial reports such as Profit and Loss Sheets and Balance Sheets, these reports were unreliable as they often contradicted one another with numbers changing from report to report. For example, in April 2021, Anson provided a Profit and Loss Statement to FAM showing that the Joint Venture earned $8,061.73 in total income for January 2021.[443] However, in April 2022, Anson provided a Profit and Loss Statement to the trustee as part of its bankruptcy reporting $37,173.26 in total income for January 2021.[444] While Ferguson denied intentionally depressing income in the April 2021 statement produced on the eve of trial in state court, he offered no explanation for the large discrepancy between the reported amounts.[445] In the same vein, Anson has, subsequent to the AUP, gone back and updated the QuickBooks for that time period, seemingly adding in expenses that were previously not included to detract from the total net profits reported as part of the AUP.[446] Further, Mr. Hendricks credibly testified that the books and records kept by Anson were not in good order.

In addition, FAM contends that Anson failed or refused to provide it with financial records showing funds received and monies paid with JV funds, including bank statements. Anson contends that it was not required to provide any of its bank statements to FAM because its bank account was not a JV bank account and those records were not JV records. As previously noted,

---

[443] PX 81, at p. 012468. Ferguson testified that this Profit and Loss Statement was provided to FAM in response to a request that Anson supplement its discovery before a scheduled trial setting in state court.

[444] PX 102, at p. 012513.

[445] While slight variations may be expected, timing differences do not account for this large of a discrepancy.

[446] In the QuickBooks records produced by Anson for the AUP, AFI Payments were $391,367 in October 2018. PX 50 (AUP Report). However, in the QuickBooks records produced by Anson in April 2021, AFI Payments for October 2018 were $334,579. It is notable that Ferguson testified at trial that Anson actually owed $391,367 as of October 2018, so it is not clear why the records produced on the eve of trial reflect a lower amount in JV profits across the board including for the period that was the subject of the AUP.

the JV Agreement provides that the books and financial records concerning "Joint Venture assets
and liabilities and all income received and all monies paid out" were to be accessible to both
partners "at all times without interruption or hindrance from the other."[447] It is undisputed that
Anson used its operating account for "all income received and monies paid out" on account of the
Joint Venture. As the only bank account that was used for JV funds and transactions, these records
should have been made available to FAM consistent with Article IV of the JV Agreement.
Additionally, the evidence at trial showed that Anson failed to maintain records or invoices for
expenses that were paid by the Joint Venture to third parties, instead relying on documents that
Anson or Ferguson's law firm generated several years after the expense was actually incurred and
paid.[448]

Therefore, based on the evidence at trial, the Court finds that Anson breached its duties
under the JV Agreement by failing to maintain correct and complete books of account, failing to
account monthly for all JV transactions, and failing to prepare or provide bi-monthly or year-end
reports.

### d.  Failure to Obtain FAM's Consent Before Making Decisions Affecting the JV and Its Business.

Finally, FAM contends that Anson made several changes to the operation and management
of the Joint Venture without obtaining FAM's consent. Article V of the JV Agreement provides
that both partners are equally responsible for the management of the Joint Venture with "[a]ll
decisions affecting the Joint Venture or its business [to] be determined by a majority vote of the
ownership interest."[449] As the Joint Venture only has two owners—FAM and Anson—both Joint

---

[447] PX 1 (JV Agreement, Article IV).

[448] PX 39.

[449] PX 1 (Second Amendment to Joint Venture Agreement, Article V).

Venturers must be in agreement about any decision or change in the management and operations of the Joint Venture.

The evidence at trial showed that, since acquiring its interest in the Joint Venture, Anson has made several changes related to the Joint Venture and its business without consulting FAM or obtaining its approval. Specifically, Anson began to charge the Joint Venture a monthly fee for performing its duty under the JV Agreement to service the JV Notes without informing FAM or obtaining FAM's approval.[450] Anson also began to hold large amounts in JV profits in reserve for expenses like unpaid taxes and road repairs—obligations for which Frazier testified the Joint Venture was not responsible for[451]—over FAM's objection.[452] Similarly, Anson used JV funds to pay for expenses that were not contemplated by the JV Agreement over FAM's objection, including costs related to road repairs.[453] Anson also unilaterally decided to use its operating account rather than a separate bank account, which was a significant departure from how JV funds were previously held and maintained. Additionally, Anson unilaterally disbursed or withdrew hundreds of thousands of dollars in JV profits without informing FAM or obtaining its consent.

FAM also asserts that Anson committed a further breach by charging the Joint Venture a monthly loan servicing fee in a manner not authorized by the JV Agreement. While Anson does not dispute that it charged the Joint Venture a fee for servicing the loans, it contends that it was entitled to do so under the terms of the JV Agreement. The Court disagrees. Anson, as Jentex's successor, had a duty to "service all loans resulting from the sale of tracts out of" the Joint Venture

---

[450] *See* PX 13 (indicating, for the first time, that Anson was charging the Joint Venture a servicing fee); PX 20; PX 102, at pp. 012522-23. According to the records produced by Anson in the Bankruptcy Case, the total amount of servicing fees collected by Anson from September 2014 through June 2021 is $57,056.72. *See also* PX 20.

[451] *See also* PX 97 (notifying buyers that the roads were private).

[452] PX 19 (Balance Sheet for 1998-2018 generated in 2019); PX 76 (2019 Balance Sheet); PX 78 (2020 Balance Sheet).

[453] PX 20.

property.[454] At trial, Anson's principal testified that, beginning in September 2014, it has charged the Joint Venture a monthly loan servicing fee for performing its duty to service the loans.[455] While the JV Agreement does permit a partner to receive payments for performing its duties, it specifies that a "salary for the services of any Joint Venturer may be paid only when agreed upon by a majority (in ownership interest) of the Joint Venturers."[456] Here, the evidence at trial establishes that Anson neither sought nor obtained FAM's approval and that Anson unilaterally decided to pay itself (and later an affiliated entity) a monthly loan servicing fee.[457] By paying itself a monthly loan servicing fee beginning on September 1, 2014, and failing to obtain FAM's consent, Anson breached the terms of the JV Agreement.[458]

These decisions constituted "decisions affecting the Joint Venture or its business" which required approval of a majority of the partners, and Anson's failure to obtain this approval constituted a breach of its obligation under the Article V of the JV Agreement.

At trial, Ferguson acknowledged that Anson had made these decisions without FAM's approval and often over FAM's objection. However, Ferguson testified that he did not believe Anson had to abide by this provision because FAM was not performing its duties under the JV Agreement. However, as the Court already noted, FAM performed its duties under the JV

---

[454] PX 1 (Article V of the JV Agreement).

[455] Ferguson testified to the fee that Anson charged the Joint Venture. This is further supported by the testimony of Kyle Hendricks, the accountant appointed by the state court to perform the AUP. The evidence at trial also established that Jentex, the partner originally responsible for servicing the loans, had never charged a servicing fee to the Joint Venture.

[456] PX 1 (Article X, JV Agreement).

[457] There is evidence, admitted as PX 13, that Ferguson asked FAM on October 9, 2016, via FAM's counsel, if it would "accept monthly statements and a check and pay a servicing fee of ((1%/12)/2) per month to cover the costs associated with servicing the loans (approx. $400)." However, at the time this email was sent, Anson had been paying itself this fee for over two years.

[458] Anson, as Jentex's successor, had a duty to "service all loans resulting from the sale of tracts out of" the Joint Venture property. *See* Article V of the JV Agreement.

Agreement. Moreover, based on Ferguson's email communications admitted into evidence, it is clear that Ferguson had no intention of working with FAM in the management of the Joint Venture.[459] The evidence also shows that any alleged breach by FAM would have occurred well after Anson began to unilaterally make changes with respect to the Joint Venture.

Therefore, the Court—having considered the evidence at trial and the arguments of the parties—finds that the weight of the credible evidence establishes that Anson breached its duties under the JV Agreement.

### 4.    *Damages to FAM on Account of Anson's Breaches*

Finally, in order to recover on its breach of contract claim, FAM must show that it suffered damages as a result of Anson's breach. As previously noted, the evidence at trial established that Anson failed to divide JV profit equally between the partners, with the evidence showing that Anson took $976,185.70 in JV profits from the Joint Venture between September 2014 through March 2022.[460] Accordingly, FAM was damaged in the amount of $488,092.85 for this breach of the JV Agreement.

Additionally, the evidence shows that Anson used JV funds to pay for personal expenses that it incurred individually. Specifically, Anson incurred $335,274.25 in legal fees and expenses in 2019 and 2020 related to this litigation as well as the litigation against Mr. Moore, with Anson using JV funds to pay for these personal expenses without FAM's consent or approval.[461]

---

[459] When FAM expressed concern in March 2015 about unilateral changes made by Anson, Ferguson told FAM that it either needed to accept the changes or else it would file a suit to partition the Joint Venture. PX 7, at p. 010920. Additionally, based on the records produced by Anson and admitted into evidence, Anson looked into how to dissolve and partition the Joint Venture before it even notified FAM that it had acquired an interest in the Joint Venture. PX 39, at p. 11059.

[460] This includes the approximate $409,000 in JV profits that were used by Anson between September 2014 through October 2018 and the $555,000 withdrawn by Anson or that Anson directed to be deposited into AFI Management's account representing profits earned from November 2018 through March 2022.

[461] PX 107; PX 77, at p. 012452. Again, this amount has already been accounted for as part of the calculation of profits for which FAM is entitled to.

Moreover, the evidence showed that Anson received JV funds without authorization as required by the Joint Venture. Specifically, Anson charged the Joint Venture $61,999.83 in servicing fees from September 2014 through January 3, 2022—including $40,741.61 from September 2014 through October 2018[462]—without FAM's consent as required under the JV Agreement.[463] During that same time period, Anson collected $10,770.72 in late fees from payments received on JV Notes and that it did not remit to the Joint Venture.[464] In sum, Anson retained $51,512.33 from the payments made on JV Notes without authorization contrary to the JV Agreement. Accordingly, the Court finds that FAM was directly damaged by this breach in the amount of $25,756.17, which corresponds to its 50% interest in the Joint Venture and its profits.[465]

In addition, the evidence shows that FAM was damaged as a result of Anson's decision to withhold or use JV profits for the delinquent taxes on lots, road repairs, and septic. Specifically, the evidence showed that Anson held a total of $105,000 in JV profits in reserve for expenses including $10,000 for delinquent taxes, $50,000 for road repairs, and $45,000 for septic repairs.[466] Anson's decision to withhold these profits was made unilaterally, without FAM's consent or

---

[462] Whereas unauthorized expenses including servicing fees and legal fees are excluded as part of the calculation of the amount of profits that FAM is entitled to, this calculation does not include expenses charged by Anson to the Joint Venture during the period of time covered by the AUP.

[463] *See* PX 102, at pp. 012513-14, 012522-23; PX 20; PX 21; PX 75, at p. 01244; PX 77, at p. 012452; PX 79, at p. 012461.

[464] PX 50 (AUP Report). While Frazier testified that he agreed to allow Jentex to retain late fees in lieu of receiving a servicing fee, he testified that he did not have any similar discussions with Anson authorizing it to retain late payments. Rather, the parties agree that the written JV Agreement constitutes the only agreement between the parties, and it does not make any mention of Anson keeping late payments.

[465] Because the servicing fees from November 2018 through March 2022 were already accounted for in the calculation of profits earned, the Court did not include those amounts when calculating this total. Rather, the total is based solely on the fees received by Anson from September 2014-October 2018.

[466] PX 50 (AUP Report), at p. 6. The Balance Sheets for 2018 generated by Anson in April 2021 reflect $10,000 held for delinquent taxes and -$28,887.37 in reserve for septic and road repairs. *See* PX 74, at p. 012441. However, the Court does not find these two-line items on the Balance Sheet are reliable for determining the precise amount withheld considering the ways Anson accounted for these reserve accounts in QuickBooks. *See* PX 50 (AUP Report), at p. 6. However, the Court does find it significant that the amount identified as being held in reserve did not change from 2018 through 2022. *See* PX 74; PX 76; PX 78; PX 102.

101

approval. Moreover, it is clear that Anson did not actually hold these funds in reserve, with Ferguson stating that no cash balance existed in the name of the Joint Venture and testifying at trial that Anson did not have any amount of JV funds in its account at the time of filing. Because Anson was not authorized to hold these profits in reserve and the evidence shows that Anson did not hold or use these funds for the stated purpose, the Court finds that FAM was directly damaged in the amount of $52,500 as a result of this breach, reflecting 50% of the total amount improperly reserved and subsequently distributed by Anson.

Therefore, the Court concludes that, based upon the evidence, FAM has established that it incurred actual damages in the amount of $566,349.02 as a result of Anson's breaches of the JV Agreement plus interest.[467]

To the extent this award is based upon the same injury that underlies the breach of fiduciary duty claim—specifically the $488,092.85 in misappropriated funds that underly both actions—the Court directs FAM to make an election as to which theory of liability it wishes to recover these damages under.[468]

---

[467] *Brainard v. Trinity Universal Ins. Co*., 216 S.W.3d 809, 812 (Tex. 2006) ("Prejudgment interest is awarded to fully compensate the injured party, not to punish the defendant…It is compensation allowed by law as additional damages for the lost use of money due as damages during the lapse of time between the accrual of the claim and the date of judgment.").

[468] "A party is generally entitled to sue and to seek damages on alternative theories." *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184 (Tex. 1998); *see also Madison v. Williamson,* 241 S.W.3d 145, 158 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). "If a plaintiff pleads alternate theories of liability, a judgment awarding damages on each alternate theory may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory." *Madison,* 241 S.W.3d at 158 (citing *Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 367 (Tex. 1987)). A corollary to this principle is the one-satisfaction rule: for one injury there can only be one recovery. *See, e.g., Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 303 (Tex.2006); *see also Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 390 (Tex. 2000); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 7 (Tex. 1991). While courts ordinarily enter judgment to effect an election of the remedy that affords the prevailing party the greatest relief, this case is complicated by other factors that make it less than clear which remedy FAM would elect. Therefore, the Court will allow FAM to make an election. *See Saden v. Smith,* 415 S.W.3d 450, 465 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (directing a partner to make an election where partner was awarded the same lost profits as actual damages for breaching the partnership agreement and for breaching its fiduciary duties).

### 5.    Attorney's Fees

FAM has also requested an award of attorney's fees, costs, and expenses. Attorney's fees are recoverable under Texas law only if authorized by contract or statute.[469] Here, the basis for recovery of fees is Subsection 38.001(8) of the Civil Practice and Remedies Code, which provides that a person "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract."[470]  To recover fees under this provision, a party must prevail on his claim under the contract and recover damages or other meaningful relief.[471] Where those conditions are satisfied and the prevailing party provides sufficient evidence of the associated fees, an award of fees is mandatory.[472]

Here, FAM has prevailed on its claim for breach of contract and is entitled to an award of damages for that breach. Therefore, FAM is entitled to recover its attorney's fees. The parties stipulated at trial that, if the court ruled that attorney's fees should be awarded, the amount would be determined at a subsequent hearing. Therefore, by separate order the Court will establish deadlines for the presentment of a request for attorneys' fees, costs and expenses.

### D.    Conversion

Turning to the next count, FAM alleges that Anson converted funds that it received and held for the benefit of the Joint Venture by making unauthorized transfers and disbursements for

---

[469] See Tucker v. Thomas, 419 S.W.3d 292, 295 (Tex. 2013); MBM Fin. Corp. v. The Woodlands Operating Co., 292 S.W.3d 660, 669 (Tex. 2009).

[470] See Tex. Civ. Prac. & Rem. Code § 38.001(8).

[471] See Rohrmoos Venture v. UTSW DVA Healthcare, LLP, 578 S.W.3d 469, 486 (Tex. 2019); In re Nalle Plastics Fam. Ltd. P'ship, 406 S.W.3d 168, 172–73 (Tex. 2013) (orig. proceeding); MBM Fin., 292 S.W.3d at 666; Mustang Pipeline, 134 S.W.3d at 201.

[472] See Hassell Constr. Co. v. Stature Com. Co., 162 S.W.3d 664, 668 (Tex. App.—Houston [14th Dist.] 2005, no pet.); Wallace Roofing, Inc. v. Benson, 2013 WL 6459757, at *13 (Tex. App.—Austin Nov. 27, 2013, pet. denied) (mem. op.).

Anson's benefit and to FAM's detriment.[473] Anson has raised several objections in response, arguing first that FAM lacks the capacity to bring its claim for conversion because the cause of action belongs to the Joint Venture.[474] Anson also argues that the conversion claim is improper because the claim is for money.[475]  Additionally, to the extent an action for conversion is proper in this case, Anson argues that FAM does not have any right or interest in the money beyond the redemption value of its interest due to its status as a withdrawn partner.[476]

FAM asserts that Anson converted the funds it received on behalf of the Joint Venture as the servicer of the JV Notes. Specifically, FAM alleges Anson misappropriated FAM's 50% of the Joint Venture income by depositing all the funds it received on behalf of the Joint Venture into the Anson operating account for its own benefit. Anson, however, argues that FAM had no right or interest in the JV income beyond the redemption value of its interest as a result of FAM's status as a withdrawn partner.[477]

Under Texas law, conversion is defined as "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights."[478] "A claim for conversion requires the plaintiff to show that (1) he owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's

---

[473] Complaint at ¶ 5.13.

[474] Docket No. 41 (Defendant's Trial Brief) at ¶ 62.

[475] Docket No. 41 at ¶ 58.

[476] Docket No. 41 at ¶ 58.

[477] Docket No. 41 (Defendant's Trial Brief) at ¶58.

[478] *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997); *ITT Commercial Fin. Corp. v. Bank of the W.*, 166 F.3d 295, 305 (5th Cir. 1999); *see also Armstrong v. Benavides*, 180 S.W.3d 359, 363 (Tex. App.—Dallas 2005, no pet. h.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971); *see also Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

rights, and (3) the defendant refused the plaintiff's demand for return of the property."[479]

Moreover, "[m]oney is subject to conversion only when it can be identified as a specific chattel."[480]

To prevail on its conversion claim, FAM must show that it owned the funds that Anson received on behalf of the Joint Venture as payments on the JV Notes. However, Texas law is clear: "Partnership property is not property of the partners. A partner. . . does not have an interest in partnership property."[481] While a partnership interest gives a partner the right to "receive his distributive share of the profits and surpluses of the partnership," it does not give a partner an interest in the partnership property itself. [482] In this case, FAM did not own and was not entitled to possess the funds that Anson received on behalf of the Joint Venture because those funds are property of the Joint Venture until distributed. Moreover, to the extent that FAM's entitlement to 50% of the JV income creates an interest sufficient to establish this element, the claim would be for a general indebtedness that can be satisfied through the payment of money generally as opposed to a claim concerning identifiable funds.

The Court therefore finds that FAM cannot prevail on its conversion claim because the funds at issue were JV property at the time of the alleged conversion.[483]

---

[479] *Automek*, 105 S.W.3d at 63.

[480] *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 456 (Tex. App.—Eastland 2006, pet. denied); *see also Houston Nat'l Bank v. Biber,* 613 S.W.2d 771, 775 (Tex. Civ. App.-Houston [14th Dist.] 1981, writ ref'd n.r.e.) ("An action will lie for conversion of money [only] when its identification is possible and there is an obligation to deliver the specific money in question, or otherwise particularly treat specific money.").

[481] Tex. Bus. Orgs. Code §152.101.

[482] *Stanley v. Reef Sec., Inc.*, 314 S.W.3d 659, 664 (Tex. App.—Dallas 2010, no pet.) (explaining that a partnership interest does not give a partner an interest in specific partnership property but rather gives the partner the right to receive his distributive share of the profits and surpluses of the partnership").

[483] This is not to say that the conduct at issue is not harmful. Only that conversion is not the proper action. *See Kronoz Internacional, S.A. v. Alvarez*, 2015 WL 12570831, at *6 (S.D. Tex. Mar. 10, 2015) ("Texas courts have consistently held that the misappropriation of partnership property for the use of one partner is constructive fraud.") (*citing Veale v. Rose,* 657 S.W.2d 834, 837 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.)).

## III.

Anson has asserted several counterclaims against FAM and Frazier, including a declaratory judgment action, a breach of contract claim, and a breach of fiduciary duty claim related to FAM's tax forfeiture.[484] On each count, Anson has not sought any compensatory damages but instead requested an award of fees and costs as well as an order limiting FAM and Frazier's damages to the redemption value of FAM's JV interest minus any damages caused by FAM's wrongful withdrawal. FAM and Frazier, in response, have denied all claims.[485]

Turning first to the declaratory judgment action, Anson has sought a declaration of its rights, status, or other legal relations in relation to the TBOC provisions concerning withdrawal and redemption.[486] In other words, Anson asks this Court to enter a declaratory judgment stating that FAM withdrew from the Joint Venture upon its tax forfeiture and that its interest was automatically withdrawn, consistent with the provisions of the TBOC. However, as discussed in relation to FAM's capacity, the Court finds that, because FAM's charter was retroactively reinstated, FAM's existence was not terminated, and it therefore did not withdraw from the Joint Venture. Therefore, Anson is not entitled to such declaratory relief.

Turning next to the breach of contract action, Anson asserts that FAM breached the JV Agreement by wrongfully withdrawing from the Joint Venture as a result of FAM's tax forfeiture. Article I of the JV Agreement provides that the "purpose of the Joint Venture shall be to purchase, own, sell, manage, develop, and improve" certain real property.[487] The JV Agreement further provides that the Joint Venture "shall continue until it is dissolved and this Agreement terminated

---

[484] *See* Counterclaim; Joint Pretrial Order.

[485] *See* Docket No. 26-2 (Live Pleadings and Orders from State Court), at pp. 8-11 (FAM and Frazier's Answer).

[486] *See* Counterclaim.

[487] PX 1 (JV Agreement).

by mutual consent of the Joint Venturers."[488] Under these provisions, the Joint Venture was to continue until all lots were sold and all JV Notes had been paid in full. According to Anson, FAM breached these provisions by withdrawing from the Joint Venture in February 2013 upon the forfeiture of its charter before the Joint Venture's purpose was completed. However, as previously discussed in relation to FAM's capacity to sue, FAM's forfeiture did not terminate its existence or result in FAM's withdrawal from the Joint Venture. Therefore, the Court finds that Anson cannot establish that FAM, as a result of its tax forfeiture, breached the JV Agreement.

Finally, turning to the breach of fiduciary duty count, Anson contends that FAM and Frazier breached their duties of care and loyalty by willfully terminating FAM's corporate existence, failing to negotiate in good faith for the redemption value of their interest, and engaging in vexatious conduct that caused the Joint Venture and Anson to incur unnecessary expenses in this litigation. FAM, as a partner in the Joint Venture, owed Anson a duty of care and loyalty.[489] The duty of care requires that a partner "act in the conduct…of the partnership business with the care an ordinary prudent person would exercise in similar circumstances,"[490]whereas the duty of loyalty requires that a partner hold and account for any partnership property derived in the conduct of partnership business and to refrain from competing or dealing with the partnership in a manner adverse to the partnership.[491]

First, with respect to the tax forfeitures, Anson presented evidence at trial that FAM had its corporate charter forfeited under the Tax Code on multiple occasions, with Frazier indicating that he had a habit or practice of doing so. The Court finds that it is likely that a partner's habitual

---

[488] *Id.*

[489] Tex. Bus. Orgs. Code § 152.204.

[490] Tex. Bus. Orgs. Code § 152.206.

[491] Tex. Bus. Orgs. Code § 152.205.

107

forfeiture of its corporate charter does not comport with the care that an ordinarily prudent person would exercise in similar circumstances. However, due to FAM's subsequent reinstatement which relates back to the date of forfeiture such that it is as if it never occurred, Anson cannot show that it suffered any harm on account of this conduct.

Second, Anson contends that FAM breached its duties by failing to negotiate in good faith for the redemption price of FAM's interest and instead initiating legal action against Anson.[492] Anson contends that, as a result of FAM's forfeiture, FAM withdrew from the Joint Venture and that the Joint Venture was automatically entitled to redeem FAM's JV interest. At trial, Ferguson testified that he repeatedly offered to split lots between the partners and that, instead of responding to this offer, FAM filed a lawsuit against Anson. However, the Court finds that, because FAM did not withdraw from the Joint Venture in 2013 as a result of its tax forfeiture, FAM's JV interest was not redeemed by the Joint Venture but rather was retained by FAM.  Moreover, neither the duty of loyalty nor the duty of care require that a partner accept an offer to buy out its interest. Therefore, the Court finds that FAM did not have a duty to negotiate the redemption price of its JV interest and did not breach its duties as a partner by initiating this suit against Anson.

Third, Anson alleges that FAM and Frazier breached their duties of loyalty and care by needlessly increasing the cost of this litigation and failing to limit the scope of the dispute to the redemption value of FAM's JV interest. According to Anson, this conduct was not in the best interest of the Joint Venture because it caused the Joint Venture to incur unnecessary costs, expenses, and fees. However, FAM did not sue the Joint Venture; it sued Anson based on its breaches of its duties under the TBOC as well as under the JV Agreement. The duties of loyalty and care do not preclude a partner from suing the other for breaching its duties and obligations.

---

[492] *See* Docket No. 26-2 (Live Pleadings and Orders from State Court), at p. 76.

Therefore, the conduct alleged simply does not implicate FAM's duties as a partner in the Joint Venture.

In sum, the Court, based on the evidence presented at trial and the arguments of counsel, concludes that Anson failed to establish that it was entitled to judgment on any of its counterclaims against FAM and Frazier.

## IV.

The Court next turns to the Proof of Claim filed by FAM and Frazier and Anson's Objection.[493] FAM and Frazier filed a proof of claim in Anson's bankruptcy based upon the claims asserted in this action in the amount of $674,515.57.[494] Anson objected on the basis that FAM is a withdrawn partner and therefore not entitled to JV profits. The Court, having determined that FAM did not withdraw and remains a partner in the Joint Venture, overrules Anson's Objection. The claim asserted by FAM and Frazier will be allowed in favor of FAM in the amount of the damages awarded hereby plus the amount of attorneys' fees, costs, and expenses hereafter awarded and determined to have been incurred as of the Petition Date.

## *CONCLUSION*

In conclusion, based upon all of the foregoing, the Court finds and concludes that FAM has proven and established that Anson breached its duties of loyalty and care and breached the JV Agreement. The Court will separately enter an order establishing procedures for the determination of attorney's fees, costs, and expenses.  Additionally, FAM is directed to make an election of

---

[493] Case No. 21-41517, Proof of Claim No. 21; Case No. 21-41517, Docket No. 234 (Anson's Objection to Proof of Claim No. 21).

[494] FAM notes that its claims have not yet been fully liquidated and reserved the right to amend its proof of claim once this action had been liquidated by adjudication or agreement.

remedies in relation to the actual damages associated with the profits misappropriated by Anson.

The Court will separately issue a judgment in conformity herewith.

### #  END OF MEMORANDUM OPINION   # # #